RECEIVED
04/27/2026
KELLY L. STEPHENS, Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

OHIO TELECOM ASSOCIATION,

Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,

Respondents.

Case No. 26-_____

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, 5 U.S.C. § 706, and Federal Rule of Appellate Procedure 15(a), Petitioner Ohio Telecom Association ("OTA") hereby petitions the Court for review of the attached final order of the Federal Communications Commission ("FCC" or "Commission"), captioned *Reducing Barriers to Network Improvements and Service Changes; Accelerating Network Modernization*, Report and Order, WC Docket Nos. 25-209, 25-208 (rel. Mar. 27, 2026) (the "Order"). The Order was published in the Federal Register on April 20, 2026. *See* 91 Fed. Reg. 20,913. A copy of the Order is attached as Exhibit A.

OTA is a statewide trade association that promotes the common interests of telecommunications companies serving and employing Ohioans. OTA represents 40 telecommunications providers, two wireless providers, and more than 100

1

associate member companies that supply goods and services to the telecommunications industry. These members include communications carriers who are directly regulated by the Order.

This Court has jurisdiction because OTA participated in proceedings before the FCC on behalf of its members aggrieved by the Order. 28 U.S.C. § 2344. Venue is appropriate in this Court because OTA resides and has its principal office in Columbus, Ohio. *Id.* § 2343. OTA has associational standing to bring this suit because its members would have standing to sue in their own right; the interests OTA seeks to protect are germane to its purpose; and neither the claims asserted nor the relief requested requires the participation of OTA's individual members. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

The Order pursues a laudable goal: "to unleash new, high-speed infrastructure builds in communities all across the country … by cutting through the red tape that has … required providers to keep aging copper lines in place." Order ¶ 1. The Order seeks to accomplish this goal through reform of its rules under Section 214 of the Communications Act. That provision requires a carrier to obtain permission from the Commission before it "discontinue[s]" a "service." 47 U.S.C. § 214(a). This requirement has, in effect, forced carriers to maintain costly and outdated copper networks, diverting finite capital away from the deployment of far better, next-

generation communications systems. The Order takes commendable steps to alleviate this problem by streamlining and eliminating burdensome and unnecessary rules—with the result being fewer Section 214 obstacles between carriers and innovative, pro-consumer technology transitions. *See* Order ¶ 22 (summarizing reforms).

However, the Commission declined to adopt an even better solution that was compelled by the statute: conditional forbearance from Section 214. The Communications Act requires the FCC to "forbear from applying … any provision of [the statute] to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services" when certain conditions are met. 47 U.S.C. § 160(a). Commenters showed that, for certain technology transitions, the forbearance conditions are satisfied and there is thus no need for a carrier to comply with Section 214's discontinuance process at all. Yet, contrary to the law and the record, the Commission declined to forbear. Order ¶¶ 79–84. The failure to forbear is unlawful and harms OTA's carrier members by saddling them with unnecessary regulatory hurdles when they make beneficial technology transitions.

For these and other reasons, aspects of the Order are contrary to law, arbitrary, capricious, an abuse of discretion, and otherwise violate the Administrative Procedure Act. *See* 5 U.S.C. § 706. OTA asks that the Court hold the Order

unlawful in part, remand without vacatur to the Commission for further proceedings, and grant any other necessary and proper relief.

Respectfully submitted,

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.
Jeremy J. Broggi
Boyd Garriott
**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
Tel: (202) 719-7000
Fax: (202) 719-7049
TMJohnson@wiley.law

Dated: April 27, 2026

# CERTIFICATE OF SERVICE

I, Thomas M. Johnson, Jr., certify that on this 27th day of April, 2026, I caused this Petition to be served on the Circuit Clerk of this Court through the CM/ECF system. I further certify that I will serve a date-stamped copy of the Petition on the following counsel by the manner indicated:

*By Electronic Mail and Certified Mail*

Adam Candeub
General Counsel
Federal Communications Commission
45 L Street, NE
Washington, DC 20554
LitigationNotice@fcc.gov

*By Certified Mail*

Todd Blanche, Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

/s/ Thomas M. Johnson, Jr.
Thomas M. Johnson, Jr.

# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Reducing Barriers to Network Improvements and Service Changes | **)** **)** | WC Docket No. 25-209 |
| | **)** | |
| Accelerating Network Modernization | **)** | WC Docket No. 25-208 |
| | **)** | |

**REPORT AND ORDER**

**Adopted: March 26, 2026** **Released: March 27, 2026**

By the Commission: Chairman Carr and Commissioners Gomez and Trusty issuing separate statements.

**TABLE OF CONTENTS**

Heading Paragraph #

I. INTRODUCTION .................................................................................................................................1
II. BACKGROUND ..................................................................................................................................8
III. DISCUSSION ....................................................................................................................................12
   A. Eliminate Network Change Disclosure Filing Requirements .....................................................12
   B. Section 214 Discontinuance .......................................................................................................22
      1. Creating One Consolidated Technology Transitions Discontinuance Rule ...........................23
      2. Eliminating Grandfathering Filing Requirements for Certain Services ..................................60
      3. Additional Requirements for Applications to Discontinue a Service Supporting
         Interconnection Trunks or the Exchange of Traffic .............................................................67
      4. Limited Section 214(a) Forbearance .....................................................................................74
      5. The 31-day Automatic Grant Period Applies to All Discontinuance Applications ................85
      6. Contents of Discontinuance Applications ..............................................................................90
      7. Emergency Discontinuances ..................................................................................................92
      8. Eliminating Outdated Discontinuance Rules ..........................................................................98
   C. State Mandates Conflicting with the FCC's Section 214 Discontinuance Authorizations
      and Authority Are Subject to Preemption .................................................................................106
IV. PROCEDURAL MATTERS..............................................................................................................116
V. ORDERING CLAUSES.....................................................................................................................119
APPENDIX A—FINAL RULES
APPENDIX B—FINAL REGULATORY FLEXIBILITY ANALYSIS

## I. INTRODUCTION

1. The FCC acts today to unleash new, high-speed infrastructure builds in communities all across the country. We do so by cutting through the red tape that has both required providers to keep aging copper lines in place and effectively prevented them from investing in the modern infrastructure that Americans want and deserve. This action can free up billions of dollars for new builds and represents another step forward in the FCC's Build America Agenda.

2. Today's communications marketplace offers consumers and businesses a vast array of advanced communications services far beyond the legacy voice service that first connected Americans in

the 19th century.[1]  However, as noted above, the expansion of these modern networks, and the benefits they afford, have been hindered by the need for carriers to divert important resources to the maintenance of aging and deteriorating legacy networks that deliver outdated services to an ever-decreasing number of subscribers.  To spur network modernization and achieve the reality of end-to-end Internet Protocol (IP) networks and truly ubiquitous availability of high-speed broadband nationwide, today's actions reduce regulatory burdens, thereby allowing providers to invest more resources toward modernizing their networks so all consumers can access more advanced communications services.

3.        The transition from legacy TDM-based networks largely controlled by incumbent local exchange carriers (LECs) to competitive all IP-based networks—i.e., the IP Transition—is a complicated, nationwide, multi-step process.[2]  And it has wide-ranging implications, affecting everything from consumer protection to emergency communications and robust competition.[3]  The federal government has a strong interest in having a coherent national policy on the transition to an all-IP environment and the benefits it will bring to the people.

4.        At the same time, we are moving forward today with a set of common sense reforms and core consumer protections.  As we do so, the record shows that certain state and local requirements have been unduly prolonging the use of legacy networks and actually preventing providers from building

---

[1] *See Technology Transitions et al.*, GN Docket Nos. 13-5 et al., Order, Report and Order and Further Notice of Proposed Rulemaking, Report and Order, Order and Further Notice of Proposed Rulemaking, Proposal for Ongoing Data Initiative, 29 FCC Rcd 1433, 1437-38, paras. 10-11 (2014) (referencing the advent of the telegraph operating over copper wire in 1844 and Alexander Graham Bell's patenting of the telephone in 1876) (*2014 Technology Transitions Order*).

[2] The Commission is approaching this transition from multiple angles.  *See, e.g.*, *Advancing IP Interconnection et al.*, WC Docket No. 25-304 et al., Notice of Proposed Rulemaking, FCC 25-73, at 3, paras. 2-3 (rel. Oct. 29, 2025) (*IP Interconnection Notice*) (seeking to tackle issues relating to "burdensome legacy interconnection regulations that . . . may prevent providers of modern, IP-based networks from interconnecting efficiently" and how to address interconnection in an all-IP world); *Reforming Legacy Rules for an All-IP Future; Accelerating Network Modernization*, WC Docket Nos. 25-311 & 25-208, Notice of Proposed Rulemaking, FCC 26-11, at 1, para. 1 (rel. Feb. 19, 2026) (*ICC Transition Notice*) (acknowledging that "some providers continue to use legacy Time-Division Multiplexing (TDM) equipment, potentially due in part to regulatory incentives embedded in the intercarrier compensation (ICC) regime" and thus proposing "comprehensive reform of the regulatory framework for voice telecommunications rates"); *Facilitating Implementation of Next Generation 911 Services (NG911) et al.*, PS Docket Nos. 21-479 et al., Report and Order, 39 FCC Rcd 8137, 8138, paras. 1-2 (2024) (adopting rules to facilitate the transition to next-generation 911, which will "provide new capabilities and improved interoperability and system resilience") (*NG911 Order*); *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities; Speech-to-Speech and Internet Protocol (IP) Speech-to-Speech Telecommunications Relay Services*, CG Docket Nos. 03-123, 08-15, Notice of Proposed Rulemaking, FCC 25-79, at 9, para. 18 (rel. Nov. 21, 2025) (*TRS Modernization Notice*) (addressing the need "to proactively adapt TRS obligations and programs, ensuring that all individuals with communication disabilities can continue to access functionally equivalent services in an increasingly IP-centric world"); *Call Authentication Trust Anchor*, WC Docket No. 17-97, Notice of Proposed Rulemaking, 40 FCC Rcd 3467, 3471, para. 9, 3475-76, para. 19 (2025) (explaining that non-IP networks create a gap in the STIR/SHAKEN caller ID authentication scheme and proposing to require providers that have not completed the transition to all IP implement non-IP caller ID authentication solutions); *Rural Digital Opportunity Fund; Connect America Fund*, WC Docket Nos. 19-126, 10-90, Report and Order, 35 FCC Rcd 686, 687, para. 2 (2020) (implementing the Rural Digital Opportunity Fund as "the Commission's single biggest step to close the digital divide"); *Connect American Fund et al.*, WC Docket No. 10-90 et al., Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 17663, 17667, para. 1 (2011) (*USF/ICC Transformation Order*), *aff'd sub nom. In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014) (in which the Commission "comprehensively reform[ed] and modernized[d] the universal service and intercarrier compensation systems to ensure that robust, affordable voice and broadband service, both fixed and mobile, are available to Americans throughout the nation").

[3] *See IP Interconnection Notice* at 3, 7, paras. 2, 12.

modern ones by limiting the types of services that may qualify as adequate replacements when carriers seek to discontinue legacy telecommunications services. Our action today addresses these state and local regulatory barriers to ensure the essential transition to an all-IP environment and the benefits it will bring to the people of this nation. State and local statutes and regulations that force providers to continue devoting resources to maintaining deteriorating legacy networks and provisioning near-obsolete services to an ever-decreasing number of subscribers that conflict with the federal regulatory framework established here frustrate federal policies and goals. Our rules must allow providers to focus on deploying next-generation networks provisioning the advanced communications services of today and tomorrow.

5.    In this Report and Order, which we adopt 30 years after the passage of the Telecommunications Act of 1996,[4] we take action to bring the regulatory environment in line with today's communications marketplace while retaining or adopting safeguards to protect public safety and ensure 911 continuity. We first eliminate the filing requirements associated with our rules implementing section 251(c)(5)'s network change disclosure mandate.[5]

6.    We next (1) overhaul our rules applicable to technology transitions discontinuance applications under section 214 of the Communications Act of 1934, as amended (the Act),[6] by adopting one consolidated rule applicable to all technology transitions discontinuance applications and eliminating rule provisions thereby rendered irrelevant;[7] (2) ease burdens associated with outdated services by granting blanket section 214(a) authority for carriers to grandfather legacy voice services, lower-speed data telecommunications services, and interconnected Voice over IP (VoIP) service provisioned over copper wire; (3) ensure that providers seeking to discontinue a service supporting interconnection trunks or the exchange of traffic ensure seamless 911 connectivity; (4) grant conditional forbearance relief from section 214(a) discontinuance requirements to resellers when the wholesale provider of their resold service engages in a technology transitions discontinuance, recognizing the practical limitations specific to resellers; (5) revise section 63.71 of our rules to apply the 31-day automatic grant period to all discontinuance applications regardless of applicants' status as dominant or non-dominant to reduce unnecessary paperwork and red tape that delays transitions to modernized technologies; (6) clarify the required contents of discontinuance applications to further ensure that discontinuances do not adversely affect the public convenience and necessity; (7) revise our rules applicable to emergency discontinuances to permit permanent discontinuance of the affected service under specific circumstances to support service modernization even during recovery efforts;[8] and (8) eliminate a number of outdated discontinuance rules that are irrelevant or redundant in today's communications marketplace to alleviate the burdens of unnecessary regulation.[9]

7.    Finally, we expressly find that federal law preempts state and local requirements to the extent they needlessly constrain the deployment of modern, next-generation IP-based networks by impeding providers' ability to discontinue providing interstate and jurisdictionally mixed legacy services and to retire outdated and deteriorating legacy networks. Such requirements conflict with the section

---

[4] The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 151 *et seq.*) (the 1996 Act).

[5] *See* 47 U.S.C. § 251(c)(5); 47 CFR §§ 51.325 *et seq.*

[6] *See* 47 U.S.C. § 214(a); 47 CFR §§ 63.60 *et seq.* Section 214(a) of the Act provides that a carrier may not discontinue, reduce, or impair a telecommunications service without Commission authorization. Unless otherwise noted, this Notice uses the term "discontinue" or "discontinuance" as a shorthand for the statutory language "discontinue, reduce, or impair."

[7] *See* 47 CFR § 63.602.

[8] *See id.* § 63.63.

[9] *See id.* §§ 63.66, 63.90, 63.100, 63.504, 63.601.

214(c)'s provision that after a carrier obtains Commission authorization to discontinue a service, it need not obtain any additional authorizations before implementing that discontinuance of service.[10] And they conflict with the important federal policy of encouraging the IP transition so that all Americans have access to its many benefits.

## II. BACKGROUND

8. *Network evolution*. With the 1996 Act, Congress sought to promote competition in the evolving communications marketplace.[11] Among the market-opening provisions included in the 1996 Act was section 251(c)(5), which requires that an incumbent LEC provide reasonable public notice of "changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks."[12] The Commission's implementing rules set forth the requirements for the timing, methods, and content of such notices.[13] These requirements were needed to open the marketplace to efficient and effective competition at the time, given incumbent LECs' control of the nation's physical communications infrastructure.[14]

9. In the decades following the Commission's implementation of the 1996 Act, the nation's communications market has evolved in innumerable ways. Competition in the communications marketplace has flourished, with incumbent LECs now holding a minority share of the voice services market.[15] Switched access voice service subject to geographically based (i.e., local and long-distance) pricing has given way to packet-switched, nationwide services that are jurisdictionally neutral, with pricing reflecting this change.[16] That transformation continues as we look to a future of all-IP networks. While voice service remains an important method of communication that originally was available only over copper-based networks, that service is now available via a multitude of transmission mediums, including fiber, wireless, and satellite. And other modes of communications that have since developed, such as video, text, and email, have become just as vital. The availability of telehealth services, remote learning, more robust disability access services, and global economic competitiveness in this increasingly interconnected world have expanded opportunities to communities and populations that previously might have been left behind.[17] The 19th century technology of copper-based networks capable of provisioning basic voice service and limited data bandwidth is no longer sufficient to meet the bandwidth-hungry needs of modern communications and thus has been rendered obsolete by more advanced networks.[18]

---

[10] U.S. Const. amend. XIV, § 1; 47 U.S.C. §§ 152(b), 214(c).

[11] *See Implementation of the Local Competition Provisions of the Telecommunications Act of 1996 et al.*, CC Docket No. 96-98 et al., First Report and Order, 11 FCC Rcd 15499, 15505, para. 1 (1996) (*First Local Competition Order*) (subsequent history omitted).

[12] 47 U.S.C. § 251(c)(5).

[13] *See* 47 CFR § 51.325 *et seq.*

[14] *See First Local Competition Order*, 11 FCC Rcd at 15506, para. 4. An incumbent LEC is "with respect to an area, the local exchange carrier that—(A) on February 8, 1996, provided telephone exchange service in such area; and (B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or (ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i)." 47 U.S.C. § 251(h)(1).

[15] *See* FCC, Office of Economics and Analytics, Voice Telephone Services: Status as of December 31, 2024 at 3, Fig. 2 (2026), https://docs.fcc.gov/public/attachments/DOC-418460A1.pdf (December 2024 Voice Telephone Services Report).

[16] *See ICC Transition Notice*, at 3-5, paras. 4-7 (discussing the history of intercarrier compensation).

[17] *USF/ICC Transformation Order*, 26 FCC Rcd at 17667, para. 3.

[18] *See, e.g.*, International Center for Law & Econ. Comments at 6 (asserting that "copper's limited bandwidth capacity constrains innovation and prevents providers from offering the advanced services consumers demand," and

(continued….)

These new networks also offer reliability benefits over copper wires, which are less resilient than other technologies[19] and are increasingly vulnerable to thefts that lead to emergency discontinuances and disruption for end users.[20]

(Continued from previous page) ────────────────

that "next-generation networks offer superior speed, lower latency, enhanced reliability, and massive scalability, which are foundational to economic growth, productivity gains, and consumer welfare in the digital age"); Nokia Comments at 2 (noting the scalability of fiber); Rural & Agricultural Council of America Comments at 2 (noting that "technologies invented in the 1800s can no longer support the data-intensive needs of 21st century rural life or meet consumer demand for reliability, speed, and innovation," characterizing copper networks as "'horse and buggy' infrastructure"); Letter from Harold Singer, Managing Dir., Econ One, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 24-99, at 1 (filed Feb. 26, 2026) (Singer Feb. 26, 2026 *Ex Parte* Letter).

[19] *See, e.g.*, USTelecom Comments at 17-18 ("Copper is also more vulnerable to weather conditions (e.g., flooding) than fiber, and it takes longer to restore than alternative services like wireless, which can run on a portable temporary cell tower (a 'cell on wheels')"); International Center for Law & Econ. Comments at 6 (noting that copper networks "are increasingly expensive to operate, consume substantial amounts of power, and are prone to weather-related damage and frequent outages"); Nokia Comments at 3 ("Fiber is also more durable than copper with lower long-term operating costs, making it an essentially future-proof technology that is easier to maintain. While copper corrodes and degrades with weather, fiber is made of silica glass, which does not corrode, and its protective sheathing keeps it sealed from water and chemicals that pose degradation risks."); Mark J. Fletcher Comments at 2 (asserting that copper "is deteriorating in the field" and that fiber "is functionally ageless," and "doesn't corrode, fatigue, or degrade the way copper does"); Letter from Eric Fruits & Brian Albrecht, International Center for Law and Econ., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 25-209, at 1-2, Attach. at 1 (filed Feb. 27, 2026) (ICLE Feb. 27, 2026 *Ex Parte* Letter); *Wireless Network Resiliency During Disasters*, FCC (last updated June 4, 2024), https://www.fcc.gov/wireless-network-resiliency-during-disasters#:~:text=The%20Mandatory%20Disaster%20Response%20Initiative,of%20these%20requirements%20during%20emergencies (describing the Commission's Mandatory Disaster Response Initiative, with which applicable wireless providers had to comply by May 1, 2024); *Resilient networks are redundant networks*, Wireless Infrastructure Ass'n (Mar. 10, 2022), https://wia.org/resilient-networks-are-redundant-networks/ (noting that "[w]ireless connectivity requires the difficult, but far less onerous [than restoring power to large areas after natural disasters], challenge of providing power only to the transmission site such as a tower to serve all the households in the service area regardless of if they have power on their premises," the availability of cells on wheels "to provide temporary network capacity," and other examples of wireless network resiliency); *Why Does Fiber Internet Perform Better During Bad Weather?*, Hunter Communications (Mar. 21, 2025), https://hunterfiber.com/fiber-internet-performs-better-during-bad-weather/#:~:text=Unlike%20copper%20wires%2C%20which%20are%20prone%20to,severe%20thunderstorms%2C%20heavy%20snowfall%2C%20or%20extreme%20humidity (noting that copper wires "are prone to corrosion" and that "fiber-optic cables do not conduct electricity, making them impervious to lightning strikes, electrical interference, and moisture-related damage"); *Comparing the Durability of Fiber Optic and Copper Cables*, Linden Photonics, Inc. (Sept. 4, 2024), https://www.lindenphotonics.com/comparing-the-durability-of-fiber-optic-and-copper-cables (stating that fiber optic cables are less susceptible to corrosion, can function effectively in a wide range of temperatures, generally have a longer lifespan than copper cables because they do not degrade as quickly, and are generally cheaper due to reduced maintenance costs and longer lifespan, particularly in "environments where durability is critical"); *see also Facilitating Implementation of Next Generation 911 Services (NG911)*; *Improving 911 Reliability*, PS Docket Nos. 21-479 and 13-75, Further Notice of Proposed Rulemaking, 40 FCC Rcd 2668, 2676, para. 18 (2025) (*NG911 Further Notice*) (noting that IP-based "NG911 architecture offers distinct advantages over legacy 911 technologies, including the possibility of greater reliability, redundancy, interoperability, and accessibility").

[20] *See, e.g.*, USTelecom Comments at 17-18; Singer Feb. 26, 2026 *Ex Parte* Letter at 2. Before 2022, the Commission processed only one copper retirement caused by copper theft, in 2014, since it implemented section 251(c)(5)'s the network change disclosure requirements in 1996. *See Implementation of the Local Competition Provisions of the Telecommunications Act of 1996 et al.*, CC Docket No. 96-98 et al., Second Report and Order and Memorandum Opinion and Order, 11 FCC Rcd 19392, 19468-98, paras. 165-236 (1996). Between early 2022 and the time the Commission's Wireline Competition Bureau waived the filing requirements in its network change disclosure rules in March 2025, *see Accelerating Wireline Broadband Deployment by Removing Barriers to*

(continued….)

10.      *Regulatory history and recent relief.*  As section 214(a) of the Act requires carriers to obtain Commission authorization before discontinuing a telecommunications service,[21] the Commission over a decade ago began affirmatively exploring how to "position all the players . . . to prepare for, maintain, and facilitate the momentum of technological advances that are already occurring,"[22] acknowledging that the nation was approaching the "tipping point" that would lead to "the turning off of the legacy suite of services that has served our nation well."[23]  In 2016, the Commission determined that discontinuances involving technology transitions should include heightened scrutiny as to the adequacy of the replacement service(s) available to affected customers.[24]  It thus created the Adequate Replacement Test, which a carrier had to satisfy in order to be eligible for streamlined treatment.[25]  With the Adequate Replacement Test, the Commission sought "to minimize uncertainty or confusion that could slow or even discourage technology transitions."[26]  It then amended its technology transitions discontinuance rules in 2018 to provide an additional, more streamlined option, the Alternative Options Test, for carriers seeking to discontinue legacy voice services.[27]

(Continued from previous page) ─────────────────────

*Infrastructure Investment*, WC Docket No. 17-84, Order, 40 FCC Rcd 2026 (WCB 2025) (*NCD Waiver Order*), it received eleven—one in 2022, three in 2023, six in 2024, and one in the first three months of 2025.  And incumbent LECs filed 11 emergency discontinuance applications in 2024 and 19 in 2025, with another seven already filed in the first 3 months of 2026.

[21] Section 214(a) of the Act requires that carriers obtain Commission authorization before discontinuing a telecommunications service, to a community or part of a community in order to "prevent[] a loss or impairment of a service offering to a community or part of a community without adequate public interest safeguards."  47 U.S.C. § 214(a); *see also Western Union Tel. Co. Petition for Order to Require the Bell System to Continue to Provide Group/Supergroup Facilities*, Memorandum Opinion and Order, 74 F.C.C.2d 293, 296, para. 6 and n.4 (1979) (*Western Union Discontinuance Order*) (discussing legislative history surrounding the 1943 amendment to section 214(a) adding discontinuance requirements).

[22] *2014 Technology Transitions Order*, 29 FCC Rcd at 1435, para. 2.

[23] *Id.* at 1436, para. 3.

[24] *Technology Transitions et al.*, WC Docket No. 13-5 et al., Declaratory Ruling, Second Report and Order, and Order on Reconsideration, 31 FCC Rcd 8283 (2016) (*2016 Technology Transitions Order*).  A "technology transition" is defined as "any change in service that would result in the replacement of a wireline TDM-based voice service with a service using a different technology or medium for transmission to the end user, whether Internet Protocol (IP), wireless, or another type."  47 CFR § 63.60(i).

[25] *2016 Technology Transitions Order*, 31 FCC Rcd at 8304-05, para. 64.  An application to discontinue an interstate switched access service that is eligible for streamlined treatment is automatically granted on the 31st day after filing unless the Commission has notified the applicant otherwise.  47 CFR § 63.71(f)(1); *see also 2016 Technology Transitions Order*, 31 FCC Rcd at 8290, para. 19 (declaring all carriers to be non-dominant in the provision of interstate switched access service).  The Adequate Replacement Test requires that a technology transition discontinuance application satisfy three requirements in order to be eligible for streamlined processing:  (1) demonstrate that an adequate replacement for their voice service exists "by either certifying or showing, based on the totality of the circumstances, that one or more replacement service(s) . . . offers substantially similar levels of network infrastructure and service quality"; (2) "show the replacement service complies with regulations regarding the availability and functionality of 911 service for consumers and public safety answering points"; and (3) "offers interoperability with key applications and functionalities."  47 CFR § 63.602(b).

[26] *2016 Technology Transitions Order*, 31 FCC Rcd at 8307, para. 70.

[27] *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Second Report and Order, 33 FCC Rcd 5660, 5673, para. 30 (2018) (*Second Wireline Infrastructure Order*).  Under the Alternative Options Test, an application seeking authorization to discontinue a legacy retail voice service as a part of a technology transition is eligible for streamlined treatment if (1) the applicant offers a stand-alone interconnected VoIP service throughout the affected service areas, and (2) at least one other alternative stand-alone facilities-based wireline or wireless voice service is available from another unaffiliated provider throughout the affected service area, unless the Commission notifies the applicant otherwise.  The Commission's rules define

(continued….)

11.     In March 2025, the Commission's Wireline Competition Bureau (Bureau) issued an Order in which it waived for two years the network change notice filing requirements set forth in the Commission's rules implementing section 251(c)(5).[28]  In March and May 2025, the Bureau issued a series of Orders addressing various discontinuance requirements.[29]  In July 2025, in the *Network and Services Modernization Notice*, we sought comment on various proposals to reduce regulatory barriers associated with sections 214(a) and 251(c)(5), including whether we should codify the relief granted in the March and May 2025 Bureau *Orders*, in order to further accelerate the transition from copper networks and the legacy services they carry to modern, more resilient networks provisioning more advanced communications services.[30]

## III.     DISCUSSION

### A.     Eliminate Network Change Disclosure Filing Requirements

12.     We adopt our proposal in the *Network and Services Modernization Notice* to encourage rapid deployment of high-speed, more resilient infrastructure by eliminating all filing requirements in the Commission's network change disclosure rules and the Commission's process of issuing public notices for short-term network changes and copper retirements and the associated objection process for interconnected service providers.[31]  These actions effectively codify the relief granted by the Bureau in

───────────────────────

(Continued from previous page)
"interconnected VoIP service" as a service that (i) enables real-time, two-way voice communications; (ii) requires a broadband connection from the user's location; (iii) requires Internet protocol-compatible customer premises equipment (CPE); and (iv) permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network.  47 CFR § 9.3.  A service is "stand-alone" if a customer is "not required to purchase a separate broadband service to access the voice service."  *Id.* § 63.71(f)(2)(iii).

[28] *See generally NCD Waiver Order*, 40 FCC Rcd 2026 (waiving, for a period of two years, (1) the filing requirements in the Commission's network change disclosure rules adopted pursuant to section 251(c)(5) of the Act, and (2) the Commission's process of issuing public notices for short-term network changes and copper retirements, as well as the associated objection process for interconnected service providers).  Based on the actions we take today, we dismiss as moot an Application for Review of the *NCD Waiver Order* and the other Bureau-level *Orders* in note 29, *infra*.  *See* Application for a Full Review by the Full Commission; & Other Actions Requested, WC Docket No. 17-84 (filed Apr. 21, 2025).

[29] *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Order, 40 FCC Rcd 1999 (WCB 2025) (*Stand-Alone and Single-Service Waiver Order*) (waiving for a period of two years (1) the "stand-alone" requirement in the Alternative Options Test, and (2) the requirement that a single replacement service satisfy all three prongs of the Adequate Replacement Test); *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Order, 40 FCC Rcd 2014 (WCB 2025) (*Testing Clarification Order*) (clarifying that the testing parameters and requirements in the *2016 Technology Transitions Order*'s Technical Appendix do not apply to the Adequate Replacement Test's totality of the circumstances showing); *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Order, 40 FCC Rcd 2019 (WCB 2025) (*March 2025 Grandfathering Order*) (eliminating any application filing requirements associated with grandfathering a legacy voice service, or a data telecommunications service operating at speeds below 25/3 Mbps); *Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Order, 40 FCC Rcd 3357 (WCB 2025) (*May 2025 Grandfathering and Technical Appendix Order*) ((1) eliminating any application filing requirements associated with grandfathering an interconnected VoIP service provisioned over copper wire, and (2) waiving, for a period of two years, the testing parameters and requirements in the *2016 Technology Transitions Order*'s Technical Appendix).

[30] *Network and Services Modernization Notice*, 40 FCC Rcd 5329.

[31] *See generally id.* at 5378, 5382, paras. 3, 12.  We note that, while not required by the existing rules, the Bureau typically released Public Notices of long-term network changes as well.  However, the objection process set forth in section 51.333 did not apply to such network change notices.

the *NCD Waiver Order*.[32]  Incumbent LECs will continue to be required to post public notice of planned network changes through industry fora, industry publications, or on the carrier's publicly accessible Internet site without the obligation to file duplicative information with the Commission.[33]  To ensure clear notice specifically to interconnecting carriers, incumbent LECs must continue to (1) provide direct notice of copper retirements and short-term network changes to directly interconnected telephone exchange service providers, 911 service providers,[34] and directly interconnecting local exchange service providers that support essential functions within 911 networks, including delivering 911 traffic to selective routers for transmission to public safety answering points (PSAPs),[35] and (2) provide public notice and communicate directly with interconnected telephone exchange service providers about network changes resulting from *force majeure* events and other events outside of the incumbent LEC's control.[36]  We note that the action we take today does not absolve incumbent LECs of their obligation under section 214(a) to obtain Commission authorization for a copper retirement or other network change as defined in section 51.325(a) of our rules[37] that also results in a service discontinuance[38] and, indeed, works hand-in-hand with our actions taken below to ensure continued 911 connectivity when a carrier seeks to discontinue a service supporting interconnection trunks or the exchange of traffic, including but not limited to 911 trunks and 911 traffic.[39]

---

[32] *See generally id.*, 40 FCC Rcd 2026.

[33] 47 CFR § 51.329(a)(2).

[34]  Defined as an entity that provides 911, E911, or NG911 capabilities such as call routing, automatic location information (ALI), automatic number identification (ANI), or the functional equivalent of those capabilities, directly to a public safety answering point (PSAP), statewide default answering point, or appropriate local emergency authority as defined in § 9.3; and/or operates one or more central offices that directly serve a PSAP.

[35] *See* Letter Tamar E. Finn, Counsel to Bandwidth, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 25-209 et al., at 1 (filed Mar. 17, 2026) (Bandwidth Mar. 17, 2026 *Ex Parte* Letter); Letter from Lauren Kravetz, Vice Pres., Gov't Affairs, Intrado Life & Safety, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-209, 25-208, at 1-2 (filed Mar. 13, 2026) (Intrado Mar. 13, 2026 *Ex Parte* Letter).

[36] 47 CFR § 51.333(a), (g).  As previously noted by the Commission, our network change disclosure rules do not negate any specific notice obligations contained in privately negotiated contracts.  *See Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WC Docket No. 17-84, Report and Order, Declaratory Ruling, and Further Notice of Proposed Rulemaking, 32 FCC Rcd 11128, 11140, para. 29 (2017) (*First Wireline Infrastructure Order*).

[37] 47 CFR § 51.325(a).

[38] *See* 47 U.S.C. § 214(a); 47 CFR §§ 63.62(a)-(b), 63.500, 63.501; *First Wireline Infrastructure Order*, 32 FCC Rcd at 11138, para. 24.

[39] *See infra* Section III.B.3.; Letter from Tamar E. Finn, Counsel to Bandwidth, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 25-209 et al., at 2-3 (filed Feb. 27, 2026) (Bandwidth Feb. 27, 2026 *Ex Parte* Letter) ("The Commission should not permit an automatic grant of a discontinuance application to undermine public safety.").  We note that INCOMPAS has asked that "copper retirement must not be permitted in areas where competitive providers rely on legacy loops to reach end-user customers and where no viable wholesale replacement exists." INCOMPAS Comments at 8.  And CWA has asserted that the actions we take today "fail[] to account for the significant workforce implications associated with accelerated copper retirement."  Communications Workers of America *Ex Parte* Comments, WC Docket Nos. 25-209, 25-208, at 2 (filed Mar. 18, 2026) (CWA Mar. 18, 2026 *Ex Parte* Letter).  However, as the Commission has previously noted, section 251(c)(5) established a notice-based network change disclosure process, and the Commission thus has no authority to prohibit copper retirements.  *See First Wireline Infrastructure Order*, 32 FCC Rcd at 11137-38, paras. 23-24.  And impacts of our actions on the workforce are similarly outside the scope of the purpose of section 251(c)(5)'s public notice requirement, which pertains to impacts on interoperability of the communications networks.  *See* 47 U.S.C. § 251(c)(5).

13.     Excessive regulatory burdens prevent carriers from investing in and deploying next-generation networks that are needed to support modern communication services.[40]  Various commenters have noted that eliminating all filing requirements while maintaining the public notice requirements will streamline the transition from legacy networks while still ensuring interconnecting entities receive adequate notice.[41]  We agree with NTCA that this approach "strike[s] the appropriate balance between reducing regulatory burden and ensuring stakeholders remain informed of network changes."[42]

14.     We find that adopting the change in filing and notice requirements proposed in the *Network and Services Modernization Notice* will not have any impact on the notices end users receive of planned network changes.  Neither section 251(c)(5) nor our implementing rules impose end-user notice obligations.[43]  Rather, carriers provide such notices to end users as a matter of practice.[44]  In the *NCD Waiver Order*, the Bureau noted that it received no comments in opposition to the more than 400 network change disclosure filings it processed and for which it released public notices over the preceding two years.[45]  And since issuing that *Order*, the Bureau has received no request or objection indicating that the lack of a filing or agency-issued Public Notice has resulted in disruption to the transmission or routing of services over an incumbent LEC's facilities.  In response to our requests for comment in the *Network and Services Modernization Notice* on whether any public benefit exists from requiring incumbent LECs to file network change disclosures with the Commission[46] and whether publishing notices of network changes on carriers' websites provides reasonable public notice of network changes,[47] commenters suggest the lack of objections submitted in response to Commission network change Public Notices indicates that filing network change disclosures has become a purely administrative task that does not provide any value.[48]  Interconnected telephone exchange service providers may still raise concerns regarding short-term network changes and copper retirements through less formal Commission processes.[49]

15.     We conclude that eliminating all filing requirements and publication of Commission-issued public notices will reduce delays and encourage development and deployment of modernized networks.[50]  Reducing regulatory costs and obligations encourages investment in modern networks and advanced communications services in all areas, especially those that are expensive to serve due to low

---

[40] *NCD Waiver Order*, 40 FCC Rcd at 2029, para. 8; *First Wireline Infrastructure Order*, 32 FCC Rcd at 11142, para. 33.

[41] WTA—Advocates for Rural Broadband (WTA) Comments at 2; Nokia Comments at 2; Telecommunications Industry Ass'n Comments at 5-6; USTelecom Comments at 38.  CWA Mar. 18, 2026 *Ex Parte* Letter at 2 ("Premature retirement of copper infrastructure without verified, fully operational replacement systems creates unacceptable risks to public safety and emergency communications continuity").

[42] NTCA—The Rural Broadband Ass'n (NTCA) Comments at 4.

[43] *First Wireline Infrastructure Order*, 32 FCC Rcd at 11147, para. 45; *see also* Vantage Point Solutions Comments at 3.

[44] *See First Wireline Infrastructure Order*, 32 FCC Rcd at 11147, para. 45.

[45] *NCD Waiver Order*, 40 FCC Rcd at 2030, para. 11.

[46] *Network and Services Modernization Notice*, 40 FCC Rcd at 5334, para. 13.

[47] *Id*.

[48] *See* Telecommunications Industry Ass'n Comments at 5-6; NTCA Comments at 3; WTA Comments at 2; International Center for Law and Econ. Comments at 7.

[49] *NCD Waiver Order*, 40 FCC Rcd at 2030-31, para. 12 (citing 47 CFR § 1.41).

[50] *Id.*; Wireless Infrastructure Ass'n Comments at 1; Nokia Comments at 2; Telecommunications Industry Ass'n Comments at 5-6; USTelecom Comments at 38.

population density or challenging topography.  Carriers will not need to divert funds and resources to complying with burdensome regulations, allowing them to devote these resources elsewhere.[51]

16.     We are not persuaded by the Alarm Industry Communications Committee's assertion that having network change notices only posted on incumbent LECs' publicly accessible websites "significantly reduces public visibility of critical infrastructure changes."[52]  The purpose of section 251(c)(5)'s public notice requirement was to promote competition.[53]  When the Commission adopted its regulations implementing section 251(c)(5), it noted the limited resources available to smaller carriers that might not participate in industry fora and publications.[54]  It thus included the filing requirement to ensure that "all carriers, competing service providers, and potential competitors . . . have equal opportunities to provide and to receive change information on a national scale."[55]  And when the Commission expressly added copper retirements to its network change disclosure scheme, it required that incumbent LECs provide direct notice of such network changes to interconnecting telephone exchange service providers, ensured that those interconnecting carriers received at least 90-days advance notice of the planned copper retirement, afforded those providers the opportunity to object, and noted that objections would be deemed denied "[u]nless the copper retirement scenario suggests that competitors will be denied access to the loop facilities required under our rules" absent Commission action on the objection within the 90-day advance notice period.[56]  Thus, the purpose of the filing requirement was never about "public visibility of critical infrastructure changes."  However, we require that the method of notice the incumbent LEC uses be publicly accessible—i.e., not behind a paywall.[57]

17.     We do not take the alternative approach of forbearing from all public notice requirements imposed by section 251(c)(5) and our implementing rules because we find that forbearance is not justified at this time.[58]  Section 10 of the Act requires the Commission to forbear from applying any requirement of

---

[51] While the Commission cannot direct how incumbent LECs spend money gained from the reduction in regulatory costs and obligations, reducing costs associated with deployment of networks generally makes all service areas attractive for investment.  *See NCD Waiver Order*, 40 FCC Rcd at 2029-31, paras. 8, 12; Nokia Comments at 2-4; Wireless Infrastructure Ass'n Comments at 1; Singer Feb. 26, 2026 *Ex Parte* Letter at 1; *cf.* Fiber Broadband Ass'n & Cartesian, Fiber Deployment Cost Annual Report (2025) (2025 FBA-Cartesian Fiber Deployment Cost Report) (stating that the growth in fiber deployment "is largely driven by private investment from Incumbent Local Exchange Carriers, or ILECs, that have been rapidly expanding their fiber footprints through acquisitions, joint ventures, legacy network upgrades, and expansions"), https://fiberbroadband.org/wp-content/uploads/2026/01/FBA_Cartesian_Fiber-Deployment-Cost-Annual-Report_2025.pdf.  *But see, e.g.*, AARP Comments at 7 (stating that reducing regulatory burdens may not encourage incumbent LECs to deploy advanced networks in unprofitable markets but that they "may choose instead to simply use those unspent monies to increase shareholder dividends").

[52] AICC Comments at 8.

[53] *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 et al.*, Second Report and Order and Memorandum Opinion and Order, 11 FCC Rcd 19392, 19471, para. 171 (1996) (*Second Local Competition Order*); *see also id*. at 19479, para. 188 (concluding that the Commission "should adopt a requirement of uniform public notice of sufficient information to deter anticompetitive behavior").

[54] *Id.* at 19483, para. 199.

[55] *Id.*

[56] *See Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers et al.*, CC Docket No. 01-338 et al., Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd 16978, 17141, 17146-67, paras. 271, 281-83 (2003); *see also* 47 CFR § 51.333.

[57] *See infra* Appx. A, § 51.329(a).

[58] *See* AARP Comments at 15; AICC Comments at 13; Intrado Comments at 1-2; NASUCA et al. Reply at 17; Public Knowledge/CWA Comments at 8-9.  *But see* Digital Progress Inst. Comments at 2-4 (supporting

(continued….)

the Act or of its regulations to a telecommunications carrier or telecommunications service if the Commission determines that (1) enforcement of the requirement "is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory," (2) enforcement of that requirement "is not necessary for the protection of consumers," and (3) "forbearance from applying such provision or regulation is consistent with the public interest."[59] All three conditions must be met to support forbearance relief.[60]

18.     Based on the record in this proceeding,[61] we conclude that the conditions for granting forbearance relief from all network change disclosure requirements do not exist at this time and that any framework or guidance regarding interconnection with incumbent LEC networks during and after the transition to IP is more appropriately addressed in the context of the proposed forbearance from the incumbent LEC-specific interconnection and related obligations in the October 2025 *IP Interconnection Notice*.[62] The rule we adopt today eliminating network change disclosure filing requirements achieves the appropriate balance between providing reasonable public notice of planned network changes and relieving incumbent LECs of unnecessary regulatory burdens.[63]

19.     *Ensuring practices are just and reasonable (section 10(a)(1)).* We conclude that enforcement of the public notice requirements imposed by section 251(c)(5) and our implementing rules is necessary to ensure incumbent LECs' practices are just and reasonable. Forbearance from all requirements in section 251(c)(5) and our implementing rules would allow incumbent LECs to make network changes or copper retirements without public notice, which might affect interoperability with interconnecting providers and may result in unintended service disruptions.[64] Public notice of network changes generally and copper retirement notices specifically ensures that incumbent LECs' practices are "just and reasonable and are not unjustly or unreasonably discriminatory"[65] by requiring that

---

(Continued from previous page) ───────────────

forbearance); Information Technology & Information Foundation Comments at 3 (supporting forbearance); International Center for Law & Econ. Comments at 7-8 (supporting forbearance).

[59] 47 U.S.C. § 160(a).

[60] *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 509 (D.C. Cir. 2003) (explaining that the three prongs of section 10(a) are conjunctive and that the Commission could properly deny a petition for failure to meet any one prong). We disagree with Wired Broadband et al.'s assertion that section 251(c)(5)'s public notice requirement "is part of Americans' procedural due process rights" under the Fifth Amendment. Wired Broadband, Inc. et al. Comments at 4. This requirement is not subject to the Fifth Amendment's due process clause as the public notice required under that statutory provision is issued by a private company, not a government entity. *See* U.S. Const. amend. XIV, § 1; *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974). Thus, while we decline to forbear from these public notice requirements at this time, we note that future forbearance from these requirements would not violate the Constitution as the public notice is issued by a private company not a government entity.

[61] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5334-37, paras. 14-20; *see also, e.g.*, AARP Comments at 15; AICC Comments at 13; Intrado Comments at 1-2; NASUCA et al. Reply at 17; Public Knowledge/CWA Comments at 8-9.

[62] *See IP Interconnection Notice* at 3, para. 4; *see also* Bandwidth Comments at 4-5.

[63] *See* NTCA Comments at 4 ("While NTCA appreciates the Commission's thorough exploration of forbearance as an alternative approach and believes there are arguments for such an approach, targeted rule changes through notice-and-comment rulemaking should provide sufficient and more direct relief without the need for the more complex and time-consuming process of utilizing the forbearance framework. The proposals for eliminating filing requirements while maintaining reasonable public notice obligations through carriers' own channels strike the appropriate balance between reducing regulatory burden and ensuring stakeholders remain informed of network changes. Clear streamlined rules will better serve both carriers and consumers than layering forbearance analysis atop existing regulatory structures.").

[64] *Network and Services Modernization Notice*, 40 FCC Rcd at 5335, para. 17.

interconnecting carriers receive timely notice regarding changes that may inhibit their ability to provide services to their end-user customers.[66]

20. *Ensuring protection of consumers (section 10(a)(2)).* We find that enforcement of the public notice requirements imposed by section 251(c)(5) and our implementing rules is necessary for the protection of consumers. The requirement that incumbent LECs provide reasonable public notice of network changes is meant to alert interconnecting carriers to changes that might affect their interoperability with the incumbent LEC's network.[67] Lack of such notice and the opportunity to ensure interoperability might cause unintentional disruption of services, ultimately harming consumers.[68]

21. *Consistent with the public interest (section 10(a)(3)).* We conclude that forbearance from the public notice requirements imposed by section 251(c)(5) and our implementing rules would not be consistent with the public interest.[69] As shown overwhelmingly in the record, lack of notice at this time could significantly impact the provision of 911 services.[70] While the transition to Next-Generation 911 (NG911) is progressing alongside broader IP modernization, the NG911 transition faces unique challenges and may not be complete for some time.[71] As we noted in the *Network and Services Modernization Notice*, "network transitions subject to section 251(c)(5) may occur in areas where 911 authorities and originating service providers (OSPs) have not yet transitioned to . . . [NG911] and will therefore continue for some time to rely on legacy selective routers and other TDM-based infrastructure for delivery of 911 calls to public safety answering points (PSAPs)" during this period of overlap.[72] Until the NG911 transition is complete, it is imperative that carriers coordinate with state and local 911. Authorities and 911 service providers, as defined above, and directly interconnecting local exchange service providers that support essential functions within 911 networks so that they are aware of network changes that could impact their ability to provide these critical services.[73]

## B. Section 214 Discontinuance

22. We next revise our rules implementing section 214(a) of the Act to bring them in line with the realities of today's communications marketplace. First, we adopt our proposal to simplify our rules applicable to technology transitions discontinuances by establishing one consolidated rule applicable to all technology transitions discontinuance applications.[74] Second, we adopt our proposal to grant

(Continued from previous page) ──────────────

[65] 47 U.S.C. § 160(a)(1).

[66] *See* NASUCA et al. Reply at 17; Public Knowledge/CWA Comments at 8.

[67] *Network and Services Modernization Notice*, 40 FCC Rcd at 5336, para. 18.

[68] *See* NASNA Comments at 2-3; Intrado Comments at 6; NENA Comments at 1-2; Public Knowledge/CWA Comments at 8-9; NASUCA et al. Reply at 17.

[69] *See, e.g.*, Public Knowledge/CWA Comments at 8-9 (asserting that "[p]ublic notice of such network changes remains important in ensuring that consumers, businesses, and government agencies using services that interconnect with other carriers are not harmed").

[70] NASNA Comments at 2-3; NENA Comments at 1-2; Intrado Comments at 6; INCOMPAS Comments at 8; Public Knowledge/CWA Comments at 8-9; NASUCA et al. Reply at 17; Comtech Comments at 4.

[71] *See NG911 Order*, 39 FCC Rcd at 8189-96, paras. 113-31 (addressing the transition timeline for NG911).

[72] *Network and Services Modernization Notice*, 40 FCC Rcd at 5337, para. 20 (citing *NG911 Order*, 39 FCC Rcd 8137).

[73] *See, e.g.*, NENA Comments at 2; Comtech Comments at 4-5; Intrado Comments at 6; Public Knowledge/CWA Comments at 8-9; NASUCA et al. Reply at 17; Competitive Carriers Ass'n Reply at 4-5; *see also Network and Services Modernization Notice*, 40 FCC Rcd at 5337, para. 20.

[74] *Network and Services Modernization Notice*, 40 FCC Rcd at 5330, 5339-40, paras. 4, 26-27. Our technology transitions discontinuance rules apply only to discontinuance of a retail wireline voice service—i.e., loop-side

(continued….)

blanket authorization for carriers to grandfather any legacy voice service, data telecommunications services operating at speeds below 25/3 Mbps, and interconnected VoIP service provisioned over copper facilities.[75]  Third, we establish requirements for applications to discontinue a service supporting interconnection trunks or the exchange of traffic, to ensure continued support for 911 service and also to ensure access for interconnecting providers on non-TDM services.  Fourth, we forbear from section 214(a) requirements in certain circumstances for resold service.  Fifth, we adopt our proposal to apply a 31-day automatic grant period to all discontinuance applications regardless of the applicant's status as dominant or non-dominant.[76]  Sixth, we clarify the required contents of discontinuance applications.[77]  Seventh, we adopt our proposal to revise our rules applicable to emergency discontinuances to address specific situations where a carrier may wish to permanently discontinue a service after the Commission has granted emergency discontinuance authority.[78]  Finally, we clear from the books outdated and irrelevant discontinuance rules.[79]  We do not act at this time on our proposal to forbear from the requirement that carriers provide notice of planned discontinuances to State Governors and the Secretary of Defense, as required by section 214(b).[80]

### 1.    Creating One Consolidated Technology Transitions Discontinuance Rule

23.    As part of the Commission's ongoing efforts to reduce regulatory burdens and thus allow providers to invest more resources toward modernizing their networks and developing and deploying newer, more advanced services, we adopt our proposal in the *Network and Services Modernization Notice* to revise the rules applicable to technology transitions discontinuances by replacing the Adequate Replacement Test and the Alternative Options Test with a single consolidated technology transitions discontinuance rule.[81]  In conjunction with this revision, we also eliminate section 63.602 and amend section 63.71 of our rules to set forth content requirements applicable to all discontinuance applications, including certain information set forth in section 63.505.[82]  With respect to technology transitions discontinuance applications, we continue to require that applications contain a statement identifying the application as involving a technology transition.  This consolidated rule stipulates that an application to discontinue a currently offered retail voice service as part of a technology transition is eligible for streamlined processing if the applicant certifies that one or more of the following replacement services is available in every location throughout the affected service area:[83]  (1) a facilities-based interconnected

---

(Continued from previous page) ──────────────────

services.  It does not apply to trunk-side services provided to another carrier, such as interconnection trunks.  *See* 47 CFR § 63.60(i); *see also* Bandwidth Comments at 2-4.

[75] *Id.* at 5356, para. 69.

[76] *Id.* 5330-31, 5360-61, paras. 5, 85-87.

[77] *See infra* Section III.B.6.

[78] *Network and Services Modernization Notice*, 40 FCC Rcd at 5331, 5363, paras. 5, 95.

[79] *Id.* at 5331, 5364-69, paras. 5, 102-15, 118-24.

[80] *Id.* at 5361-62, paras. 4, 90-91.

[81] The provisions of section 63.71(f)(2) pertain to last-mile, end-user legacy voice service.

[82] *See infra* Section III.B.6; *see also* 47 CFR § 63.602(a) (requiring technology transitions discontinuance applications to set forth the information required by section 63.505).

[83] In adopting the Adequate Replacement Test, the Commission stated that "in order to meet [the network coverage] prong and thus be eligible for streamlined processing, a replacement service must be available to all affected customers covering the entire geographic scope of the service area subject to the application and actually function as intended for affected customers, or else it cannot be certified as a replacement service for those customers," thus "promot[ing] the core value established by the Act, including that of ensuring universal access."  *2016 Technology Transitions Order*, 31 FCC Rcd at 8328, para. 123.  Commenter concerns regarding "reliance on facilities not yet built and technologies not yet deployed," *see* Public Knowledge/CWA Comments at 15, are obviated by the

(continued….)

VoIP service;[84] (2) a facilities-based mobile wireless service; (3) a voice service offered pursuant to an obligation from one of the Commission's modernized high-cost support programs; (4) a voice service that has been available from the applicant throughout the affected service area for the previous six months and for which the carrier has at least a certain number of existing subscribers and which supports access to 911; or (5) a widely available alternative voice service that supports access to 911. Upon due consideration of the record in this proceeding and the ample support for this approach reflected therein,[85] we find that this rule will accelerate the application process while simultaneously protecting legacy service customers by ensuring that they have replacement service options available to them when their legacy service is discontinued. This in turn will ensure that consumers receive the benefits of technology transitions with "all reasonable efficiency."[86]

24. We find that replacing both the Adequate Replacement Test and the Alternative Options Test with the single consolidated rule we adopt today, along with the application content requirements discussed below,[87] will more effectively accelerate and streamline the technology transitions discontinuance process while still providing adequate protection to consumers. We find that, rather than minimizing uncertainty and confusion, the Adequate Replacement Test actually caused widespread confusion that may have prevented carriers from pursuing technology transition discontinuances under the test, as evidenced by the fact that the Commission did not receive its first technology transitions discontinuance application pursuant to the Adequate Replacement Test until nearly eight years after the rule was adopted and six years after its effective date.[88] We further find that the Alternative Options Test has failed to align with competitive marketplace options and has hampered investment and innovation in modern services by effectively discouraging applicants from filing to discontinue legacy voice services under that test. Indeed, in the nearly seven years since the Alternative Options Test was adopted, the Bureau has found that presumptive streamlined treatment under the test was utilized only eight times.[89] We agree with the International Center for Law & Economics that making it costly and time-consuming for carriers to exit obsolete and inefficient copper-based services slows the flow of capital toward the

---

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
requirement that the replacement service must be available in all locations throughout the affected service area in order to be eligible for streamlined processing.

[84] A facilities-based service is any service that is offered using (1) physical facilities that the provider owns and that terminate at the end-user premises; (2) facilities that the provider has obtained the right to use from other entities, such as dark fiber or satellite transponder capacity as part of its own network, or has obtained; (3) unbundled network element (UNE) loops, special access lines, or other leased facilities that the entity uses to complete terminations to the end-user premises; (4) wireless spectrum for which the provider holds a license or that the provider manages or has obtained the right to use via a spectrum leasing arrangement or comparable arrangement pursuant to 47 CFR §§ 1.9001-1.9080; or (5) unlicensed spectrum. *See* 47 CFR § 1.7001(a)(2).

[85] *See, e.g.*, Center for Regulatory Freedom Comments at 6-7; International Center for Law & Econ. Comments at 10; NTCA Comments at 5-8; Telecommunications Industry Ass'n Comments at 3-5; U.S. Chamber of Commerce Comments at 2; USTelecom Comments at 23; WTA Comments at 3; USTelecom Reply at 9-10.

[86] *Network and Services Modernization Notice*, 40 FCC Rcd at 5340, para. 27.

[87] *See infra* Section III.B.6.

[88] *Comments Invited on AT&T's Section 214 Application to Grandfather and Discontinue Legacy Voice Service as Part of a Technology Transition*, WC Docket No. 24-220, Public Notice, DA 24-1158 (WCB Nov. 20, 2024) (accepting AT&T's application for filing and establishing an automatic grant date of December 21, 2024). The filing of that application was itself delayed by several months while AT&T conducted the performance testing delineated in the Technical Appendix. *Testing Clarification Order*, 40 FCC Rcd at 2017, para. 7. This extended timeline is contrary to a streamlined process.

[89] Petition of USTelecom—The Broadband Association for Limited Waiver, WC Docket No. 17-84 at 2 (filed Feb. 27, 2025), https://www.fcc.gov/ecfs/document/102272010007405/1 (citing eight Bureau-level Accepted for Filing notices) (USTelecom Waiver Petition).

deployment of next-generation networks, where it is needed.[90]  Creating one straightforward, consolidated rule that applies to all technology transitions discontinuance applications will more effectively accelerate and streamline the technology transitions discontinuance process while still providing adequate protection to consumers than revising the Adequate Replacement Test and the Alternative Options Test.

25.        A discontinuance application can rely on the availability of multiple replacement services, particularly when the application encompasses multiple wire centers covering large geographic areas.  We decline to adopt Public Knowledge's proposal to require applicants to identify the replacement service they are relying on for each subscriber address.[91]  Requiring such a level of granularity would impose an unreasonable burden on carriers and is not always necessary to confirm the availability of the replacement service(s) across the geographic area subject to discontinuance.  However, we do find merit in requiring applicants to provide a greater level of detail than simply providing a high-level aggregate list of which replacement services it relies on for any given large geographic area covered by the application.[92]  In order to minimize the burden on carriers while still providing Bureau staff with sufficient information to evaluate the availability of the replacement services and thus the impact on the public convenience and necessity, we afford carriers flexibility in how they break down the available replacement services in the various affected service areas.[93]  We thus require carriers to identify the available replacement services using the smallest practicable geographic unit depending on the geographic areas implicated by the specific application at issue, which could consist of, among other things, census blocks, census block groups, or ZIP codes.  If the information regarding the geographic availability of the replacement service(s) is insufficient or incomplete, the Bureau may require additional information as necessary for its review.

### a.        Specific Categories of Adequate Replacement Services

26.        As delineated above, the consolidated rule we adopt today sets forth five categories of replacement services that an application to discontinue a currently offered retail voice service as part of a technology transition can rely on to be eligible for streamlined processing.  We now address each of these categories in turn.

27.        The Commission has previously declined to adopt presumptions or exclusions regarding specific types of replacement services, stating that the "public interest analysis demands that applicants provide objective evidence showing a replacement service will provide quality service and access to needed applications and functionalities."[94]  Given the rapid developments in the communications marketplace since the Commission adopted the Adequate Replacement and Alternative Options Tests, we

---

[90] *See* International Center for Law & Econ. Comments at 8-9; *see also* ICLE Feb. 27, 2026 *Ex Parte* Letter at 1-2.

[91] *See* Public Knowledge Mar. 13, 2026 *Ex Parte* at 3.

[92] *See id*.

[93] *See id*.

[94] *2016 Technology Transitions Order*, 31 FCC Rcd at 8308-09, para. 75; *see also id*. at 8309, para. 75 (further noting that "it is critical that we retain the ability to examine each discontinuance application given the potential for variability in different implementations of the same technology," adding that "[t]he same technology could nonetheless utilize different features, be produced by different vendors with different methodologies, and use different quality measurement techniques, any of which could result in varied service quality and thus lead to potential interoperability issues"); *Second Wireline Infrastructure Order*, 33 FCC Rcd at 5675, para. 35 (declining to replace the Adequate Replacement Test with a simple requirement that a discontinuing carrier show that any fixed or mobile voice service, including interconnected VoIP, is available to qualify for streamlined treatment, stating that such a rule would "fail[] to ensure the availability of a voice replacement service in the community as a condition to obtaining streamlined treatment that sufficiently addresses commenters' concerns . . . about the characteristics of the replacement voice service, and [would] not carry the added benefit of ensuring the availability of multiple alternatives to affected customers, whether present or future").

find the Commission's concerns in 2016 and 2018 have been obviated.[95]  While some commenters contend that replacing the Adequate Replacement Test and the Alternative Options Test with the consolidated rule we adopt today will harm consumers and leave them with substandard alternative connections,[96] we find that these concerns, too, are unfounded.

28.      Since 2018, communications technology has improved, and the marketplace for voice services, including interconnected VoIP and mobile voice, has vastly expanded and spurred the creation of new and innovative communications technologies that benefit consumers and whose usage has far surpassed that of legacy voice service.[97]  Indeed, interconnected VoIP lines have jumped from 58% of all retail fixed voice service connections in 2018 to over 79% by December of 2024.[98]  The number of legacy switched access connections has dropped precipitously since 2018 while the number of fixed broadband connections that support over-the-top interconnected VoIP service rose to 91 residential fixed broadband connections per 100 households with speeds of at least 25 Mbps/3 Mbps by the end of 2024.[99]  These rapid changes in the marketplace demonstrate that consumers now have access to a wide array of voice services provisioned over a variety of technologies.  And this disparity between legacy voice service and interconnected VoIP connections will only increase as fiber deployments around the country continue.[100]

29.      We conclude that, rather than allowing legacy voice services to be discontinued and replaced with inferior options, specifying explicit categories of adequate replacement services will implement a baseline of quality and availability for replacement services in the event of a discontinuance,

---

[95] *See* International Center for Law & Econ. Comments at 10 (stating that the Adequate Replacement and Alternative Options Tests "have failed to achieve their purpose of facilitating technology transitions"); NTCA Comments at 5-6 ("[T]he Commission's previous efforts to ensure consumers obtain the benefits of technology transitions in rapid fashion have not worked as intended."); Telecommunications Industry Ass'n Comments at 3 (stating that the Adequate Replacement and Alternative Options Tests fostered unnecessary procedural complexity by creating a "dual-track regime"); Digital Progress Inst. Comments at 5 (noting that "the Adequate Replacement Test and the Alternative Options Test have not lived up to their promises of accelerating the IP Transition or aiding American consumers").

[96] *See* Public Knowledge/CWA Comments at 10-16; NASUCA et al. Reply at 11-14; Rural County Representatives of California (RCRC) Reply at 2-4; CWA Mar. 18, 2026 *Ex Parte* Letter at 2-3; *see also* Letter from Harold Feld, Senior Vice Pres., Public Knowledge, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-209, 25-208, at 2 (rec. Mar. 16, 2026) (Public Knowledge Mar. 16, 2026 *Ex Parte* Letter).

[97] *See, e.g.*, International Center for Law & Econ. Comments at 9 (asserting that "the fact that nearly 95% of Americans have at least three mobile-wireless choices, as well as the rapid growth of competitive VoIP, is dispositive evidence of a dynamic and competitive market"); *see also id.* at 10 ("IP-based services are not mere replacements; they are fundamentally different products that offer immense value that TDM cannot, including mobility, data integration, and scalability.").

[98] *See* FCC, Office of Economics and Analytics, Voice Telephone Services: Status as of June 30, 2018 at 2-3 (2020), https://docs.fcc.gov/public/attachments/DOC-362881A1.pdf (2018 Voice Telephone Services Report); December 2024 Voice Telephone Services Report at 3, Fig. 2.

[99] FCC, Office of Economics and Analytics, Internet Access Services: Status as of December 31, 2024 at 10 (2026), https://docs.fcc.gov/public/attachments/DOC-418459A1.pdf (December 2024 Internet Access Services Report); FCC, Office of Economics and Analytics, Internet Access Services: Status as of June 30, 2018 at 10 (2020), https://docs.fcc.gov/public/attachments/DOC-366979A1.pdf (June 2018 Internet Access Services Report); *see also* Fiber Broadband Ass'n Comments at 4-5; ICLE Feb. 27, 2026 *Ex Parte* Letter at 1 (noting their finding "that between 2014 and 2024, copper last-mile subscriptions fell by 81%" and that "fewer than one percent of Americans now rely exclusively on landlines").

[100] The latest report issued by the Fiber Broadband Association indicates that the number of homes with access to fiber increased by 11% in 2025, despite rising costs associated with rising labor costs, tariffs on imported materials, and inflation.  2025 FBA-Cartesian Fiber Deployment Cost Report at 5, 10-11.  According to this report, more than 60% of American homes are now passed by fiber.  *Id.* at 5.  And the majority of eligible locations in 2025 in the BEAD program will use fiber.  *Id.* at 31.

thus ensuring that no consumer receives replacement services that fall beneath a certain level of service.[101]  Moreover, we find that specifying categories of adequate replacement services will provide greater certainty for carriers regarding the kinds of replacement services that could result in the Commission removing a technology transitions discontinuance application from streamlined processing. We also find that the federal government's interest in having a coherent national policy on these matters outweighs state governments' interests in the types of service that may qualify as adequate replacements for purposes of streamlined discontinuance applications.  As observed by the Telecommunications Industry Association, clear guidance on what qualifies as a replacement service will allow providers to know what attributes a potential successor service must possess as they work to improve their community's services.[102]  The categories of adequate replacement services we adopt today will furnish providers with sufficient criteria to provide certainty in planning transitions, and ensure that consumers in geographically rural, insular communities, including Tribal communities, the disability community, and other vulnerable communities have access to advanced service options.[103]

30.       We conclude that the approach we adopt today will not impede access to critical applications such as home security alarms and medical monitoring devices given the wide array of IP-based devices and over-the-top services that perform similar functions available on the market today.[104] Our streamlined processing rules still require carriers to notify customers of their applications to discontinue service, which must be done no later than the date they file their applications, and provide information regarding replacement service options.[105]  Thus, even in instances where a carrier may seek to avail itself of streamlined processing of its discontinuance application, any customers or other interested stakeholders with concerns—including about the technical and interoperability information for a specific replacement service—have the opportunity to file comments or objections to that application with the Commission.[106]  Should the Bureau have any concerns about whether a particular request to discontinue service could adversely affect the public interest, it will remove the application from streamlined processing for closer review,[107] thus mitigating the risk that a replacement service of inferior quality or

---

[101] *Cf. Technology Transitions et al.*, WC Docket No. 13-5 et al., Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 30 FCC Rcd 9372, 9378, 9478, paras. 7, 202 (2015) (noting that "[w]ith clear standards in place, carriers will not have to guess as to how they can obtain approval to discontinue TDM services once they are ready to do so" and that the Commission's "existing case-by-case approach may not provide sufficient guidance as to what constitutes an adequate substitute with regard to cutting-edge technology transitions"). As the Commission noted in the *2016 Technology Transitions Order*, "[t]he Bureau will normally authorize the discontinuance 'unless it is shown that customers would be unable to receive service or a reasonable substitute from another carrier or that the public convenience or necessity is otherwise adversely affected.'"  31 FCC Rcd at 8303-04, para. 61 (quoting 47 CFR § 63.71(a)(5)(i)-(ii)).  *But see* Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 2 ("The adequate replacement test required not simply 911 access, but comparable service.  Especially with regard to wireless, calls may now drop at a level that renders the service unusable – even if it technically reaches 911 and the PSTN.").

[102] *See* Telecommunications Industry Ass'n Comments at 4.

[103] *See id.*

[104] *See, e.g.*, *Stand-Alone and Single-Service Waiver Order*, 40 FCC Rcd at 2005, para. 11; USTelecom Comments at 20 (noting that to the extent that consumers still rely on the applications the Commission recognized as key, these applications "have been replaced by IP-based and wireless options that do not rely on POTS networks"); Nokia Comments at 4.  *But see* AICC Comments at 10-11 (questioning whether the categories of replacement services specified in the rules we adopt today will be capable of supporting interoperability with key applications and functionalities, primarily home security alarms and medical monitoring devices).

[105] 47 CFR §§ 63.71(a), (c).

[106] *See Second Wireline Infrastructure Order*, 33 FCC Rcd at 5677, para. 37.

[107] *See* 47 CFR § 63.71(f)(1) (providing that a discontinuance application "shall be automatically granted on the 31st day after its filing with the Commission without any Commission notification to the applicant unless the

(continued….)

availability will be imposed upon consumers in the event of a discontinuance.[108] Meanwhile, the streamlined process will more efficiently deliver access to modernized services that better support functions like home security and telehealth, as compared to the legacy networks in place today.[109] And the providers of these devices and services have been on notice for almost a decade that the list of "key applications" contained in the *2016 Technology Transitions Order* as part of the Adequate Replacement Test was temporary. Indeed, under the rules adopted in 2016, the requirement that "replacement services [] be compatible with these devices" sunset in 2025.[110]

31. We decline to ivmpose on technology transitions discontinuance authorizations a condition that "the replacement service support G.711 codec handshake with RFC 2833 disabled on calls to telephone numbers serving life safety alarm monitoring receivers, end-to-end through all carrier handoffs," as recommend by AICC.[111] Introducing a new compatibility requirement for legacy devices, ten years after the *2016 Technology Transitions Order* established a sunset date for compatibility for alarms using low-speed modem devices, would introduce unnecessary delay from the transition to modern, reliable services. Such a requirement is also impracticable if the discontinuing carrier relies on the availability of one or more replacement services offered by third parties. In such instances, the discontinuing carrier has no control over the configuration of the network over which the replacement service is provisioned. However, we encourage carriers to ensure their IP networks are appropriately configured so as to prevent alarm signaling failures.[112]

32. *Facilities-based interconnected VoIP service*. We find that facilities-based interconnected VoIP service is an adequate replacement for purposes of determining eligibility for streamlined processing.[113] As the Commission recently found, interconnected VoIP service benefits consumers by providing access to networks that can support advanced protocols and technologies, such as STIR/SHAKEN, which helps protect consumers from illegally spoofed robocalls, and NG911, which will help save lives by ensuring faster call delivery to 911 call centers through improved reliability and

---

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Commission has notified the applicant that the grant will not be automatically effective"); *see also 2016 Technology Transitions Order*, 31 FCC Rcd at 8309-10, paras. 76, 78.

[108] In light of the opportunities to identify instances where a proposed discontinuance may result in a loss of service to a customer without an adequate replacement, we decline to adopt additional remediation requirements after the approval of the discontinuance. *But see* Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 3-4.

[109] *See, e.g.*, International Center for Law & Econ. Comments at 6 (asserting that IP-based networks are needed for consumer welfare); Rural & Agricultural Council of America Comments at 2 (noting that legacy networks "can no longer support the data-intensive needs of 21st-century rural life or meet consumer demand for reliability, speed, and innovation).

[110] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8342, 8345, paras. 158-59, 170. *But see* Letter from Sascha Kylau, Co-Chair, Alarm Industry Communications Committee (AICC), to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-209, 25-208, at 4 (filed Mar. 19, 2026) (AICC Mar. 19, 2026 *Ex Parte* Letter) (asserting that the 2025 sunset of the key application requirements established in the *2016 Technology Transitions Order* "does not address the five million installed [alarm] panels that use dialer-based protocols and will continue to do so during the transition").

[111] AICC Mar. 19, 2026 *Ex Parte* Letter at 5-6.

[112] *Id.* at 2.

[113] There is also evidence that facilities-based interconnected VoIP service compares favorably in price on average to legacy voice services. *See, e.g.*, *Stand-Alone and Single-Service Waiver Order*, 40 FCC Rcd at 2003, para. 5 n.28 (citing USTelecom Waiver Petition at 11-13 (indicating that facilities-based voice service is available from certain providers through unlimited voice/text mobile plans at advertised prices of $20 per month, or for $5 per month more, customers can purchase unlimited data, and that depending on where customers live, they can purchase bundled voice and broadband options through providers for $45 or $50 per month as compared to, e.g., legacy voice prices of $45, $54, and $87 per month)); USTelecom Comments at 12-13; Fiber Broadband Ass'n Comments at 5.

resiliency, enhanced information about the caller's location and the nature of the emergency, and the ability to receive additional multimedia, including video.[114]

33.     The only specific opposition in the record does not dispute the quality of facilities-based interconnected VoIP service but instead raises competition concerns.[115]  We find AARP's claim that there is not sufficient competition in the interconnected VoIP market to be overstated in light of the current state of competition and our continuing ability to remove applications from streamlined processing should the need arise.[116]  We agree that in the context of wireline voice services, the availability of service from another provider may provide competitive benefits for consumers.[117]  As of December 2023, at least 95% of the U.S. population had 4G LTE coverage from at least three service providers.[118]  And to the extent that the affected customers will have access to a facilities-based interconnected VoIP service, they will have the option to purchase broadband access, giving them access to a multitude of communications applications, including over-the-top VoIP service.[119]  Moreover, the Commission's standards for streamlined and non-streamlined processing of discontinuance applications continue to apply.  If the Bureau has concerns regarding whether it is in the public interest to grant a particular request to discontinue service—including relevant considerations of competition in a given service area—it can remove that application from streamlined processing and engage in a further review.[120]  Other than AARP, no commenters weighed in specifically on the appropriateness of facilities-based interconnected VoIP service as an adequate replacement for purposes of eligibility for streamlined processing.

[114] *Stand-Alone and Single-Service Waiver Order*, 40 FCC Rcd at 2006, para. 12 n.59.  Interconnected VoIP providers must meet applicable E911 service requirements as a condition of providing service to consumers and must support NG911 service upon the request of a 911 Authority.  47 CFR §§ 9.11, 9.28 *et seq*.

[115] NASUCA et al. broadly oppose all of the specific categories of replacement services proposed in the *Network and Services Modernization Notice* but do not raise arguments specific to facilities-based interconnected VoIP services.  *See* NASUCA et al. Reply at 12-14.  Other commenters object to our finding that VoIP need not be offered on a stand-alone basis to be considered an adequate replacement.  *See* NTCA Comments at 6; Public Knowledge/CWA Comments at 17-18; Michigan PSC Reply at 5.  We address those arguments below.  *See infra* Section III.B.1.b.

[116] AARP Comments at 12.

[117] *See, e.g.*, *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 582 (D.C. Cir. 2004) (agreeing with the Commission that "robust intermodal competition from cable providers—the existence of which is supported by very strong record evidence, including cable's maintenance of a broadband market share on the order of 60% [citation omitted] means that even if all CLECs were driven from the broadband market, mass market consumers will still have the benefits of competition between cable providers and ILECs"); *Modernizing Unbundling and Resale Requirements in an Era of Next-Generation Networks and Services*, WC Docket No. 19-308, Report and Order, 35 FCC Rcd 12425, 12457, para. 60 (2020) (finding that "[i]ntermodal competition in the form of cable competition alone is enough to establish the existence of sufficient competition even in the absence of UNEs"); *see also Business Data Services in an Internet Protocol Environment et al.*, WC Docket No. 16-143 et al., Report and Order, 32 FCC Rcd 3459, 3515, para. 121 (2017) ("We reject some commenters' characterization of the Qwest Phoenix Order as a blanket finding by the Commission that two competitors are insufficient to constrain incumbent LEC pricing.  Although the Commission raised concerns about the competitive nature of a duopoly in that order, it did not categorically reject the possibility that a market with two competitors could represent sufficient competition to restrain supracompetitive pricing by providers.  To the contrary, it specifically recognized that 'under certain conditions a duopoly will yield a competitive outcome.'").

[118] *See Communications Marketplace Report*, GN Docket No. 24-119, 2024 Communications Marketplace Report, 39 FCC Rcd 14116, 14160, para. 56 (2024) (*2024 Communications Marketplace Report*).

[119] *See* 47 CFR § 9.3 (defining interconnected VoIP service as a service that (1) enables real-time, two-way voice communications; (2) requires a broadband connection from the user's location; (3) requires internet protocol-compatible customer premises equipment (CPE); and (4) permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network).

[120] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8309-10, paras. 76, 78.

34.     *Facilities-based mobile wireless service*.  We find facilities-based[121] mobile wireless service operating at speeds of at least 5/1 Mbps, as reflected on the National Broadband Map,[122] to be an adequate replacement for purposes of eligibility for streamlined processing.[123]  Mobile telephony (mobile voice) service is a real-time, two-way voice service that is interconnected with the public switched network using an in-network switching facility that enables the provider to reuse frequencies and accomplish seamless handoff of subscriber calls.[124]  As of December 2024, there were approximately 390.9 million mobile voice subscriptions in the United States;[125] and according to preliminary data from the Centers for Disease Control and Prevention, as of December 2023, approximately 76% of adults were living in and relying on a wireless-only household, with adults in lower age-groups more likely to live in wireless-only households.[126]  As the market has thus spoken on the adequacy of mobile wireless service, we disagree with Public Knowledge's argument that a facilities-based mobile wireless service is not a suitable replacement for a wireline voice service in the context of a section 214(a) discontinuance review.[127]  As the Commission recently noted, "consumers continue to rely more heavily on mobile wireless services," and that these services have thus "become an essential part of everyday life."[128]

35.     We decline to adopt additional verification requirements for the availability of mobile wireless service beyond the data reflected in the National Broadband Map, as suggested by some commenters.[129]  While NTCA contends that despite broadband mapping improvement over time, it

---

[121] *See supra* note 78.

[122] *See* 47 CFR § 1.7004(c)(3) (noting the parameters on which mobile providers must base their coverage maps).

[123] *See, e.g.*, NTCA Comments at 5 (supporting our proposal to consider mobile wireless service an adequate replacement service for purposes of eligibility for streamlined processing).  The 5/1 Mbps broadband speed is a proxy for services with sufficient quality to be adequate replacement services.

[124] 47 CFR § 20.3; *see also 2024 Communications Marketplace Report*, 39 FCC Rcd at 14233, para. 155; FCC, *FCC Form 477 Local Telephone Competition and Broadband Reporting Instructions* at 9 (Jan. 2, 2023), https://us-fcc.app.box.com/v/Form477Instructions.

[125] *See* December 2024 Voice Telephone Services Report at 13, tbl. 4.

[126] *2024 Communications Marketplace Report*, 39 FCC Rcd at 14234, para. 158 (citing U.S Department of Health and Human Services, National Center for Health Statistics, Wireless Substitution:  Early Release of Estimates from the National Health Interview Survey, July-December 2023 at 2 (June 2024), https://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless202406.pdf (NCHS 2024 Wireless Substitution Report)).

[127] *See* Public Knowledge/CWA Comments at 14 (asserting that "facilities-based mobile wireless is not a suitable replacement for a wireline voice service" in light of such things as line-of-sight obstructions, congestion that results in degradation of service during emergencies, and carrier exaggeration in their coverage maps); *see also* Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 2; NTCA Mar. 13, 2026 *Ex Parte* Letter at 2; NASUCA et al. Reply at 12-14 (opposing all of the specific categories of replacement services proposed in the *Network and Services Modernization Notice*).  In addition to these objections, multiple parties filed comments asserting concerns about the potential negative health impact of increased electromagnetic radiation as a result of the retirement of legacy copper networks and the increased use of wireless alternatives.  *See generally, e.g.*, Wired Broadband, Inc. et al. Comments; Physicians for Safe Technology Comments.  Commission-regulated equipment is subject to our rules limiting human exposure to radio frequency (RF) emissions from such equipment, as applicable.  *See* 47 CFR §§ 1.1307(b), 1.1310.  The Commission's rules limiting human exposure to RF emissions are outside the scope of this proceeding.

[128] *2024 Communications Marketplace Report*, 39 FCC Rcd at 14159, para. 54.  As of December 31, 2024, we note that 4G LTE is available at 99% of locations and 5G-NR at speeds of at least 7/1 Mbps is available at 96% of locations nationwide.  FCC, Office of Economics and Analytics, Internet Access Services: Status as of December 31, 2024 at 16, fig. 10 (2026), https://docs.fcc.gov/public/attachments/DOC-418459A1.pdf (December 2024 Internet Access Services Report).

[129] *See* AARP Comments at 13 ("AARP cautions against relying solely on the data that service providers report to the FCC as it assesses the availability of alternative services."); NTCA Comments at 6 (asserting that "the Commission should require additional verification beyond baseline mapping data before accepting mobile service as

(continued….)

"remains unreliable on a granular level in many rural areas" and thus that the Commission should proceed with caution,[130] we find that there are already sufficient safeguards in place to account for discrepancies, including in rural areas, without the need to adopt more stringent, mobile-specific verification requirements at this time.[131] Indeed, affected customers faced with a planned technology transitions discontinuance relying on the availability of a facilities-based mobile wireless service, as well as other interested stakeholders such as public interest groups and state public utility commissions, may also file objections and seek to have the Bureau remove the application from streamlined processing for further review of the availability of mobile wireless service in the affected service area. Given the existence of these guardrails, we find it unnecessary and redundant to implement additional mobile-specific verification requirements as part of this current rulemaking. Such a requirement would negate the primary purpose of this rulemaking—to make technology transitions more efficient and encourage the deployment of advanced, next-generation networks—while providing no material benefit that is not already available to consumers via the two review mechanisms enumerated above.

36.      *Voice service funded by Commission modernized high-cost mechanisms*. We find facilities-based voice services provided via funding from one of the Commission's modernized high-cost support mechanisms to be an adequate replacement for the purposes of eligibility for streamlined processing. We exclude from the purview of this rule any legacy high-cost support mechanisms that do not contain the same deployment reporting obligations as the modernized mechanisms. The Commission began modernizing its universal service high-cost support mechanisms in 2011 with the *USF/ICC Transformation Order*,[132] which established the Connect America Fund. In that *Order*, the Commission required support recipients to offer broadband service in addition to the supported "voice telephony" service.[133] In the years since, the Commission has established additional mechanisms to support voice-

(Continued from previous page) ────────────────────

sufficient replacement service"); NTCA Reply at 2-4; NTCA Mar. 13, 2026 *Ex Parte* Letter at 2; *see also* AARP Comments at 6 (referring to rural communities where "high-speed internet networks have not yet been deployed and wireless service is unreliable").

[130] NTCA Comments at 7; *see also* CWA Mar. 18, 2026 *Ex Parte* Letter at 2.

[131] *See, e.g.*, Wireless Infrastructure Ass'n Comments at 3-4 (describing how cellular technologies and mapping techniques have improved over time). As compared to the initial months following the launch of the National Broadband Map, the data reflected in the map has become much less susceptible to correction through the challenge process, resulting in a more stable dataset to inform the agency's work. Based on internal staff analysis, the total number of challenges to the National Broadband Map in 2025 as of June 30 equaled one-half of one percent of the total number of challenges filed in the same period in 2022. And approximately nine percent of the challenges filed in that period in 2025 were conceded or upheld, whereas almost 81 percent of the challenges filed during the equivalent time period in 2022 were conceded or upheld. Nevertheless, if consumers or stakeholders have concerns regarding a provider's reported mobile coverage data as reflected on the National Broadband Map, they may file a mapping challenge and initiate a review of the reported coverage data in the specified location. To file a challenge to the availability data in the National Broadband Map, go to https://broadbandmap.fcc.gov/home, type the relevant location into the search bar, select the 'Mobile Broadband' tab, and click on the 'Mobile Challenge' link.

[132] *See generally USF/ICC Transformation Order*, 26 FCC Rcd 17663.

[133] *See id.* at 17695, para. 87, 17696-702, paras. 91-105, 17691-92, paras. 75-78 (establishing the Connect America Fund (CAF) and requiring recipients of CAF Phase I support to offer broadband service with speeds of at least 4/1 Mbps in most areas, with latency sufficiently low to enable the use of real-time communications (defining "voice telephony" as the supported service and describing its core functionalities). The Commission requires recipients of CAF Phase II support "to offer broadband service with latency suitable for real-time applications, including Voice over Internet Protocol [VoIP], and usage capacity that is reasonably comparable to comparable offerings in urban areas, at rates that are reasonably comparable to rates for comparable offerings in urban areas." 47 CFR § 54.309(a); *see also id.* § 54.309(a)(2)(i)-(v) (setting forth speed and latency requirements for different performance tiers); *Connect America Fund et al.*, WC Docket Nos. 10-90 et al., Report and Order and Further Notice of Proposed Rulemaking, 31 FCC Rcd 5949, 5956-63, paras. 14-37 (2016) (*CAF Phase II Order*).

and broadband-capable networks.[134]  Recipients of these mechanisms must offer voice telephony at rates that are reasonably comparable to urban rates and must report compliance with their deployment obligations showing where they have built out the required facilities and offer voice and broadband service.[135]  They also must provide access to emergency services via 911 and provide E911 capabilities wherever local governments have implemented those systems.[136]  No commenters disputed the appropriateness of voice service provided via funding from one of the Commission's modernized high-cost support mechanisms as an adequate replacement for purposes of eligibility for streamlined processing, and we find it reasonable to accept such service as an adequate replacement.

37.     *Carrier's already available alternative voice service.*  We find that, where a carrier has already made available its own alternative voice service throughout the affected service area, the service is an adequate replacement for the service being discontinued in that area for purposes of eligibility for streamlined processing if that service has been available for at least the immediately preceding 60 days and the carrier certifies that based on the results of its own internal network testing routinely undertaken to measure performance in rolling out a new product or service, the service offers substantially similar levels of network performance and availability[137]—for example, that it is provisioned over a network with speeds of at least 25/3 Mbps and that it offers mouth-to-ear latency of no more than 200 ms[138]—and permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network or any successor network that utilizes numbers issued pursuant to the North American Numbering Plan.[139]  We find that these standards better accomplish our goal of encouraging the development of modern communications service offerings than the proposed standards on which we sought comment—i.e., that the replacement service in question must have been available for a minimum time period of the immediately preceding six months throughout the affected service area, and that at least 50 percent of the carrier's total voice service customer base in the

---

[134] *See* 47 CFR § 54.309(a); *see also id.* § 54.309(a)(2)(i)-(v) (setting forth speed and latency requirements for different performance tiers); *CAF Phase II Order*, 31 FCC Rcd at 5956-63, paras. 14-37 (requiring recipients of CAF Phase II support "to offer broadband service with latency suitable for real-time applications, including Voice over Internet Protocol [VoIP], and usage capacity that is reasonably comparable to comparable offerings in urban areas, at rates that are reasonably comparable to rates for comparable offerings in urban areas"); *Rural Digital Opportunity Fund et al.*, WC Docket Nos. 19-126 et al., Report and Order, 35 FCC Rcd 686, 689, para. 3 (2020); *Rural Digital Opportunity Fund; Connect America Fund*, WC Docket Nos. 19-126, 10-90, Report and Order, 35 FCC Rcd 686, 703, paras. 32-33 (2020) (increasing the speed for the minimum performance tier for the Rural Digital Opportunity Fund to 25 Mbps/3 Mbps and setting a high latency limit under which 95% or more of all peak period measurements of network round trip latency are at or below 750 milliseconds and a demonstration of a score of 4 or higher using the Mean Opinion Score with respect to voice performance); *Connect America Fund et al.*, WC Docket No. 10-90 et al., Report and Order, Notice of Proposed Rulemaking, and Notice of Inquiry, 38 FCC Rcd 7040, 7057-58, para. 37 (2023) (requiring "deployment obligations requiring every Enhanced A-CAM recipient to deploy, by the end of 2028, 100/20 Mbps or faster broadband service, with latency of 100 milliseconds or less, to all Enhanced A-CAM required locations in their service areas" to "maximize compatibility with the Infrastructure Act and BEAD Program"); 47 CFR § 54.311.

[135] *See* 47 CFR § 54.316(c); *USF/ICC Transformation Order*, 26 FCC Rcd at 17693, para. 81.

[136] 47 CFR § 54.101(a) and (b); *see also USF/ICC Transformation Order*, 26 FCC Rcd at 17693, para. 78.

[137] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8314, para. 91; *Testing Clarification Order*, 40 FCC Rcd 2014; *see also* USTelecom Mar. 19, 2026 *Ex Parte* Letter at 7.

[138] *See, e.g.*, *2016 Technology Transitions Order*, 31 FCC Rcd at 8318-19, para. 99 and n.265; *CAF Phase II Order*, 31 FCC Rcd at 5956-63, paras. 14-37.

[139] *See* Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 3 (raising concern that a potential replacement service might not be able to interconnect with the PSTN).

affected service area must be subscribed to the alternative voice service[140]—without undue delay while still ensuring that consumers have available to them an adequate replacement service.[141]  Finally, the service must provide access to 911 and comply fully with our 911 requirements applicable to that service.[142]  We require carriers to describe any such replacement service and to certify that it meets these temporal, subscriber percentage, and public safety requirements.  As a whole, we find that these requirements adequately balance the need to ensure a service is stable and satisfies the Commission's goal of ensuring that carriers can rapidly transition their resources and investments toward next-generation services.  No commenters disputed the appropriateness of such service as an adequate replacement for purposes of eligibility for streamlined processing, and we find it reasonable to accept such service as an adequate replacement.

38.       *Widely available alternative voice service*.  We find a widely available alternative voice service offered by a third party that is available in all locations throughout an affected service area and provides access to 911 and complies fully with applicable 911 requirements, to be an adequate replacement for purposes of being eligible for streamlined processing if the carrier certifies that based on publicly available information, the service offers substantially similar levels of network performance and availability[143] and permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network or any successor network that utilizes numbers issued pursuant to the North American Numbering Plan.[144]  Permitting a discontinuing carrier to  rely on the availability of an adequate replacement service offered by a third party to support a technology transitions discontinuance application and to rely on publicly available information to make the requisite showing is consistent with previous Commission action.[145]  We find that this flexible approach will minimize burdens on carriers while safeguarding consumers' need for an adequate replacement service.

39.       Permitting third-party alternative voice service with access to 911 and substantially similar levels of network performance and availability as the service being discontinued to serve as a replacement service will enable innovative new service offerings, such as low-earth orbit satellite-based services, to qualify as replacement services without requiring the Commission to engage in additional time-consuming rulemaking proceedings and is consistent with both our standards applicable to voice services funded by our modernized high-cost universal service support mechanisms discussed earlier in this section and the standards the Commission previously adopted in connection with the Adequate Replacement Test.[146]

---

[140] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5344, para. 33.  This analysis is not limited to residential subscribers alone, and should include enterprise subscribers.

[141] *See* USTelecom Mar. 19, 2026 *Ex Parte* Letter at 6-7.

[142] *See* 47 CFR pt. 9.

[143] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8314, para. 91; Testing Clarification Order, 40 FCC Rcd 2014; *see also* USTelecom Mar. 19, 2026 *Ex Parte* Letter at 6-7.

[144] *See* Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 3.

[145] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8311-12, paras. 84-86

[146] *See* USTelecom Comments at 11 (in the context of proposing conditional forbearance from section 214 discontinuance obligations, asserting that "any service offering with higher download and upload speeds and less than 200 ms mouth-to-ear latency enables a more-than-sufficient alternative to legacy voice service"); Fiber Broadband Ass'n Reply at 2-3 & n.8 (in the context of supporting USTelecom's conditional forbearance proposal, agreeing with the proposed "technical standard for what constitutes a suitable replacement voice service"—i.e., voice service "provided over any commercially available broadband network that offers less than 200 ms mouth-to-ear latency").  *But see* NTCA Comments at 7-8 (asserting that this category of replacement service requires a fact-intensive review); Public Knowledge/CWA Comments at 13 (opposing all of the specific categories of replacement

(continued….)

40.        We find that the standards we adopt for eligibility of a widely available alternative voice service for streamlined processing obviate NTCA's concerns regarding that the proposed widely adopted alternative voice service category as set forth in the *Network and Services Modernization Notice* is a "highly detailed and fact-specific view of a particular market/geographic area," and that such a "fact-specific inquiry is more suited to a waiver proceeding under which the Commission can analyze data brought forth by a petitioning provider as opposed to utilizing a certification that fails to analyze such data across the market in question."[147]  We further find that these standards address the concerns raised by Public Knowledge after release of the public draft of this Order that this replacement service category would not afford sufficient safeguards for consumers and thus might incentivize discontinuing carriers to rely on third-party services for which they do not need to make the showings required when relying on the carrier's own already-available alternative voice service.[148]  The standards we adopt today for this alternative service option provide sufficient backstops to provide predictability and protect consumers.  Moreover, as we have noted above, our streamlined processing rules still require carriers to notify customers of their applications to discontinue service and provide information regarding replacement service options.[149]  Customers with concerns about the adequacy of the purportedly "widely available" alternative service, as well as other interested parties, can file comments or objections to an application for streamlined processing with the Commission,[150] and the Bureau has the discretion to remove the application from streamlined processing for further review, including the ability to request supplemental information from the applicant.[151]  We further expressly delegate to the Bureau the authority to remove from streamlined processing an application relying on this category of replacement service if the service has little to no customers.  Bureau staff may consider the extent to which the widely available service has been adopted outside the affected service area.  We find that these safeguards address commenter concerns raised in the record[152] and obviate the need for staff to conduct such time-consuming reviews of every application filed relying on this category of replacement service.

### b.        Voice Service Need Not be Offered on a Stand-alone Basis to be Considered an Adequate Replacement

41.        We affirm the Bureau's finding in the *Stand-Alone and Single-Service Waiver Order* that VoIP need not be offered on a stand-alone basis to be considered an adequate replacement[153] and thus decline to impose such a requirement in the consolidated technology transitions rule we adopt today.[154]  In

services proposed in the *Network and Services Modernization Notice*); NASUCA et al. Reply at 12-14 (opposing all of the specific categories of replacement services proposed in the *Network and Services Modernization Notice*).

[147] NTCA Comments at 7-8.

[148] Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 2-3.

[149] 47 CFR § 63.71(a).

[150] *See Second Wireline Infrastructure Order*, 33 FCC Rcd at 5677, para. 37.

[151] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8309-10, paras. 76, 78.

[152] *See, e.g.*, Public Knowledge/CWA Comments at 13-14 ("Under the language of the NPRM, a carrier could 'make available' a service of poor quality and – without regard to any customer experience, or even use by a single customer – certify it as a replacement service."); Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 2-3.

[153] *Stand-Alone and Single-Service Waiver Order*, 40 FCC Rcd at 2002-03, para. 6.

[154] *See* AARP Comments at 3, 12 (urging the Commission to require that for VoIP to be considered an adequate replacement, it must be offered on an unbundled basis so that those seeking voice-only services need not purchase bundled packages that may include broadband and/or video services and which may be more expensive).  We note that while bundled services that include VoIP may still be considered an adequate replacement, broadband-only service would *not* qualify under this rule as an acceptable replacement service.  Broadband provides fundamentally different functionality from traditional voice telephony, and while it does enable users to engage in activities such as email and messaging, it is not an adequate replacement for voice telephony service for the purposes of our

doing so, we conclude that the record in this proceeding supports both the Bureau's finding in that *Order* that the elimination of the stand-alone requirement is warranted due to rapid developments in the communications marketplace since the adoption of the Alternative Options Test and extending that finding to apply to each of the categories of replacement service delineated in the consolidated technology transitions discontinuance rule we adopt today.[155]

42. Since the Commission adopted its Alternative Options Test with its stand-alone requirement, the technologies associated with voice services have improved and the marketplace for voice services, such as interconnected VoIP and mobile voice, has vastly expanded and spurred the creation of new and innovative communications technologies and bundled service offerings that benefit consumers.[156] While interconnected VoIP lines accounted for just 60% of all wireline retail voice service connections in December 2018,[157] that number had already risen to almost 80% by the end of 2024.[158] The number of legacy switched access connections has also dropped precipitously since the adoption of the Alternative Options Test, and the number of fixed broadband connections that support over-the-top interconnected VoIP service has risen from 61 residential fixed broadband connections per 100 households with speeds of at least 25 Mbps/3 Mbps in 2018 to 91 by December 2024.[159]

43. The proliferation of interconnected VoIP providers has "brought advanced communications services to the marketplace to the benefit of consumers,"[160] and ensures that strong competition for IP-based voice service exists in every locality with broadband access. As of December 2023, more than three-quarters of adults in this country had gone fully wireless for their voice service.[161] As the Commission recently noted, "there are many other types of telecommunications offerings, including apps running solely on data networks that are nearly indistinguishable to the consumer from the core communications functionality of the public switched telephone network . . . [that] combine the benefits of voice, video, and text communications into one data-based service,"[162] obviating the need or desire for stand-alone voice service. These rapid changes in the marketplace have granted consumers access to a wide array of voice services with many capabilities, and in response few providers now offer stand-alone interconnected VoIP service.[163] Indeed, as the Commission recently noted, "there are many other types of telecommunications offerings, including apps running solely on data networks that are nearly indistinguishable to the consumer from the core communications functionality of the public switched telephone network . . . [that] combine the benefits of voice, video, and text communications into

(Continued from previous page) ────────────────
discontinuance rules. With that said, broadband facilities may be used to provision a qualifying voice replacement service.

[155] *Stand-Alone and Single-Service Waiver Order*, 40 FCC Rcd at 2003, para. 9.

[156] *See id.* at 2003-04, para. 9; USTelecom Waiver Petition at 2 & n.3.

[157] *See* 2018 Voice Telephone Services Report at 2-3.

[158] *See* FCC, Office of Economics and Analytics, Voice Telephone Services: Status as of December 31, 2024 at 2-3, Fig. 2 (2025), https://docs.fcc.gov/public/attachments/DOC-418460A1.pdf (December 2024 Voice Telephone Services Report).

[159] December 2024 Internet Access Services Report at 10; June 2018 Internet Access Services Report at 10.

[160] *Numbering Policies for Modern Communications et al.*, WC Docket Nos. 13-97 et al., Second Report and Order and Second Further Notice of Proposed Rulemaking, 38 FCC Rcd 8951, 8952, para. 1 (2023).

[161] *2024 Communications Marketplace Report*, 39 FCC Rcd at 14234, para. 158 (noting that "preliminary data from the Centers for Disease Control and Prevention (CDC), as of December 2023, approximately 76% of adults lived in a wireless-only household in late 2023, with adults in lower age-groups more likely to live in wireless-only households"); *see also* Fiber Broadband Ass'n Comments at 5; WTA Comments at 3.

[162] *2024 Communications Marketplace Report*, 39 FCC Rcd at 14232, para. 154.

[163] USTelecom Waiver Petition at 7-8.

one data-based service."[164]

44.　　We disagree with commenters who contend that consumers must retain access to stand-alone voice service separate from a bundled broadband service simply to obtain and maintain access to voice communications.[165]　The fact that technologically advanced VoIP services may only be available in certain areas and from certain providers bundled with broadband, text messaging, or some other service should not preclude it being considered an adequate replacement if the price the consumer would pay for the bundle is comparable to the price the consumer pays for the legacy voice service or is otherwise affordable.[166]

45.　　We agree with the Bureau that the Commission's findings in the *2024 Communications Marketplace Report* about the variety of services now available to consumers obviates the need for stand-alone voice service.[167]　We require applicants to provide pricing information so that the Bureau can compare the price of the legacy voice service to post-promotional and non-sale pricing of any bundled options carriers might rely on as a replacement service in order to consider the likelihood of any unreasonable price increases for consumers.[168]　When it adopted the Adequate Replacement Test, the Commission required that a technology transitions discontinuance application include, among other things, the information set forth in section 63.505.[169]　Among other things, section 63.505 requires that a discontinuance application include the "difference, if any, between present charges to the public and charges for the service to be substituted."[170]　We conclude that maintaining the requirement to provide this information will ensure that Bureau staff have this important information when evaluating such applications.

46.　　Carriers are still required under our streamlined processing rules to notify their customers of their applications to discontinue service and provide information regarding replacement service options and the customers' ability to object to the proposed discontinuance, and we note that this broad requirement encompasses particular demographics raised in the record, such as customers in rural areas or older customers.[171]　While an application may be eligible for streamlined treatment under the rule we adopt today by the applicant demonstrating the availability of its own or another voice service throughout the affected area that may only be available on a bundled basis, customers with concerns about the

---

[164] *2024 Communications Marketplace Report*, 39 FCC Rcd at 14232, para. 154.

[165] *See* NTCA Comments at 6; Public Knowledge/CWA Comments at 17-18; Michigan PSC Reply at 5.

[166] *2016 Technology Transitions Order*, 31 FCC Rcd at 8307, para. 71 (noting that the four factors considered by the Commission, aside from the adequacy of the replacement service, when evaluating discontinuance applications "offer a traditional balancing of the financial and competitive needs of industry against the values of consumer affordability and expectations"); *id.* at 8345, para. 171 (noting that "affordability already plays an important role in our pre-existing evaluation process"); *id.* at 8346, para. 174; *see also* USTelecom Waiver Petition at 2 n.4 ("Many large providers do not enable consumers to purchase voice service on a stand-alone basis.").

[167] *Stand-Alone and Single-Service Waiver Order*, 40 FCC Rcd at 2003, para. 9.

[168] *See infra* Section III.B.6 (discussing the incorporation of application content requirements in section 63.71(c)(5)); *see also* AARP Comments at 11 (urging "the Commission to consider . . . 'increased charges for alternative services'"); Public Knowledge Mar. 13, 2026 Ex Parte Letter at 4-5 (asking that the Commission "prevent carriers from engaging in a "bait and switch," such as providing introductory low rates it reports on its application, only to raise the rates after the discontinuance" or " comparing seasonal or infrequent sale prices [for third-party replacement services] with the carrier's standard subscription fee").

[169] 47 CFR § 63.602(a)(1); *see also Technology Transitions Order*, 31 FCC Rcd at 8348, para. 176; *see also id*. at 8345, para. 171 (noting that "affordability already plays an important role in [the Commission's] pre-existing evaluation process").

[170] 47 CFR § 63.505(e).

[171] *Id.* § 63.71(a); *see also* AARP Reply at 9.

adequacy or affordability of a replacement service, as well as other interested parties, may file comments or objections to that carrier's discontinuance application with the Commission.[172]

47.     The Commission's standards for processing streamlined and non-streamlined applications for discontinuance continue to apply regardless of whether the replacement service is available on a stand-alone or bundled basis.  If the Bureau has concerns regarding whether it is in the public interest to grant a particular request to discontinue service, it can remove that application from streamlined processing and engage in a further review,[173] which may include looking at whether bundled services that include interconnected VoIP could result in raised consumer prices or reduced voice service quality.  With the added safeguard of the requirement that an application disclose pricing differential information, we thus reject AARP's request and affirm the finding in the *Stand-Alone and Single-Service Waiver Order* that interconnected VoIP need not be offered on a stand-alone basis to be considered an adequate replacement.[174]

### c.     Access to Emergency Services

48.     We find that the rules we adopt today are sufficient to safeguard access to emergency services.  In the record, several commenters urged the Commission to take steps to ensure that any revisions to our discontinuance rules not reduce or otherwise impair access to 911 service to any part of the affected community.[175]  We agree with these commenters that modernizing our discontinuance rules cannot come at the expense of legitimate safety concerns and that consumers must be able to rely on swift and accurate access to emergency services.  We add certain safeguards for discontinuances related to trunk lines, 911 TDM circuits, TDM private line circuits, and transport services that provide 911 connectivity as one way to address this concern, as explained below.[176]  Providers of voice service remain subject to our 911 and outage reporting requirements,[177] and it is our expectation that the speedy implementation of NG911 will greatly improve the success, reliability, and accessibility of 911.[178]  At the same time, we must facilitate the transition away from deteriorating, outdated networks that could ultimately jeopardize access to emergency services.

---

[172] *See Second Wireline Infrastructure Order*, 33 FCC Rcd at 5677, 5679-80, paras. 37, 42; *see also* NTCA Comments at 6 (stating that any "replacement service assessment under the consolidated rule must preserve the availability of standalone voice options at reasonable rates"), Public Knowledge/CWA Comments at 17-18 (raising concerns about the relative cost of bundled services that include facilities-based interconnected VoIP service); Michigan PSC Reply at 5 (citing the language from NTCA's comments regarding reasonable rates).  More generally, when evaluating discontinuance applications, the Bureau will continue to evaluate the cost of alternative services in a manner appropriate to the circumstances, and we therefore need not go further in adopting specific requirements governing pricing or pricing information as some have proposed.  *See, e.g.*, Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 4-5 (expressing concern about reliance on infrequently offered prices); NTCA Mar. 13, 2026 *Ex Parte* Letter at 2.

[173] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8309-10, paras. 76, 78.

[174] *Stand-Alone and Single-Service Waiver Order*, 40 FCC Rcd at 2002-03, para. 6.

[175] *See generally* AICC Comments; Bandwidth Comments; Intrado Comments; *see also* AARP Comments at 3-4; NENA Comments at 2; Pennsylvania PUC Comments at 6-7; Public Knowledge/CWA Comments at 8-9; AARP Reply Comments at 3-7; Michigan PSC Reply Comments at 2-4; NTCA Reply Comments at 5-6.

[176] *See infra* Section III.B.3; Appx. A, § 63.71(c)(7).

[177] *See* 47 CFR §§ 4.3-4.18, pt. 9.

[178] *See* FCC, *Next Generation 911 (NG911) Services*, https://www.fcc.gov/policy-and-licensing-division/911-services/NG911 (last visited Mar. 20, 2026) ("In the transition to NG911, state and local 911 authorities are replacing legacy 911 technology with IP-based infrastructure that will support new 911 capabilities, including text, video, and data, and that will improve 911 interoperability, security, and system resilience."); 911.gov, *Next Generation 911*, https://www.911.gov/issues/ng911/ (last visited Mar. 20, 2026).

49.     While some commenters are concerned that replacing plain old telephone service (POTS) provided over copper lines with IP-based service over fiber, wireless, or satellite networks could jeopardize communications during emergencies,[179] the experiences of rural commenters demonstrate that such concerns, while certainly well intentioned, may be misplaced.[180]  Deteriorating copper is more susceptible to adverse weather events than fiber[181] and requires more time to restore than alternative services like mobile wireless.[182]  And alternative voice services can still work during outages or emergencies.[183]  For example, mobile wireless services are designed to work during cellular network outages through built-in redundancies such as cellular failover and satellite connectivity.[184]  Additionally,

---

[179] *See, e.g.*, National Center for Frontier Communities Comments; NENA Comments at 2; Public Knowledge/CWA Comments at 8-9; AARP Reply at 3-7; Michigan PSC Reply at 2-4; NTCA Reply at 5-6.

[180] *See, e.g.*, Rural Agricultural Council of America Comments at 2 ("Americans in rural and agricultural communities rely just as much—if not more—on robust, redundant network options for public safety.  First responders are already migrating away from legacy copper, adopting fiber, VoIP, and wireless solutions that provide improved reliability and advanced 911 features such as location data, texts to 911, and multimedia capabilities.  Today, over 90% of 911 calls are made from mobile devices and these modern platforms offer superior resilience during outages, floods, or emergencies."); *see also* 2025 FBA-Cartesian Fiber Deployment Cost Report at 31 (asserting that BEAD "projects will bring fiber to all corners of the US and connect more rural communities than ever before" and that "sentiment around fiber as a resilient, long-term broadband technology remains strong").

[181] *See, e.g.*, USTelecom Comments at 17-18; International Center for Law & Economics Comments at 6 (noting that copper networks "are increasingly expensive to operate, consume substantial amounts of power, and are prone to weather-related damage and frequent outages"); Mark J. Fletcher Comments at 2 (asserting that copper "is deteriorating in the field" and that fiber "is functionally ageless," and "doesn't corrode, fatigue, or degrade the way copper does"); Rural Agricultural Council of America Comments at 2.

[182] *See* USTelecom Comments at 17; *Why Does Fiber Internet Perform Better During Bad Weather?*, Hunter Communications (Mar. 21, 2025), https://hunterfiber.com/fiber-internet-performs-better-during-bad-weather/#:~:text=Unlike%20copper%20wires%2C%20which%20are%20prone%20to,severe%20thunderstorms%2C%20heavy%20snowfall%2C%20or%20extreme%20humidity ("Unlike copper wires, which are prone to corrosion, fiber-optic cables do not conduct electricity, making them impervious to lightning strikes, electrical interference, and moisture-related damage.  This allows fiber networks to operate smoothly even during severe thunderstorms, heavy snowfall, or extreme humidity."); *Comparing the Durability of Fiber Optic and Copper Cables*, Linden Photonics, Inc. (Sept. 4, 2024), https://www.lindenphotonics.com/comparing-the-durability-of-fiber-optic-and-copper-cables (stating that fiber optic cables are less susceptible to corrosion, can function effectively in a wide range of temperatures, generally have a longer lifespan than copper cables because they do not degrade as quickly, and are generally cheaper due to reduced maintenance costs and longer lifespan, particularly in "environments where durability is critical").

[183] *See, e.g.*, Rural Agricultural Council of America Comments at 2 (noting that "[t]oday, over 90% of 911 calls are made from mobile devices and these modern platforms offer superior resilience during outages, floods, or emergencies"); *Facilitating Implementation of Next Generation 911 Services (NG911); Location-Based Routing for Wireless 911 Calls*, PS Docket Nos. 21-479, 18-64, Report and Order, 39 FCC Rcd 8137, 8172, para. 73 (2024) (stating that IP delivery will materially reduce the number of 911 outages through improved network reliability) (citing to an *ex parte* submission by Intrado in that proceeding); *id.* at 8217, para. 174 ("[T]he implementation of NG911 is far more likely to reduce the risk of dropped 911 calls than to increase it.  OSPs that make the necessary changes to fully implement NG911 will be able to leverage improvements to 911 security and reliability, including the ability to reroute 911 calls in response to network congestion or outages.").

[184] *See, e.g.*, *What is Cellular Failover?*, Inseego (Mar. 18, 2025), https://inseego.com/resources/blog/what-is-cellular-failover/ ("Cellular failover solutions use a combination of 4G LTE/5G cellular networks and dual-SIM routers to provide a backup connection if the primary connection fails.  The dual-SIM routers are connected to both the primary and secondary networks, and the router will switch to the secondary connection when needed."); *Network outages: Common causes and how to stay connected*, AT&T (2026), https://www.att.com/wireless/stay-connected-during-network-outages (recommending that consumers connect to Wi-Fi for a data connection and activate Wi-Fi calling on their device for voice calls during network outages); *How to connect to emergency satellite on iPhone and Android during natural disasters*, Leah Sarnoff, ABC News (Oct. 10, 2024),

(continued….)

interconnected VoIP service will continue to work during a power outage if Internet service is operational and the end user maintains a backup power supply.[185] And despite commenter arguments that phone service provisioned over copper lines always works during a power outage,[186] this is not true. Utility poles that carry copper can and do go down during severe weather events and natural disasters, cutting off both service and power to residents and businesses, while not all alternative services are vulnerable to the same type of disruption.[187]

### d. Accessibility

50. As we clear the way for providers to replace legacy networks and services with modern technologies, we expect that the technology transitions expedited by today's Order will speed the availability of advanced Internet-based accessibility solutions.[188] With regard to telecommunications relay services (TRS) specifically, the Commission has recently initiated proceedings to modernize TRS to ensure that those services remain effective, accessible, and sustainable for the individuals who use them.[189] We believe that the Commission's comprehensive review in that proceeding is the appropriate avenue to address the needs of relay users in the transition to Internet-based alternatives from analog relay services. Significantly, carriers remain obligated to comply with all accessibility requirements applicable to the services they offer and provide, and Bureau staff may remove applications from streamlined processing, if necessary, to review any concerns regarding the accessibility of the proffered replacement service. We thus decline to adopt an accessibility-specific requirement as part of the service discontinuance review under section 214 in this Order.

---

(Continued from previous page) ───────────────

https://6abc.com/post/how-connect-emergency-satellite-iphone-android/15412132/ (detailing how to connect mobile devices to a satellite during cellular network outages in order to text emergency services, request roadside assistance, message friends and family, and share locations).

[185] *See, e.g.*, FCC, *FCC/FEMA Emergency Communications Tips*, https://www.fcc.gov/emergency; *see also Ensuring Continuity of 911 Communications*, PS Docket No. 14-174, Report and Order, 30 FCC Rcd 8677, 8678-79, paras. 1-4 (2015); *Do VoIP Phones Work During a Power Outage? What You Need to Know for Emergency Communication*, Interwest Communications (Mar. 20, 2025), https://www.interwestcommunications.com/blog/do-voip-phones-work-during-a-power-outage/ (asserting that VoIP phones continue to work during a power outage if backup power and internet connectivity are maintained); *VoIP Reliability in a Power Outage: What You Need to Know*, Dice Communications, https://dicecommunications.com/voip-reliability-in-a-power-outage-what-you-need-to-know (last visited Jan. 16, 2026) (confirming that VoIP will continue to operate during power outages through the use of backup power).

[186] Wired Broadband, Inc. et al. Comments at 5-7; Physicians for Safe Technology Comments at 1.

[187] *See, e.g.*, Rebecca Egan McCarthy & Jake Bittle, *The winter storm exposed the grid's real weakness: Lots of old poles*, Grist (Jan. 28, 2026), https://grist.org/energy/winter-storm-fern-utility-poles-wires-electricity-grid/; Associated Press, *Pa. storm leaves 3 dead, about 450,000 customers without power*, The Morning Call (Apr. 30, 2025), https://www.mcall.com/2025/04/30/pa-storm-3-deaths-power-outages/; Peter Behr, *Widespread power outages block Helene recovery*, E&E News by Politico (Oct. 1, 2024), https://www.eenews.net/articles/widespread-power-outages-block-helene-recovery/; Travis Jacques Rose, *Helene caused multi-day power outages in Powdersville, Belton; 'looks like a war zone'*, Independent Mail (Oct. 7, 2024), https://www.independentmail.com/story/news/local/2024/10/07/anderson-county-powdersville-belton-honea-path-tropical-storm-helene-power-outages-boil-water/75464426007/.

[188] *See TRS Modernization Notice* at 4, para. 8 (noting the "significant transformation[]" of the TRS landscape and that [t]hese developments include a decline in the use of analog relay services, the emergence of advanced Internet-based solutions, and the integration of accessible communications functionalities into smart devices"); *id.* at 6-9, paras. 12-18; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities et al.*, CG Docket No. 03-123 et al., Notice of Proposed Rulemaking, FCC 26-4 (rel. Jan. 30, 2026) (*IP TRS Modernization Notice*).

[189] *See TRS Modernization Notice* at 6-9, paras. 12-18.

51. In their comments, the Accessibility Organizations argue that "any replacement test the FCC adopts should require carriers to explain, with specific examples, how at least one replacement service offered permits [individuals who are deaf, deafblind, hard-of-hearing, or who have speech disabilities] to access TRS and effectively engage in other telephone communications."[190]

52. In the *TRS Modernization Notice* adopted in November 2025, the Commission, in light of technological advances and declining use of analog relay services, sought to ensure that "relay services remain effective, accessible, and sustainable for individuals who are deaf, hard of hearing, deafblind, or have speech disabilities, by proposing a series of reforms to transition users to Internet-based alternatives."[191] We agree with Hamilton Relay that the *TRS Modernization* proceeding—which focuses on reforms designed to ensure that relay services remain effective, accessible, and sustainable as technology advances and networks transition—is the best venue in which to address any TRS issues related to technology transitions.[192] However, we find that expanding IP-based services through streamlined technology transitions will work hand-in-hand with the *TRS Modernization* proceeding to ensure that no individuals who are deaf, deafblind, deafdisabled, hard of hearing, or who have speech disabilities are left without access to services that are functionally equivalent to those provided to voice telephony users.[193] Concerns regarding the accessibility features of the five categories of replacement services contained in the consolidated technology transitions discontinuance rule we adopt today should be addressed in that proceeding.

### e. Other Issues

53. *Technology transition definition*. In the *Network and Services Modernization Notice*, we sought comment on whether we should retain the definition of "technology transition" in section 64.60(i) of our rules or whether we should adopt a different definition.[194] Section 64.60(i) currently defines a "technology transition" as "any change in service that would result in the replacement of a wireline TDM-based voice service with a service using a different technology or medium for transmission to the end user, whether internet Protocol (IP), wireless, or another type . . . ."[195] We received no comments on this proposal. Because we still consider the existing language to be an accurate and comprehensive definition of the term "technology transition" for purposes of our discontinuance rules, we retain it at this time.

54. *Edge cases requiring additional time*. We recognize that there are some instances—as in the case of isolated rural facilities, critical access hospitals,[196] or customers with unique accessibility issues[197]—in which discontinuances may require more time than is provided for by our streamlined processing to avoid stranding consumers without access to voice services. Carriers seeking to avail themselves of our streamlined processing rules for a technology transitions discontinuance are required to

---

[190] Accessibility Organizations Comments at 4-5; *see also* AARP Reply at 8; Michigan PSC Reply at 3.

[191] *TRS Modernization Notice* at 2, para. 1.

[192] *See* Hamilton Relay Reply at 3.

[193] As Chairman Carr noted when the Commission adopted the *IP TRS Modernization Notice*, "this action supports our broader effort to encourage the IP transition. As we make the transition, we are mindful of consumer protection provisions and necessary updates to them like those we propose today." *IP TRS Modernization Notice* at 50 (Statement of Chairman Brendan Carr).

[194] *Network and Services Modernization Notice*, 40 FCC Rcd at 5340, para. 27.

[195] 47 CFR § 63.60(i).

[196] *Rural Health Care Support Mechanism*, WC Docket No. 02-60, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 18 FCC Rcd 24546, 24553, n.37 (2003) (defining "critical access hospitals" as "limited-service rural non- or for-profit hospitals that provide outpatient and short-term inpatient hospital care on an urgent or emergency basis, then release patients or transfer them to a full-service hospital").

[197] Center for Regulatory Freedom Comments at 3.

notify customers of their plan to discontinue a service and must show the availability of at least one of the replacement services enumerated above.[198]  Any customers with concerns, as well as other interested parties, can file comments or objections to specific applications with the Commission.[199]  Should the Bureau have any concerns about whether it is in the public interest to grant a particular request to discontinue service, it will remove the application from streamlined processing for further review,[200] thus mitigating the risk that customers will be left without voice services in the wake of a discontinuance.  In cases where a party submits plausible objections to a specific discontinuance application based on critical access needs,[201] the Bureau may determine that it is appropriate to remove the application from streamlined processing so that it may work with the discontinuing carrier to ensure that no at-risk customers are left stranded.[202]

55.　　To ensure that this process operates as intended, we direct the Wireline Competition Bureau to (1) create a master docket number for consumer section 214 discontinuance objections or comments, (2) work with the Office of the Managing Director to make any necessary changes to the Electronic Comment Filing System to accommodate such consumer objections, and (3) release a Public Notice announcing the opening of the master docket and providing instructions for discontinuing carriers. Additionally, we require carriers seeking Commission authorization for a technology transitions discontinuance application to include in their notice to customers of such planned discontinuances specific information as to how a customer who wants to object to a specific proposed discontinuance of service will be able to do so, including but not limited to providing the master docket number for such objections and the webpage(s) identified by the Bureau for further guidance and resources to file an objection or comment.

56.　　*Consumer outreach and education*.  We decline to adopt any specific consumer outreach and education requirements in connection with the discontinuance rules we adopt today.  While some commenters assert that comprehensive consumer outreach and education are essential to minimizing the potential for consumer harm during any technology transition,[203] we find, consistent with prior Commission action in this regard,[204] that any such requirements would be unduly burdensome in light of current marketplace incentives for carriers to provide customers with timely and necessary information regarding replacement voice services when those carriers seek to cease offering legacy TDM voice service.  As noted previously, the Commission also puts discontinuance applications on public notice,

---

[198] 47 CFR §§ 63.71(a) (requiring customer notice of a planned discontinuance), 63.505 (requiring in the discontinuance application a "[s]tatement of the factors showing that neither present nor future public convenience and necessity would be adversely affected by the granting of the application"); Appx. A. § 63.71(f)(2); *see also supra* Section III.B.1.

[199] *See Second Wireline Infrastructure Order*, 33 FCC Rcd at 5677, para. 37.

[200] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8309-10, paras. 76, 78.

[201] *See IP-Enabled Services et al.*, WC Docket No. 04-36 et al., Report and Order, 22 FCC Rcd 11275, 11338, (2007) (statement of Commissioner Jonathan S. Adelstein) (stating in the context of extending disability access requirements to providers of interconnected VoIP that "[t]his accessibility is critical in order to promote the independence of persons with disabilities, participation in our society, and critical access in emergency situations").

[202] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8300, para. 83, 8309-10, para. 51 (noting that "the Commission's discontinuance rules grant the Commission discretion to remove an application from streamlined treatment when the public interest demands a more searching review" and that it has done so "when addressing discontinuance applications that raised significant issues that required further scrutiny to protect consumers and the public interest").

[203] *See* AARP Comments at 7-8; Michigan PSC Reply Comments at 4; *see also generally* Vermont PUC Comments; Center for Regulatory Freedom Comments.

[204] *Second Wireline Infrastructure Order*, 33 FCC Rcd at 5668-72, paras. 22-28 (eliminating the uncodified education and outreach mandates adopted in the *2016 Technology Transitions Order*).

which triggers the discontinuance review process and gives affected customers and other interested parties an opportunity to comment on or object to an application.  If customers facing a discontinuance of their legacy voice service do not believe they have sufficient data regarding a replacement service from a carrier seeking Commission approval to discontinue a legacy voice service, they can raise these objections with the Commission and ask the Commission to remove the application from streamlined processing for further review.

57.    There are strong marketplace incentives for providers to communicate with and educate customers regarding replacement services related to their technology transitions.  As the Commission has previously found, competition among carriers and differing technologies encourages carriers to communicate with customers to retain them and remain competitive.[205]  Carriers' ongoing customer relationship experience best positions them to understand and implement effective customer education and communication strategies.[206]  Our existing rules ensure that carriers make available necessary information to consumers regarding replacement voice services when those carriers seek to discontinue legacy voice services.  We thus decline to adopt specific consumer outreach and education requirements in connection with the discontinuance rules we adopt today, requirements that would be redundant in light of our existing regulatory framework and notice requirements.

58.    *Additional commenter proposals*.  We decline to adopt USTelecom's proposal that we begin the 31-day period before streamlined applications are automatically granted when the provider submits its application to the Bureau, instead of the date the Bureau issues a Public Notice of the proposed discontinuance.[207]  While existing customers who would potentially be affected by a discontinuance will have received notice no later than when the carrier files its application,[208] other interested parties in an affected area are only made aware of the discontinuance application and given time to comment after the Bureau releases a Public Notice of the discontinuance application.  The process also enables the Bureau to confirm that an application is complete before letting the "clock" begin for a streamlined approval, consistent with section 214(a)'s mandate that the Commission consider whether a discontinuance will adversely affect the future public convenience and necessity.[209]  This benefit outweighs any short potential delays experienced by providers as a result of this requirement.[210]  We note Bureau staff's diligence in releasing Public Notices once applications are posted to the Commission's Electronic Comment Filing System (ECFS) and their speed in processing applications once they are complete.  However, to ensure that application processing is not unreasonably delayed, we direct the Bureau to release a Public Notice of a complete discontinuance application filing as soon as practicable but not later than ten business days of when the application is posted to the Commission's ECFS or, if the application is not complete, to communicate deficiencies in the application to the applicant within that timeframe.

59.    We also decline to adopt USTelecom's proposal that we establish specific restrictions governing when the Commission can remove discontinuance applications from streamlined processing, and a timeline for the Bureau to act on an application after removing it from streamlined processing.[211]  In light of the above-discussed changes consolidating the applicable tests for technology transitions

---

[205] *Id.* at 5669, para. 23 (citing *First Wireline Infrastructure Order*, 32 FCC Rcd at 11147, para. 45).

[206] *Id.* at 5672, para. 27.

[207] *See* USTelecom Comments at 24-25.

[208] *See* 47 CFR § 63.71(a).

[209] 47 U.S.C. § 214(a).

[210] *See* USTelecom Comments at 24-25.

[211] *See id.* at 25-26; *see also* Letter from Trint Hatt, Exec. Dir., Ohio Telecom Ass'n, and Megan Mauro, Interim Pres. & CEO, Texas Ass'n of Business, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-209, 25-208, at 3 (filed Mar. 19, 2026) (Ohio Telecom Ass'n and Texas Ass'n of Business Mar. 19, 2026 *Ex Parte* Letter).

discontinuances and expanding the range of applications eligible for a 31-day streamlined review, it is not necessary to adopt additional rules restricting the Bureau's application review or creating additional time periods for objections and responses.  USTelecom does not point to specific applications that have previously been subject to unnecessary discretionary delay under the current rules.  Indeed, over the last five years, Bureau staff have removed only 11 discontinuance applications from streamlined processing, nine of which were in 2025 and were the result of a shutdown of certain agency operations due to a lapse in federal appropriations.  In all 11 instances, staff released Public Notices granting all of those applications 51 days after such removal.  And we believe that the rule changes we adopt today will make delay even less likely, because this Order broadens and clarifies the circumstances in which an alternative service is to be considered an adequate replacement for the service being discontinued.  The Commission therefore maintains the necessary flexibility to address proposed discontinuances that would otherwise result in the loss of service altogether, while the treatment of discontinuances that include an adequate replacement for customers is clarified and expedited.

### 2. Eliminating Grandfathering Filing Requirements for Certain Services

60.        We revise our rules to grant blanket section 214(a) authority for carriers to grandfather the following services to the extent they come within the purview of section 214(a):  (1) any legacy voice service; (2) any lower-speed data telecommunications service; and (3) any interconnected VoIP service provisioned over copper wire.[212]  We define low-speed data telecommunications services as those operating at speeds below 25/3 Mbps while we consider forbearance from the incumbent LEC-specific interconnection and related obligations as proposed in the *IP Interconnection Notice*, after which we will revisit this definition.[213]  This blanket grant of authority eliminates the need for carriers to file a section 214(a) application when grandfathering these services, allowing carriers to focus their resources on the development and deployment of next-generation networks while still providing service to current customers.

61.        In the *Network and Services Modernization Notice*, we proposed to codify the relief granted in the Bureau's *March 2025 Grandfathering Order* and *May 2025 Grandfathering and Technical Appendix Order*.[214]  In the *March 2025 Grandfathering Order*, the Bureau granted section 214(a) authority for carriers to grandfather any legacy voice or telecommunications data service covered by sections 63.71(k)-(1) of the Commission's rules and waived the requirement that carriers file a section 214(a) application seeking Commission authorization in that instance.[215]  The *May 2025 Grandfathering and Technical Appendix Order* extended the relief granted in the *March 2025 Grandfathering Order* to interconnected VoIP service provisioned over copper lines.[216]  The Bureau determined in both *Orders* that granting blanket section 214(a) authority was warranted due to developments in communications technologies that allow consumers to be less dependent on these legacy services.[217]

---

[212] *See VoIP Discontinuance Order*, 24 FCC Rcd 6039, 6044-47, paras. 9-13 (2009) (*VoIP Discontinuance Order*) (exercising ancillary authority under Title I of the Act to extend section 214 discontinuance obligations to interconnected VoIP service providers).

[213] This definition is consistent with sections 63.71(k)-(l) of our current rules.  47 CFR §§ 63.71(k)-(l); *see also March 2025 Grandfathering Order*, 40 FCC Rcd at 2021, para. 6; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3360, para. 9; *IP Interconnection Notice* at 3, para. 4.

[214] *Network and Services Modernization Notice*, 40 FCC Rcd at 5356, para. 69; *March 2025 Grandfathering Order*, 40 FCC Rcd at 2021 para. 6; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3360, para. 9.

[215] *March 2025 Grandfathering Order*, 40 FCC Rcd at 2021, para 6.

[216] *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3360, para. 9.

[217] *March 2025 Grandfathering Order*, 40 FCC Rcd at 2023, para. 10; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3361, para. 12.

62.      We agree with commenters that eliminating unnecessary grandfathering requirements reduces carriers' burdens while not affecting existing subscribers, as current customers are entitled to keep the grandfathered service.[218]  A carrier still must file a discontinuance application seeking authority to permanently discontinue one of these services, and affected customers will be notified of the planned discontinuance and have the opportunity to comment.[219]  In the *March 2025 Grandfathering Order*, the Bureau noted that "carriers grandfathering these services will necessarily need to communicate to customers the grandfathering status of their service beforehand."[220]  We take the next step and require that carriers continue to notify current customers before grandfathering a service, including TDM-based transport services and services reliant on TDM-based trunk lines, 911 TDM circuits, and TDM private line circuits, which shall include (1) a "no earlier than" date, by which it intends to seek to permanently discontinue the service, and (2) a statement regarding alternative services available in the affected service area.[221]

63.      We retain a notification requirement because this relatively low burden on carriers will help ensure that customers learn as soon as possible that their service is likely to be discontinued at some point in the future, so they can make informed decisions about what services to purchase even before a discontinuance is imminent.[222]  And any customers that still subscribe to the grandfathered service when the carrier later seeks permanent discontinuance authority will have the ability to object and ask to have the application removed from streamlined processing.[223]  These requirements alleviate concerns raised in the record that eliminating the need to file grandfathering applications in the above scenarios will allow carriers to eliminate services without any notice.[224]

64.      We define "lower-speed" data telecommunications service for purposes of this blanket grant of authority consistent with our existing grandfathering rules—i.e., encompassing the data telecommunications services currently subject to sections 63.71(k) and (l) of our rules.[225]  We proposed in the *Network and Services Modernization Notice* to define lower-speed data telecommunications service as

---

[218] *See March 2025 Grandfathering Order*, 40 FCC Rcd at 2023-24, para. 11; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3361, para. 13; US Chamber of Commerce Comments at 1; WTA Comments at 4; USTelecom Comments at 35-36.  *But see* Bandwidth Feb. 27, 2026 *Ex Parte* Letter, Att. (proposing that the Commission except from any grant of blanket grandfathering authority low-speed data telecommunications services subject to sections 63.500 or 63.501).

[219] *March 2025 Grandfathering Order,* 40 FCC Rcd at 2021, para. 6; *May 2025 Grandfathering and Technical Appendix Order*, 40 FCC Rcd at 3361-63, para. 13.

[220] *March 2025 Grandfathering Order,* 40 FCC Rcd at 2021, para. 6.  Indeed, to the extent that an incumbent LEC has already retired its copper facilities before grandfathering or seeking to permanently discontinue any of the services covered by our actions today, it will have already engaged with its customers.  *See, e.g., 2016 Technology Transitions Order*, 31 FCC Rcd at 11147, para. 45 (noting incumbent LECs' "strong incentives to work closely with their retail customers in order to retain their business given the competition they face from competitive LECs, cable providers, and wireless providers" and that "these communications must necessarily occur for the incumbent LEC to continue providing the services to which its customers subscribe").  *But see* NASUCA et al. Reply at 17-24 ("Forbearance from . . . the Section 251(c)(5) public notice rules would remove the only transparent mechanism by which consumers, local governments, and competitive carriers can track where and when network changes occur."); Public Knowledge/CWA Comments at 10-16 ("The Commission should not dilute the remaining notice requirements. Impacted customers **already** face little notice and short timelines for the opportunity to urge the Commission to remove an application from streamlined treatment.") (emphasis in original).

[221] *See infra* Appx. A, § 63.71(j).

[222] INCOMPAS Comments at 8.

[223] 47 CFR §§ 63.71(a)(5), (f).

[224] *See* Rural County Representatives of California Comments at 4.

[225] *See* 47 CFR §§ 63.71(k)-(l); *see also infra* Appx. A, § 63.71(j).

a data telecommunications service operating at speeds below 25/3 Mbps.[226]  When the Commission adopted section 63.71(k), which allows streamlined treatment of applications to grandfather low-speed services, it defined that term as those operating at speeds below 1.544 Mbps.[227]  The Commission accounted for rising network speeds in the *Second Wireline Infrastructure Order* by extending the streamlined treatment of grandfathering applications to services operating at speeds below 25/3 Mbps if replaced with services operating at 25/3 Mbps or higher.[228]

65.     In connection with our proposed definition, we sought comment on whether we should define lower-speed service as services operating below 45 Mbps symmetrical "given the rapidly increasing bandwidths of networks today."[229]  As discussed below, we agree with commenters' concerns regarding potential unintended impacts, particularly for emergency services, if we raise the speed threshold for blanket grandfathering authority too soon.[230]  We thus find it appropriate to defer consideration of such action until after the Commission acts on the proposed forbearance from the incumbent LEC-specific interconnection and related obligations.[231]  Defining lower-speed data telecommunications service as those services operating under 25/3 Mbps strikes the appropriate balance between acknowledging the increased bandwidth capabilities of modern networks and minimizing any unintended impacts on emergency services.

66.     Finally, we decline to extend the scope of the blanket grandfathering authority we grant today to all interconnected VoIP services, regardless of transmission medium.[232]  While we agree with USTelecom that many consumers use interconnected VoIP lines provisioned over a variety of transmission mediums, we limit the blanket section 214(a) authority we grant today to interconnected VoIP services provisioned over copper lines to promote the ongoing transition from legacy and copper-based networks to IP networks.[233]  Many consumers use interconnected VoIP service as a replacement service[234] and have expectations about its availability, and we continue to find that the section 214(a) discontinuance requirements applicable to grandfathering for the majority of interconnected VoIP services is an important safeguard.[235]

### 3.     Additional Requirements for Applications to Discontinue a Service Supporting Interconnection Trunks or the Exchange of Traffic

67.     As part of the rules we adopt today, we require carriers seeking authority to discontinue a

---

[226] *Network and Services Modernization Notice,* 40 FCC Rcd at 5356, paras. 69-70.

[227] *First Wireline Infrastructure Order*, 32 FCC Rcd at 1161, para. 84.

[228] *Second Wireline Infrastructure Order*, 32 FCC Rcd at 5662-64, paras. 5, 7, 11.

[229] *Network and Services Modernization Notice,* 40 FCC Rcd at 5356, para. 70.

[230] *See* Intrado Comments at 12-13; Bandwidth Comments at 9-12; Rural County Representatives of California Comments at 4; *see also infra* Section III.B.3.

[231] *See* USTelecom Comments at 37 (stating that the definition of lower-speed data telecommunications service should be updated to speeds below 45 Mbps symmetrical).

[232] *See id.* at 35-36.

[233] *See* Intrado Comments at 1-2, 12-13 (describing the potential impact to emergency services should the Commission eliminate discontinuance requirements too quickly).

[234] Interconnected VoIP lines accounted for 79% of all retail voice service connections by June of 2024, the last time the Commission reported such data.  *See* December 2024 Voice Telephone Services Report at 3, Fig. 2.

[235] *See VoIP Discontinuance Order,* 24 FCC Rcd at 6043-49, paras. 8-17 (applying section 214(a) discontinuance requirements to interconnected VoIP service so customers have notice and to safeguard against "abrupt" changes to availability).

service supporting interconnection trunks or the exchange of traffic,[236] including but not limited to 911 trunks and 911 traffic—e.g., a discontinuance resulting from the decommissioning of one or more trunk lines, TDM lines directly connected to 911 selective routers, dedicated 911 TDM circuits, or TDM private line circuits, or the discontinuance of a TDM-based transport service—to specifically identify the service to be discontinued, not just the branded name of the service being discontinued.[237]  Carriers must also include in such discontinuance applications, in addition to the information required by sections 63.500 and 63.501,[238] (1) a statement that at least 90 days prior to the planned discontinuance filing, the carrier provided a designated point of contact with authority to facilitate the orderly transition from legacy facilities that support 911[239] to the 911 Authorities,[240] 911 service providers as defined above,[241] and directly interconnecting local exchange service providers that support essential functions within 911 networks, including delivering 911 traffic to selective routers for transmission to public safety answering points (PSAPs)[242] in the affected service area for coordination of the transition to ensure continued 911 connectivity,  and (2)  a list of providers that received notice as described above in the affected service area with which the carrier has coordinated and the date(s) of that coordination.[243]

68.        We expect the carrier's designated point of contact for facilitating the orderly transition to know whether to file either an application to dismantle or remove trunk lines, or an application to sever physical connections or to terminate or suspend interchange of traffic with another carrier.  We find that a pre-filing notice and coordination period of at least 90 days is sufficient and decline to adopt either a shorter or longer period.[244]  We similarly decline to adopt Intrado's request that we do not streamline discontinuance authorization requests "to dismantle circuits that carry 9-1-1- traffic" or to adopt a presumption that initial extension requests of up to 90 days should be presumed reasonable "if  the circuit

---

[236] *See* 47 CFR § 63.62(a)-(b) (requiring formal applications for the discontinuance of such services).

[237] *See* Bandwidth Comments at 4; Bandwidth Reply at 3-4; Intrado Comments at 10-11; *cf.* Bandwidth Feb. 27, 2026 *Ex Parte* Letter at 2 (asking the Commission to "require carriers filing Section 63.71 discontinuance applications to make clear the service does not support interconnection trunks and that no such service will be discontinued without filing an application under Section 63.500 or 63.501").

[238] 47 CFR §§ 63.500, 63.501.

[239] *See* Intrado Reply at 5; *see also* Letter from Diana Eisner, Vice Pres., Regulatory & Legal Affairs, USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-208, 25-209, at 2 (filed Feb. 5, 2026) (USTelecom Feb. 5, 2026 *Ex Parte* Letter).

[240] 47 CFR § 9.28 (defining 911 Authority as "[a] State, territorial, regional, Tribal, or local governmental entity that operates or has administrative authority over all or any aspect of a communications network for the receipt of 911 traffic at NG911 Delivery Points and for the transmission of such traffic from that point to PSAPs").

[241] *See supra* note 34.

[242] Bandwidth Mar. 17, 2026 *Ex Parte* Letter at 1; see also Letter from Christoper L. Shipley, Exec. Dir. Of Public Policy, INCOMPAS, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-209, 25-208, at 2 (filed Mar. 20, 2026) (INCOMPAS Mar. 20, 2026 *Ex Parte* Letter).

[243] *See Networks and Service Modernization Notice*, 40 FCC Rcd at 5349, 5358-59, paras. 44, 77.  We note that because our rules require carriers to send copies of their discontinuance applications to state public utility commissions, 47 CFR § 63.71(a), we do not need to amend our rules to include such notice, as proposed by certain commenters.  *See* NASNA Comments at 2-3; Pennsylvania PUC Reply at 8.

[244] *See, e.g.*, Letter from Lauren Kravetz, Vice President, Government Affairs, Intrado, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-208, 25-209, at 5 (filed Feb. 27, 2026) (Intrado Feb. 27, 2026 *Ex Parte* Letter) (in response to release of the public draft of this Order, asking for "180 days' advance notice before dedicated 9-1-1 circuits can be decommissioned"); Bandwidth Mar. 17, 2026 *Ex Parte* Letter at 1-2 (in response to release of the public draft of this Order, asking for extensions beyond 90 days); USTelecom Mar. 19, 2026 *Ex Parte* Letter at 7-8 (in response to release of the public draft of this Order, asking the Commission to reduce the pre-filing coordination to 30 days).

customer certifies to the circuit provider that the circuit in question is carrying live 9-1-1 traffic and there is no alternative available within the time frame of the notice."[245]  Rather, we expect the parties to work cooperatively during this pre-filing coordination period, including the granting of good faith requests from 911 service providers for reasonable extensions upon a showing of both continued live 911 traffic over the affected facilities and the lack of an alternative available within the timeframe of the planned discontinuance, to ensure that 911 continuity is not disrupted.[246]

69.     To comply with this certification requirement, we expect that carriers and service providers will engage in a planned and managed process for the orderly shutdown or reduction of services to customers, including 911 Authorities handling live traffic, while ensuring compliance with regulatory requirements and a smooth transition to alternative providers.[247]  While we agree with USTelecom that "an email account for a centralized team (*e.g.*, "publicsafety@provider.com") that is available to address any customer concerns if a vendor learns from a PSAP that a circuit is being disconnected is sufficient for purposes of this requirement,"[248] we expect that inquiries sent to that account would be timely addressed by a person with decision-making authority to ensure a timely, good faith response to such communications.[249]  We believe this modification, in conjunction with the existing requirement that an application to sever a physical connection or terminate or suspend the interchange of traffic with another carrier include a "statement as to whether severance of physical connection or termination or suspension of interchange of traffic is being made with consent of other carrier,"[250] strikes the correct balance to promote the Commission's goals of encouraging the development and deployment of advanced, next-generation networks and services and supporting the parallel adoption of NG911 emergency services networks, while ensuring seamless 911 connectivity.[251]

70.     We decline Bandwidth's proposals to include an explicit requirement that carriers

---

[245] Intrado Feb. 27, 2026 *Ex Parte* Letter at 5-6.

[246] *Cf.* Intrado Feb. 27, 2026 *Ex Parte* Letter at 5-6 (proposing that the Commission find that extension requests where live 911 traffic is still being carried over the circuits at issue and no alternative solution is available are presumptively reasonable); Bandwidth Feb. 26, 2026 *Ex Parte* Letter at 2 (explaining what happens if no replacements for trunk-side services are available).

[247] *See, e.g.*, Letter from Lauren Kravetz, Vice Pres., Gov't Affairs, Intrado Life & Safety, Inc., to Marlene Dortch, Secretary, FCC, WC Docket Nos. 25-304 & 17-97, at 1-3 (dated Feb. 17, 2026) (Intrado Feb. 18, 2026 *Ex Parte* Letter).  The discontinuing carrier is responsible in the first instance to ensure it is complying with the proper discontinuance application requirements and that it is taking the steps necessary to fulfil its role in a managed and orderly shutdown of service.  Where a carrier falls short in any of those respects, the Bureau is empowered to more closely scrutinize, remove from streamlining, or condition future discontinuance requests by that carrier.  Given this, we are not persuaded of the need to go further to ensure that discontinuing carriers, like 911 authorities and other service providers, do their part to ensure a smooth and orderly transition process, as some suggest.  *See, e.g.*, Public Knowledge Mar. 17, 2026 *Ex Parte* Letter at 3-4 (expressing concerns that the needs of specific, individual customers might not be met); Bandwidth Mar. 17, 2026 *Ex Parte* Letter at 1-2 (advocating certifications regarding following the proper filing process and a specifically-defined due diligence requirement);  (Intrado Mar. 13, 2026 *Ex Parte* Letter at 2-3 (proposing requirements addressing the resolution of coordination discussions); Intrado Feb. 25, 2026 *Ex Parte* Letter at 6 (expressing a need for extensions of time where 911 service could be adversely affected).

[248] USTelecom Feb. 5, 2026 *Ex Parte* Letter at 2.

[249] *See* Intrado Feb. 18, 2026 *Ex Parte* Letter at 2; Public Knowledge Mar. 13, 2026 *Ex Parte* Letter at 5 (in response to the public draft of this Order, asking that the Commission "require a response to 911 providers or vendors within 24 hours, or at a minimum, 1 business day").

[250] 47 CFR § 63.501(p).

[251] *See, e.g.*, NENA Comments at 1, 4 (asserting that "9-1-1 entities must receive adequate notice and be provided with reliable alternatives before any changes [to copper wire service] occur"); INCOMPAS Comments at 3-6, 8; Bandwidth Comments at 4-7; Intrado Comments at 5-12; NASNA Comments at 3-6; Pennsylvania PUC Comments at 7-8.

"perform pre-filing diligence to determine whether an application under rule 63.500 or 63.501 is required" and to require a discontinuing carrier to include in all other discontinuance applications that the discontinuance will not impact 911.[252]  We find that the coordination requirement we adopt today, together with our short-term network change and copper retirement disclosure requirements and the certification requirement for all discontinuance applications, is transparent and sufficient to ensure that carriers seeking to discontinue a service supporting interconnection trunks or the exchange of traffic, including but not limited to 911 trunks and 911 traffic, will engage in the requisite coordination and comply with all applicable discontinuance application content requirements.  We also find that the guardrails we adopt today obviate the concerns raised by Allerium regarding the service quality of available replacement services.[253]

71.　　While we find that forbearance relief is not appropriate for lower-speed data telecommunications services as defined in this Order,[254] we decline to adopt NTCA's proposal to specifically disallow the discontinuance of DS1 and DS3 circuits "absent a showing by the provider . . . that the carrier has an alternative IP offering available for the same route pathway as the discontinued service on reasonable rates, terms, and conditions."[255]  NTCA contends that many of its members rely in part on DS1 and DS3 connections provided by larger providers for the exchange of voice traffic through subtended tandems, and that price cap carriers have been increasing pricing on these transmission circuits.[256]  It further asserts that in some instances, price cap carriers suggested discontinuance altogether despite the purported lack of meaningful alternative facilities or services, whether in IP or TDM.[257]

72.　　We agree with NTCA that these circuits are critical infrastructure for many rural providers and that price cap carriers' ability to discontinue DS1s and DS3s without adequate replacement services could harm rural communities.[258]  However, our rules already require that carriers obtain Commission authorization before dismantling or removing a trunk line or severing a physical connection or terminating or suspending the interchange of traffic with another carrier,[259] and the availability of an adequate replacement service is already factored into Bureau staff's consideration of whether to grant

---

[252] Bandwidth Mar. 17, 2026 *Ex Parte* Letter at 1-2; *see also* INCOMPAS Mar. 20, 2026 *Ex Parte* Letter at 2-3 (in response to the public draft of this Order, asking that the Commission require the same certification requested by Bandwidth as well as a certification from a carrier seeking streamlined discontinuance that such services—i.e., decommissioning of trunk lines and trunk-side services impacting the exchange of traffic— "will not be discontinued prior to filing an application under §§ 63.500 or 63.501").

[253] *See generally* Letter from Susan C. Ornstein, Sr. Dir., Legal & Regulatory Affairs, Allerium, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-209, 25-208 (filed Mar. 17, 2026) (Allerium Mar. 17, 2026 *Ex Parte* Letter); *see also* Letter from Harriet Rennie-Brown, Exec. Dir., National Ass'n of State 911 Administrators, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-209, 25-208, at 1 (filed Mar. 19, 2026) NASNA Mar. 19, 2026 *Ex Parte* Letter.

[254] *See infra* Section III.B.4.b.

[255] *See* NTCA Comments at 8-9; *see also* Competitive Carriers Ass'n Reply at 3; Intrado Mar. 13, 2026 *Ex Parte* Letter at 3.

[256] NTCA Comments at 8.

[257] *Id.*

[258] *Id.*; *see also* Bandwidth Comments at 4; Bandwidth Reply at 5.

[259] 47 CFR §§ 63.62(a)-(b), 63.500, 63.501; *see also First Wireline Infrastructure Order*, 32 FCC Rcd at 11170, para. 112 & n.361 (stating that its conclusion that a carrier need not seek Commission approval before discontinuing service "when a change in service directly affects only carrier-customers" does not apply to "severance of physical connection or the termination or suspension of the interchange of traffic with another carrier" (quoting 47 CFR § 63.62(b)); Bandwidth Comments at 9; INCOMPAS Comments at 6-7; Bandwidth Reply at 3.

discontinuance authorization.[260]  We find that any further requirements relating to such situations are more appropriately addressed in our *IP Interconnection* proceeding in which we will examine the regulatory framework for TDM and IP interconnection for voice services.[261]  In the interim, incumbent LECs remain obligated to provide direct notice to interconnected telephone exchange service providers, 911 service providers,[262] and directly interconnecting local exchange service providers that support essential functions within 911 networks, of planned network changes and copper retirements,[263] and to obtain Commission authorization should any planned network change or copper retirement result in a discontinuance of service, including complying with the pre-application filing coordination requirement we adopt today.[264]  The additional requirements we adopt here for discontinuances involving dismantling or removing a trunk line or severing a physical connection or terminating or suspending the interchange of traffic with another carrier ensure collaboration between the respective parties[265] and provide safeguards to avoid unintended disruptions of 911 connectivity.[266]  And wholesale customers that use circuits for 911 purposes may request priority designation from their wholesale provider so that the circuits are identified as 911 circuits.[267]

73.     Finally, as discussed further below,[268] we retain at this time our rules setting forth the

---

[260] In evaluating whether "the public convenience and necessity is otherwise adversely affected" by the discontinuance, the Commission has long considered:  (1) the financial impact on the common carrier of continuing to provide the service; (2) the need for the service in general; (3) the need for the particular facilities in question; (4) increased charges for alternative services; and (5) the existence, availability, and adequacy of alternatives. *Network and Services Modernization Notice*, 40 FCC Rcd at 5338, n.63; *2016 Technology Transitions Order*, 31 FCC Rcd at 8304, para. 62; *Applications for Authority Pursuant to Section 214 of the Communications Act of 1934 to Cease Providing Dark Fiber Service*, Memorandum Opinion and Order, 8 FCC Rcd 2589, 2600, para. 54 (1993), *remanded on other grounds*, *Southwestern Bell v. FCC*, 19 F.3d 1475 (D.C. Cir. 1994); *see also* 47 CFR §§ 63.500(n) (requiring a "complete statement showing how the traffic load on the line proposed to be removed will be diverted to other lines and the adequacy of such other lines to handle the increased load"), 63.501(n) (requiring a "statement as to how points served by means of such physical connection or interchange will be served thereafter"); *cf.* Bandwidth Feb. 27, 2026 *Ex Parte* Letter at 2 (asking the Commission to require the discontinuing carrier to "certify that one of the following fully functional replacement services are available: (1) the PSAP(s) being served by the selective router is connected to an ESInet that will handle the E911 traffic formerly served by the DS1 interconnecting to the selective router; (2) the discontinuing carrier offers Ethernet transport plus a protocol conversion service that enables the delivery of E911 traffic to the selective router; or (3) a third-party offers Ethernet transport plus a protocol conversion service that enables delivery of E911 traffic to the selective router").

[261] *See generally IP Interconnection Notice*, FCC 25-73; *see also* INCOMPAS Comments at 7 ("Eliminating 63.500 and 63.501 without replacing them with a strong, enforceable interconnection framework would effectively allow ILECs to withdraw essential facilities such as those required for 911 call delivery without public notice, Commission review, or regard for competitive consequences.").

[262] *See supra* Section III.A

[263] *See supra* Section III.A; *infra* Appx. A, § 51.333; *see also* Bandwidth Mar. 17, 2026 *Ex Parte* Letter at 1 (noting that "trunk-side TDM services are typically provided over fiber").

[264] 47 U.S.C. § 214(a); 47 CFR §§ 63.62(a)-(b), 63.500, 63.501.

[265] *But see* Letter from Kathleen Slattery Thompson, Vice Pres., Regulatory & Legal Affairs, et al., USTelecom— The Broadband Ass'n, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 25-209 et al., at 1 (filed Feb. 27, 2026) (USTelecom Feb. 27, 2026 *Ex Parte* Letter) (asserting that "[a] cooperative process, tailored to the specific circumstances of a particular decommissioning effort, remains the best way to work through Intrado's concerns" regarding 911 connectivity).

[266] *See* Bandwidth Comments at 1 (stating that "TDM services are used for interconnection and delivery of 911 calls"); Pennsylvania PUC Comments at 7-8; NASNA Comments at 2-3; NENA Comments at 1.

[267] USTelecom Reply Comments at 10-11.

[268] *See infra* Section III.B.7.b.

content requirements for applications seeking to dismantle or remove a trunk line, to sever physical connections, or to terminate or suspend interchange of traffic with another carrier.[269] We find that these backstops should be sufficient to address 911 service provider concerns. Regardless, the Commission can deny individual applications to discontinue TDM services if the backstops prove insufficient and discontinuance would adversely affect the public convenience or necessity.

### 4. Limited Section 214(a) Forbearance

74. We grant forbearance relief to resellers "for resold services that are the subject of a technology transition discontinuance by the reseller's wholesale provider,"[270] conditioned on appropriate notice to customers. However, we do not grant broader forbearance relief from any section 214(a) discontinuance requirements or associated regulations at this time. Based on the record in this proceeding, we conclude that the conditions for granting forbearance relief from discontinuance requirements beyond that described above do not exist at this time.[271] Rather, the subject of broader forbearance relief is more appropriately addressed after any forbearance from the incumbent LEC-specific interconnection and related obligations as proposed in the October 2025 *IP Interconnection Notice of Proposed Rulemaking*.[272]

### a. Conditional Forbearance for Resold Services

75. In this Order, we determine that it is appropriate to forbear from all section 214(a) discontinuance requirements for resellers discontinuing resold services where the reseller's wholesale provider is engaging in a technology transitions discontinuance, with the condition that the discontinuing resellers provide reasonable notice to their customers. We sought comment on such forbearance relief in the *Network and Services Modernization Notice*,[273] and no commenters objected to this relief.

76. *Ensuring practices are just and reasonable (section 10(a)(1))*. We find that enforcement of section 214(a)'s discontinuance requirements, as well as the requirements of the Commission's implementing rules, where a resold service is being discontinued as a result of the wholesale provider's technology transitions discontinuance is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that carrier or service are just and reasonable and are not unjustly or unreasonably discriminatory.[274] We agree with INCOMPAS that "[a] review of the consequences of the reseller's 'charges, practices, classifications, or regulations by, for, or in connection with' those services is an empty formalism."[275] In these situations, the discontinuance is due to circumstances beyond the reseller's control. Moreover, the discontinuance of the resold service at issue will be subject to Commission consideration in the context of the wholesale provider's technology transitions discontinuance application, including consideration of any objections filed in response to such application.[276] Thus, there is no need to engage in a redundant review when the reseller then seeks to discontinue the resold service.

77. *Protection of consumers (section 10(a)(2))*. We also find that enforcement of section

---

[269] *See* 47 CFR §§ 63.500, 63.501.

[270] INCOMPAS Comments at 9-14.

[271] *See, e.g.*, Public Knowledge/CWA Comments at 20 (asserting that "Congress did not intend for Section 10 to replace Notice-and-Comment rulemaking, but to provide the Commission with a precision tool to respond to changing market conditions and the emergence of new technologies Congress could not foresee").

[272] *See IP Interconnection Notice* at 17, para. 32.

[273] *Network and Services Modernization Notice*, 40 FCC Rcd at 5349, para. 43.

[274] 47 U.S.C. § 160(a)(1).

[275] INCOMPAS Comments at 11.

[276] 47 CFR § 63.71(f)(2).

214(a)'s requirements, as well as the requirements of the Commission's implementing rules, is not necessary in this context to protect consumers.[277]  When a wholesale provider discontinues a legacy voice service, the reseller in nearly all cases has no available alternative sources from which to obtain replacement TDM-based services to resell to its end-user customers.[278]  The only requirement needed to ensure that consumers are protected in such situations is notice from the reseller to its customers.[279]  We thus impose on any reseller availing itself of this forbearance relief the condition that it provide such notice to its affected customers as soon as practicable after the reseller receives notice from its wholesale provider of the planned technology transitions discontinuance that it will no longer be able to provide the relevant legacy voice service.  Such notice is to be provided to customers as soon as practicable via any method for which the customer has previously provided express, verifiable approval, and it must set forth the following:  (1) the name and address of the carrier; (2) the date of the planned service discontinuance; (3) the points of geographic areas of service affected; (4) a brief description of type of service affected; and (5) a statement regarding the availability of alternative services in the affected service area.  We find that this condition will sufficiently protect consumers when a reseller discontinues a resold service because it will no longer be available from the wholesale provider.

78.     *Consistent with the public interest (section 10(a)(3)).*  Finally, we hold that forbearance from applying the discontinuance requirements in the circumstances described above is consistent with the public interest.[280]  The discontinuance of the resold service at issue will be subject to Commission consideration in the context of the wholesale provider's technology transitions discontinuance application,[281] and the Commission will not grant that underlying discontinuance application if the discontinuance would adversely impact the public interest, including with respect to the provision of 911 service.[282]  Moreover, forbearance in this limited situation is consistent with the public interest because it will conserve carrier resources that might otherwise be spent on regulatory compliance, and we expect carriers to make those resources available for better bundling of services, better tailoring of packages to businesses and consumers, and by providing support to customers.  This could include managing first-level technical support, billing, and customer service, and acting as the primary contact for customers, and offering value-added services, including specialized expertise, customized solutions, and bundled IT services.

### b.     No Broad Section 214(a) Forbearance

79.     We find that broader forbearance from discontinuance requirements, whether limited to legacy voice service in specific instances or with respect to all applications to discontinue any type of service, without qualification,[283] is not warranted at this time.[284]  The streamlined approach we adopt

---

[277] 47 U.S.C. § 160(a)(2).

[278] *See* INCOMPAS Comments at 11.

[279] *But see* INCOMPAS Comments at 12 (asserting that a customer requirement is unnecessary to protect consumers because "[r]esellers have powerful incentives to notify their own customers of any discontinuance so that they can persuade those customers to purchase replacement services offered by the reseller").

[280] 47 U.S.C. § 160(a)(3).

[281] 47 CFR § 63.71(f)(2).

[282] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8307-08, para. 72 (noting that 911 service is a critical application that must remain available and functional as part of any technology transition).

[283] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5346-47, para. 37.  *But see* USTelecom Comments at 3-23 (urging the Commission to conditionally forbear from section 214(a)'s discontinuance requirements for technology transitions discontinuances); Ohio Telecom Ass'n and Texas Ass'n of Business Mar. 19, 2026 *Ex Parte* Letter at 2 (supporting USTelecom's request for conditional forbearance for technology transitions discontinuances).

above speeds transitions where acceptable marketplace alternatives exist. Broader forbearance risks unintended disruptions to public safety and the proper operation of, among other things, security and medical monitoring services, and thus is not consistent with the public interest.[285]

80. *Ensuring practices are just and reasonable (section 10(a)(1))*. We conclude that the requirements of sections 214(a) of the Act and 63.71 of our rules are still necessary at this time to ensure that charges, practices, classifications, or regulations are just and reasonable and are not unjustly or unreasonably discriminatory. Areas still exist in this country where, despite the broad scope of wireless and satellite service offerings, no alternative services exist.[286] The record reflects concerns regarding price increases, whether real or potential, that could negatively impact customers.[287] The filing of discontinuance applications allows the Commission and all stakeholders to receive notice and review in real time service transitions as carriers plan them.

81. *Ensuring protection of consumers (section 10(a)(2))*. We find that enforcement of the requirements at issue are necessary for the protection of consumers. As illustrated in the record, locations exist where fiber has not yet been deployed and where wireless service may not reach or be sufficiently robust to support reliable voice service.[288] By retaining the requirement that a carrier must seek

(Continued from previous page) ─────────────────

[284] 47 U.S.C. § 160(a); *see also, e.g.*, AICC Comments at 13-15. *But see* WTA Reply at 4 (stating that "[t]he availability of alternative services from that provider or other providers means that the discontinuance requirements are not necessary to protect consumers, and the public interest would be enhanced by the elimination of these requirements").

[285] *See, e.g.*, AICC Comments at 13-15; Public Knowledge/CWA Comments at 19. *But see* WTA Reply at 2-3 (asserting that "the majority of alarm systems are now connected via cellular/wireless or Internet service" and that "most of the alarm monitoring is conducted via wireless or Internet connections, so Commission action here to hasten the technology transition will not lead to a spike in burglaries").

[286] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5347, para. 40; *see also* Public Knowledge/CWA Comments at 19 ("Carriers that cannot meet the existing adequate replacement test almost definitively face no competition and nothing to constrain them from charging unjust and unreasonable rates, or engaging in unreasonably discriminatory practices – such as refusing to serve customers in high-cost rural areas or in low-income communities."); NASUCA et al. Reply at 11-13 ("[S]afe, reliable alternative options do not exist in every region of every state. Another example from Connecticut of where that level of competition does not exist is Greenwich, Connecticut . . . . Likewise, in the AT&T California proceeding where it sought to eliminate its COLR obligations, the Commission rejected AT&T's contention that there were adequate alternatives."); Competitive Carriers Ass'n Comments at 2-3 (asserting that "the potential for these facilities to be discontinued altogether without alternative facilities or services threaten real harm to communications in rural areas. These ILEC practices create unnecessarily high transport and equipment expenses on small carriers and perpetuate inefficiencies that also stifle network innovation and modernization"); Wired Broadband et al. Comments at 3 ("Removing copper landlines would endanger the lives of Americans because there is no adequate or reliable substitute in the event of an electrical or cellular outage. There is no effective alternative to replace copper landlines in emergencies.").

[287] *See, e.g.*, Public Knowledge/CWA Comments at 19 (asserting that "[c]arriers that cannot meet the existing adequate replacement test almost definitionally face no competition and nothing to constrain them from charging unjust and unreasonable rates, or engaging in unreasonably discriminatory practices – such as refusing to serve customers in high-cost rural areas or in low-income communities."); NTCA Comments at 6 ("Any replacement service assessment under the consolidated rule must preserve the availability of standalone voice options at reasonable rates.").

[288] *See, e.g.*, Public Knowledge/CWA Comments at 19 ("Section 214 plays a critical role in ensuring that the Commission has an adequate understanding of where services are no longer available and in protecting communities from the loss of potentially life-saving services on which a great deal of social and economic activity still depends."); NTCA Reply at 6-7 ("Consumer protection, a key requirement for forbearance under section 10(a)(2), demands verification of service availability and adequacy, and forbearance at this time—absent detailed analysis of local conditions, particularly in rural areas where availability and adequacy can be limited, and coverage data can be spotty—would create regulatory uncertainty rather than clarity while also risking stranding customers in remote areas who have the most need of a reliable, working connection in the event of an emergency."); NASUCA et al.

(continued….)

Commission authorization to discontinue the service at issue, we ensure that customers and other interested parties, including state regulators, will have the opportunity to raise such concerns in objections to the discontinuance application,[289] thereby allowing the Commission to more fully examine the merits of such claims and work with carriers to ensure that no consumers lose access to vital communications capabilities.[290]  This concern applies with equal force to the type of conditional forbearance proposed by USTelecom and supported by the Ohio Telecom Association and the Texas Association of Business.[291]

82.     *Consistent with the public interest (section 10(a)(3))*.  In the *Network and Services Modernization Notice*, we proposed that forbearance in certain circumstances would "promote competitive market conditions by eliminating superfluous regulations that slow the transition to next-generation IP-based services and by enabling carriers to redirect resources away from legacy voice services—which are no longer competitive and are not in high demand—and toward maintaining and building out the next-generation IP-based services that consumers not only desire but have come to expect."[292]

83.     Based on the record, we do not adopt this proposal and determine that forbearance from section 214(a) discontinuance requirements as a general matter is not consistent with the public interest at this time.  Without the backstop of customer objections and Commission review of an application and those objections, the Commission would not be able to confirm the availability of an adequate

(Continued from previous page) ————————————————

Reply at 7 ("The populations who rely most heavily on legacy landlines are those aged 65 or older, rural Americans, and Native American tribes in rural territories that are historically underserved and where legacy copper networks may provide the only available service."); *see also* Rural County Representatives of California Comments at 2 asserting that forbearance from discontinuance requirements is "a direct threat to the safety and connectivity of millions of rural Americans").  *But see* USTelecom Comments at 7-8 ("[T]he Commission should forbear from enforcing Section 214(a)'s requirement of Commission approval of a discontinuance application for a technology transition where a carrier attests in a notice filed with the Commission that (1) marketplace alternatives exist for the discontinued service throughout the service area, and (2) it has notified its remaining customers of the planned discontinuance of the legacy service."); Ohio Telecom Ass'n and Texas Ass'n of Business Mar. 19, 2026 *Ex Parte* Letter at 2-3 (making the same request).

[289] *See* 47 CFR § 63.71(a); *Network and Services Modernization Notice*, 40 FCC Rcd at 5341, para. 29; *see also, e.g.*, NTCA Reply at 6 ("While NTCA does not oppose forbearance in principle, the arguments and limited facts presented in this record do not satisfy the statutory criteria under Section 10 of the Act for a sweeping grant of forbearance. As discussed above, theoretical coverage depicted on the NBM bears little resemblance to consumers' actual experience with these services, particularly in rural areas. Consumer protection, a key requirement under Section 10(a)(2), demands verification of service availability and adequacy, not assumptions based on flawed mapping data."); Public Knowledge/CWA Comments at 19-20 ("As the Commission has long observed when considering the necessity of retaining or imposing Section 214 discontinuance requirements, Section 214 plays a critical role in ensuring that the Commission has an adequate understanding of where services are no longer available, and in protecting the community of service from loss of life-saving services on which a great deal of social and economic activity still depends . . . . [T]here is no reason to use forbearance rather than rulemaking. Congress did not intend for Section 10 to replace Notice-and-Comment rulemaking, but to provide the Commission with a precision tool to respond to changing market conditions and the emergence of new technologies Congress could not foresee.").

[290] *See, e.g.*, NTCA Reply at 6 ("Consumer protection, a key requirement under Section 10(a)(2), demands verification of service availability and adequacy, not assumptions based on flawed mapping data."); Public Knowledge/CWA Comments at 19.  *But see* USTelecom Comments at 16 (asserting that forbearance from Section 214(a) discontinuance applications will not affect consumers' access to emergency services, nor will it affect the applications and functionalities that the Commission in the past has identified as key for legacy voice consumers); WTA Comments at 4 (asserting that "the discontinuance requirements are not necessary to protect consumers").

[291] USTelecom Comments at 7-8; Ohio Telecom Ass'n and Texas Ass'n of Business Mar. 19, 2026 *Ex Parte* Letter at 2.

[292] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5348, para. 42.

replacement service for the affected customers, including in instances where a provider may be relying on "not-yet-deployed technologies," particularly in less economically attractive locations.[293] Moreover, we find that forbearance from section 214(a) discontinuance requirements would remove the safeguard of the objection process that might reveal the potential for unintended impacts on, among other things, continued 911 connectivity.[294] Our streamlined application of section 214(a)'s requirements with less burdensome non-dominant procedures in place is predictable and functions as a backstop that allows the Commission to promote competitive market conditions.[295]

84. We also specifically find that granting forbearance relief from the section 214 requirements for discontinuance of lower-speed data telecommunications services is not in the public interest because of potential impacts on, among other things, the provision of 911 service.[296]

---

[293] *See, e.g.*, AARP Comments at 15-16; Wired Broadband et al. Comments at 7.

[294] *See, e.g.*, INCOMPAS Comments at 2-3 (urging "caution[] against wholesale elimination of core protections that ensure continued interconnection, access to public safety networks (including 911), and the competitive viability of providers that depend on the very facilities being retired" and noting that without access to IP interconnection, [c]ompetitive providers . . . are being forced to rely on legacy trunk-side facilities, like DS1/DS3 links and selective router connections, for which there are often no viable alternatives"); Competitive Carriers Ass'n Reply at 3-4 (agreeing with INCOMPAS that "the success of the tech transition will depend not just on the loop side of the network, but on the preservation of reliable, nondiscriminatory interconnection on the trunk side as well"). *But see* USTelecom Comments at 11 (" Eliminating the requirement to file Section 214 applications and obtain Commission discontinuance approval — where alternatives exist and after providing notice to customers —will not adversely impact consumers. Consumers, by their own actions in the marketplace, have established that there are numerous sufficient (and superior) replacements for legacy voice service. And any customers remaining on a legacy voice service will have ample notice of the planned discontinuance, affording an opportunity to bring to the Commission any legitimate concerns about the availability of replacement voice service. Consumers are best protected by the robust competition in the communications marketplace, not by the Commission's Section 214(a) discontinuance application requirements."); WTA Comments at 4 (asserting that "the public interest would be enhanced by the elimination of these [discontinuance] requirements").

[295] *See Minnesota Independent Equal Access Corporation's Petition for Forbearance from Dominant Carrier Regulation*, WC Docket No. 22-407, Declaratory Ruling and Memorandum Opinion and Order, 38 FCC Rcd 10869, 10886, para. 36 (2023) (granting conditional forbearance from dominant carrier regulation, "subject to MIEAC's compliance with the non-dominant carrier rules associated with" relevant provisions of the Act, noting "precedent whereby the Commission has granted forbearance from particular provisions of the Act or regulations because other applicable regulatory requirements (including requirements imposed as a condition of the grant of forbearance) provided the necessary safeguards to ensure sufficient competition and protect consumer welfare").

[296] *See, e.g.*, Intrado Comments at 6 (asserting that "[f]orbearance with respect to the need to carefully coordinate the decommissioning of TDM circuits used in 911 . . . might hasten catastrophic 911 outages in areas of the country that have not transitioned if ILEC 911 circuit providers have free rein to take circuits down without deliberate, advance coordination with state public safety agencies and their vendors supported by Commission oversight"); Bandwidth Comments at 5 (urging the Commission "adopt safeguards to ensure the continuity of 911 service," including by "mak[ing] clear that any network change that results in discontinuing a service supporting interconnection trunks or the exchange of traffic requires a carrier to file an application under 47 C.F.R. §§ 63.500 and 501 to dismantle a trunk line and suspend the interchange of traffic with another carrier"); INCOMPAS Comments at 4 ("[D]espite the ILECs' rapid migration of their own loop-side customers to IP-based services they continue to require [competitive providers] to maintain TDM interconnection at the tandem, end office, and selective router level. This includes the critical delivery of 911 calls, which remains heavily dependent on trunk-side TDM connections. Moreover, ILECs have declined to offer a pathway for [competitive providers ] to use newly deployed Ethernet transport facilities to interconnect with tandems or deliver 911 traffic. Even in cases where [competitive providers are] investing in Ethernet-based collocations at nearly 200 wire centers, ILECs still demand DS1 cross-connects to the tandem—a requirement that is increasingly unworkable given both the scarcity of DS1 services and their rapidly escalating costs") (internal citations omitted); NTCA Comments at 8-9; AICC Comments at 16-17 ("[M]any alarm systems and monitoring operations continue to rely on these services for critical communications functions. Specifically, many alarm systems utilize data communication for signal transmission, and monitoring centers often employ diverse

(continued….)

### 5. The 31-day Automatic Grant Period Applies to All Discontinuance Applications

85. We adopt our proposal to revise section 63.71 of our rules to extend the 31-day automatic grant period applicable to applications to discontinue a service for which a carrier is non-dominant to all instances in which a domestic carrier submits a request to discontinue a service,[297] along with the corresponding 15-day objection period.[298] Section 63.71(f)(1) of the Commission's rules allows a discontinuance application filed by a domestic, non-dominant carrier to be automatically granted on the 31st day after it is filed with the Commission,[299] unless the Commission notifies the applicant otherwise.[300] If a carrier is dominant, however, the current automatic grant period is 60 days after filing.[301] Expanding the applicability of the 31-day automatic grant period to include dominant carrier discontinuance applications will speed up the processing of those applications and further the critical goal of transitioning to modern networks for all consumers. And because the Commission retains the authority to remove applications from streamlined processing, the public interest will still be protected as required by section 214(a).[302]

86. We conclude that 31 days is sufficient time for the Commission to determine whether to remove a dominant carrier's discontinuance application from streamlined processing or to allow automatic grant of the discontinuance.[303] Some commenters suggest that the 31-day auto-grant period, which provides a 15-day window for customers and other interested parties to file objections,[304] is not enough time for consumers to learn about adequate replacements and ensure there are no unintended consequences of the discontinuance, such as loss of 911 services.[305] However, 31 days has proven to be

---

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

communication pathways including lower speed data connections for redundancy and reliability purposes. The availability of higher speed alternatives does not eliminate the ongoing need for these services in life safety applications."); *see also* Rural County Representatives of California Comments at 2 (asserting that forbearance from discontinuance requirements is "a direct threat to the safety and connectivity of millions of rural Americans").

[297] *Network and Services Modernization Notice*, 40 FCC Rcd at 5331, 5360-61, paras. 5, 85-89.

[298] *See* 47 CFR § 63.71(a)(5)(i).

[299] An application is deemed filed on the date the Commission releases a Public Notice of the filing. *Id.* § 63.71(f)(1). The 31-day period thus only begins to run once the Commission releases the Public Notice of the filing of the discontinuance application.

[300] *Id.* The Commission first established the dominant/non-dominant distinction in 1980 to "reduce barriers to entry" caused by dominant carriers' "substantial opportunity and incentive to subsidize the rates for [their] more competitive services with revenues obtained from [their] monopoly or near-monopoly services." *2016 Technology Transitions Order*, 31 FCC Rcd at 8286-87, para. 10 (quoting *Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations Therefor*, First Report and Order, 85 FCC 2d 1, 4, para. 15 (1980)).

[301] 47 CFR § 63.71(f)(1).

[302] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5361, para. 87.

[303] *See* WTA Comments at 3 (generally supporting the Commission's proposals in the *Network and Services Modernization Notice* to streamline discontinuance processes); *see also 2016 Technology Transitions Order*, 31 FCC Rcd at 8290, para. 19 (declaring all carriers to be non-dominant in the provision of interstate switched access service); *Second Wireline Infrastructure Order*, 32 FCC Rcd at 11164, para. 91 (stating that "in light of the technological and competitive dynamics of today's modern communications landscape, [the Commission] find[s] it unnecessary to maintain a distinction between dominant and non-dominant carriers in the context of section 214 applications to grandfather low speed legacy services").

[304] *See* 47 CFR §§ 63.71(a)(5)(i), (f)(1).

[305] *See* AARP Comments at 10; Public Knowledge/CWA Comments at 11; INCOMPAS Mar. 20, 2026 *Ex Parte* Letter at 3.

sufficient for the public to review recent non-dominant carrier applications, including technology transitions discontinuance applications, and assess any changes or disruptions that may occur due to the discontinuance.[306] And since 2013, the Commission has received, on average, only 12 dominant carrier discontinuance applications each year, with objections filed with respect to only approximately 10 percent of those applications and only three being removed from streamlined processing and subsequently granted.

87. We thus determine that 31 days will be sufficient time to review dominant carriers' applications as well. Additionally, the Commission retains discretion to remove an application from streamlined processing at any point during the 31-day period should the discontinuance raise concerns.[307] This notice requirement and the backstop retained by the Commission ensure adequate review of applications by dominant carriers as the public and carriers are notified of the discontinuance application and have the ability to raise concerns about applications with the Commission before the automatic grant.

88. We decline to adopt USTelecom's request to amend section 63.71(f)(1) to allow the automatic grant period to begin to run upon the carrier's filing of an application rather than after the Commission releases the Public Notice.[308] Without the Public Notice, affected customers and other interested parties, such as state regulators, public safety organizations, and public interest groups, would not be able to submit objections in the docket ultimately assigned to the relevant application, thus delaying staff's receipt of those objections.[309] This would have the effect of reducing the amount of time available to Bureau staff to review an application for completeness or to determine, as required by statute, whether the application raises concerns regarding the potential impact of the requested discontinuance authorization on the public interest, regardless of whether it receives objections. We find such a potential effect to be unacceptable. However, as discussed above, we direct the Bureau, within ten business days of posting of an application in ECFS, to either contact the applicant to identify deficiencies and request any additional information necessary to make the application complete or to issue a Public Notice of filing of the complete application to ensure timely processing that will support our modernization efforts.[310]

89. We disagree with Bandwidth's assertion that section 63.71 and its automatic grant provisions apply only to retail, loop-side services and not to trunk-side services.[311] In support of its assertion, Bandwidth points to sections 63.500 and 63.501 as the purportedly governing provisions for such services.[312] However, those provisions simply set forth the content requirements for the formal applications required for the specified types of discontinuances.[313] The discontinuance application

[306] *See* AICC Comments at 17 (discussing AICC's participation in AT&T's 2023 discontinuance application); *see generally also* Public Knowledge Comments, WC Docket No. 24-220 (rec. Dec. 2, 2024) (supporting AT&T's first technology transitions discontinuance application relying on the Adequate Replacement Test); *supra* Section III.B.1.a. AICC asks the Commission to "ensure that any streamlining measures preserve adequate time for public safety evaluation and stakeholder response." AICC Comments at 20.

[307] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5361, para. 87.

[308] S*ee* USTelecom Comments at 24.

[309] *See* 47 CFR § 63.71(a)(5) (requiring a carrier to include in its notice to affected customers instructions for filing objections to a planned discontinuance).

[310] *See supra* Section III.B.1.e.; *see also* Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 5-6.

[311] *See* Bandwidth Mar. 17, 2026 *Ex Parte* Letter at 1.

[312] *See id*.

[313] *See* 47 CFR §§ 63.500 (Contents of applications to dismantle or remove a trunk line.), 63.501 (Contents of applications to sever physical connection or to terminate or suspend interchange of traffic with another carrier); *see also* 47 CFR § 63.62 (setting forth the types of service discontinuances requiring formal application "containing the information required by the Commission in the appropriate sections to this part").

procedures, on the other hand, are set forth in section 63.71, and those procedures apply to all formal discontinuance applications[314] other than emergency discontinuance applications, which are specifically covered by section 63.63.[315]

### 6. Contents of Discontinuance Applications

90.     We revise section 63.71(c) of our rules to consolidate the following content requirements applicable to all discontinuance applications, unless otherwise provided for or otherwise stated herein,[316] to ensure that Bureau staff have sufficient information before them when evaluating discontinuance applications:[317] (1) for technology transitions discontinuance applications only, the difference in price, if any, between the service being discontinued and replacement services available in the affected service area;[318] (2) for technology transitions discontinuance applications only, description of the affected community or part of a community, including the population size and demographics and general characteristics of customers affected; (3) description of replacement services, whether available from the applicant or third parties, that would remain in the affected community or part of the community in the event the application is granted, including the name of any other carrier(s) providing replacement services to the affected community; and (4) statement of the factors otherwise showing that neither the present nor future public convenience and necessity would be adversely affected by the granting of the applications.[319]  And carriers will be required to include in their discontinuance applications a certification, executed by an officer or other authorized representative of the applicant, that the information required by our rules is true and accurate.[320]  Our current rules already explicitly require this information for technology transitions discontinuance applications.[321]  We conclude that this information is necessary for evaluating all discontinuance applications, particularly in this rapidly changing technological environment.

91.     As discussed above, pricing differentials between services being discontinued and available replacement services is important for evaluating the affordability of the replacement service.[322]

---

[314] *See* 47 CFR § 63.71 (Procedures for discontinuance, reduction or impairment of service by domestic carriers).

[315] *See id.* § 63.63 (Emergency discontinuance, reduction, or impairment of service).

[316] For example, the contents of emergency discontinuance applications are set forth in section 63.63.  *See* 47 CFR § 63.63(a)(1)-(5).  And applications to dismantle or remove a trunk line or to sever physical connection or to terminate or suspend interchange of traffic with another carrier must  comply with sections 63.500 and 63.501, respectively, of our rules.  *See id.* §§ 63.500, 63.501.

[317] *See Networks and Services Modernization Notice*, 40 FCC Rcd at 5340-41, 5344-45, 5347-49, 5359-60, 5364, 5369, paras. 28-29, 32-33, 39-42, 79-84, 102, 125; *see also* 47 CFR § 63.602(a)(1) (requiring that a technology transitions discontinuance application include "the contents specified in § 63.505 of this part").

[318] *See* USTelecom Mar. 20, 2026 *Ex Parte* Letter at 5-6 (in response to the public draft of this Order, requesting that the Commission not require pricing differential information in non-technology transitions discontinuance applications).

[319] *See infra* Appx. A, § 63.71(c); *see also* USTelecom Mar. 20, 2026 *Ex Parte* Letter at 5 (in response to the public draft of this Order, asking that the Commission confirm that "it is codifying in proposed section 63.71(c)(6)-(8) the type of information that recent successful applications contained").  These content requirements are in addition to those we adopt elsewhere in this Order.  *See supra* Sections III.B.1. and III.B.3.

[320] *See infra* Appx. A, § 63.71(c); *see also* Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 2 n.2 (raising the "need for enforcement where carriers submit false information or proceed recklessly").  Our existing technology transitions discontinuance rules already include this requirement.  *See* 47 CFR § 63.602(a)(4).

[321] *See* 47 CFR § 63.602(a) (requiring a certification regarding the truth and accuracy of the contents of application and incorporating the application content requirements set forth in section 63.505).

[322] *See supra* Section III.B.1.b; *see also 2016 Technology Transitions Order*, 31 FCC Rcd at 8346, para. 174 (noting that "[w]hen called upon to apply [the affordability] standard in the context of technology transitions, the

(continued….)

And information regarding the affected community, a description of the replacement services that would remain available, and other information relevant to the determination of whether the discontinuance would not adversely affect the public convenience and necessity, the statutory standard, are also important to staff evaluation of discontinuance applications.[323]  Our rules already require that specific types of discontinuance applications, including technology transitions discontinuance applications, include this information.[324]  In conjunction with our elimination of section 63.602,[325] which currently sets forth the content requirements for technology transitions discontinuance applications, including the elements of the Adequate Replacement Test, we incorporate these existing requirements for technology transitions discontinuance applications in section 63.71.  And the content requirements of sections 63.500, 63.501, and 63.505 remain unchanged.  For other types of discontinuances that do not fall within any of these categories, we do not expressly require pricing differential and affected community information.[326]  However, in this rapidly changing communications environment, we do extend the requirement that applications to discontinue such services—i.e., not involving "technology transitions" and not covered by sections 63.500, 63.501, and 63.505—include a description of the replacement services that would remain available,[327] other information relevant to the determination of whether the discontinuance would not adversely affect the public convenience and necessity, the statutory standard, and the certification described in the preceding paragraph.[328]  As the Commission has repeatedly noted, the adequacy and

(Continued from previous page) ———————————————

Commission's focus will be on the price to consumers before and after a discontinuance resulting from transition to a newer technology"); AARP Comments at 3, 6, 9, 12 (expressing concerns regarding affordability of replacement services).

[323] *See, e.g.*, AARP Comments at 3, 6, 9, 12 (expressing concerns regarding availability of replacement services in rural communities); Center for Regulatory Freedom Comments at 3; NTCA Comments at 6-8; Comtech Reply at 3-4 (addressing concerns regarding 911 connectivity in the context of copper retirements); Intrado Reply at 5-6 (addressing concerns regarding 911 connectivity, particularly in "less well-funded rural areas"); Competitive Carriers Ass'n Reply at 1-3; Center for Regulatory Freedom Comments at 4, 6 (addressing the need for emergency communications safeguards and taking note of "seniors, people with disabilities, and linguistically diverse communities" and the possibility of stranding "isolated rural facilities, critical-access hospitals with legacy equipment, or locations requiring specific accessibility features"); *see also generally* NTCA Reply; Rural County Representatives of California Reply.

[324] *See* 47 CFR §§ 63.500, 63.501, 63.505, 63.602.

[325] *Id* § 63.602.  Because we are eliminating this provision, we are revising the cross-references to it in sections 63.19(a) and (b).  *See id* §§ 63.19(a)-(b).

[326] *See* USTelecom Mar. 19, 2026 *Ex Parte* Letter at 5 (asserting that providing pricing information in applications to discontinue services not involving a technology transition would be "all but impossible" because "providers typically negotiate rates, terms, and conditions with business data service customers").  We note that applications to discontinue a business data service that supports interconnection trunks or the exchange of traffic remain subject to the content requirements set forth in sections 63.500 and 63.501.  *See supra* Sections III.B.3. and III.B.8.b.

[327] For example, a competitive LEC application to discontinue a legacy voice service in a service area where that legacy voice service is still available from the incumbent LEC does not qualify as a technology transitions discontinuance and thus need not comply with the requirements specific to that category of discontinuances.  However, competitive LEC applications seeking discontinuance authorization for a legacy voice service still must demonstrate the existence of an adequate replacement service, which in this case would include the legacy voice service available from the incumbent LEC.

[328] *See, e.g.*, AARP Comments at 3, 6, 9, 12 (expressing concerns regarding availability of replacement services in rural communities); Center for Regulatory Freedom Comments at 3; NTCA Comments at 6-8; Comtech Reply at 3-4 (addressing concerns regarding 911 connectivity in the context of copper retirements); Intrado Reply at 5-6 (addressing concerns regarding 911 connectivity, particularly in "less well-funded rural areas"); Competitive Carriers Ass'n Reply at 1-3; Center for Regulatory Freedom Comments at 4, 6 (addressing the need for emergency communications safeguards and taking note of "seniors, people with disabilities, and linguistically diverse communities" and the possibility of stranding "isolated rural facilities, critical-access hospitals with legacy

(continued….)

availability of replacement services is one of the traditional five factors the Commission considers when determining whether discontinuance of a service to a community or part of a community would adversely affect the current or future public convenience and necessity.[329] Expressly requiring this information will minimize the need for Bureau staff to request from the applicant additional information necessary for their evaluation of applications to discontinue those services,[330] thus making the process more efficient and predictable and, combined with the overall regulatory relief we grant today, should not result in burdensome filing requirements that delay service transitions for consumers.

### 7. Emergency Discontinuances

92. We adopt our proposal to revise our emergency discontinuance rules[331] to explicitly provide that a carrier may permanently discontinue a service a showing that: (1) the carrier has previously obtained emergency discontinuance authority for the service in question, (2) the service is one for which the requesting carrier has had no customers or reasonable requests for service during the 60-day period immediately preceding the permanent discontinuance, and (3) an adequate replacement service is available throughout the affected service area. We decline at this time to allow for streamlined processing of requests to permanently discontinue a service that is contained in an initial emergency discontinuance application.[332]

#### a. Emergency discontinuances leading to no customers.

93. Section 63.63 of our rules sets forth procedures carriers must follow when seeking authority for an emergency discontinuance.[333] We now revise that rule to allow carriers to permanently discontinue a service for which the carrier has previously obtained emergency discontinuance authority upon a showing that (1) the service is one for which the requesting carrier has had no customers or reasonable requests for service during the 60 days immediately preceding the permanent discontinuance,

---

(Continued from previous page)

equipment, or locations requiring specific accessibility features"); *see also generally* NTCA Reply; Rural County Representatives of California Reply. *But see* USTelecom Mar. 19, 2026 *Ex Parte* Letter at 5-6 (asking that the Commission not require non-technology transitions discontinuance applications to include a description of the replacement services that would remain available or other information relevant to the determination of whether the discontinuance would not adversely affect the public convenience and necessity).

[329] *See, e.g.*, *Second Wireline Infrastructure Order*, 33 FCC Rcd at 5665-66, para. 13 n.38; *2016 Technology Transitions Order*, 31 FCC Rcd at 8304, para. 62; *Verizon Tel. Cos. Section 63.71 Application to Discontinue Expanded Interconnection Service Through Physical Collocation*, 18 FCC Rcd 22737, 22742, para. 8 (2003).

[330] Section 63.71 requires applicants to provide "[a]ny other information the Commission may require." 47 CFR § 63.71(a)(5). Many carriers already provide the types of information required by our revised requirements in their discontinuance applications in order to paint a fuller picture for Bureau staff and avoid further questions from staff about the proposed discontinuance(s).

[331] *Id.* § 63.63.

[332] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5364, para. 101.

[333] 47 CFR § 63.63. Our rules define an emergency discontinuance as "any discontinuance, reduction, or impairment of the service of a carrier occasioned by conditions beyond the control of such carrier where the original service is not restored or comparable service is not established within a reasonable time." *Id.* § 63.60(c). Providers must submit an application for authority for an emergency discontinuance of service as soon as practicable but not later than 65 days following the occurrence of the conditions which occasion the discontinuance. *Id.* § 63.63(a). Authority is deemed granted as of the date the request is filed unless the Commission notifies the carrier otherwise on or before the 15th day after the date of filing, and a carrier may request to have the authorization renewed if the conditions leading to the emergency discontinuance "may reasonably be expected to continue for a further period and what efforts the applicant has made to restore the original or establish comparable service of such authority." The carrier must notify the Commission if "the same or comparable service is reestablished before the termination of the emergency authorization." *Id.* § 63.63(b).

and (2) an adequate replacement service is available throughout the affected service area.[334]  While our proposal in the *Network and Services Modernization Notice* referred to "comparable service," we find it more appropriate to use the phrase "adequate replacement service" in this instance to confirm that the standards for replacement services are the same for all permanent discontinuances, whether the provider proceeds under section 63.63(b) or section 63.71(g) of our rules.

94.        Under our existing rules, carriers may submit an informal request to permanently discontinue a service for which the carrier has already received emergency discontinuance authority, which the Commission may authorize "upon a proper showing."[335]  Our rules do not define what constitutes a "proper showing."  We conclude that the amendment we adopt today, which addresses a narrow set of circumstances, strikes the appropriate balance between safeguarding consumers and enabling carriers to be more deft and responsive in reacting to natural disasters and other emergencies.  The amendment also allows carriers to focus their rebuilding efforts on modernized, more resilient networks rather than restoring deteriorating, obsolete legacy networks and services.  We find that there is little risk that a permanent discontinuance of the affected service will adversely affect any existing or potential customers in instances where a carrier has previously filed for emergency discontinuance authority, has had no customers nor reasonable requests for service for a minimum of 60 days, and an adequate replacement service is available.[336]

95.        When legacy voice service facilities are damaged or destroyed during a natural disaster or other event outside the carrier's control, it may be costly as well as inefficient to require the carriers to restore these legacy facilities, especially in areas where the requesting carrier has had no customers or reasonable requests for service for 60 days prior to the request for permanent discontinuance and where an adequate replacement service is already available.  Such an approach also mitigates the risk that consumers in an affected area will be stranded without service.  Indeed, the increasing incidences of copper thefts have resulted in emergency discontinuances that leave affected customers without service, sometimes repeatedly.[337]  Consumers will also benefit in the long term as this amendment to our rules will

---

[334] *Network and Services Modernization Notice*, 40 FCC Rcd at 5363, para. 95.

[335] 47 CFR § 63.63(b).  *But see* USTelecom Comments at 3 (asserting that the rule we proposed in the *Network and Services Modernization Notice* would "limit the ability to permanently discontinue services only to instances where the carrier no longer has any customers following the emergency discontinuance").

[336] Contrary to USTelecom's assertion, *see* USTelecom Comments at 3, when the Commission forbore in the *Second Wireline Infrastructure Order* from applying the discontinuance approval obligations set forth in section 214(a) of the Act and our implementing rules to carriers choosing to discontinue services for which the carrier has had no customers and no reasonable requests for service for at least the immediately preceding 30 days, *see Second Wireline Infrastructure Order*, 33 FCC Rcd at 5666-68, paras. 15-21, it excluded from this forbearance the requirements associated with emergency discontinuances where a carrier's existing customers are without service for a period of time exceeding 30 days.  *See id.* at 5666, para. 15 n.46.  By extending the period in which the carrier has had no customers or reasonable requests for the affected service to 60 days and limiting the application of the rule we adopt today to only those areas where an adequate replacement service is available in the affected service area, we believe we have adequately addressed the concerns that prompted this carve-out in the *Second Wireline Infrastructure Order*.

[337] *See, e.g.*, USTelecom Comments at 17-18 (noting, among other things, that "[b]etween June and December 2024, the telecommunications industry reported nearly 6,000 incidents of copper theft and infrastructure vandalism nationwide" and that "[i]n California alone, AT&T has seen a more than 3,500% increase in copper theft incidents from 2020 to 2024"); Rural & Agricultural Council of America Comments at 3 (asking the Commission to "[s]upport rural providers' efforts to rapidly reconnect customers with new technologies in the event of copper theft/damage"); Matt Daneman, Communications Daily, Cable Industry Launches Coalition to Focus on Network Vandalism (Sept. 4, 2025) (noting that the impact of copper theft "has escalated"), https://communicationsdaily.com/article/view?search_id=42055&id=2458304; Naomi Jindra, Broadband Breakfast, FCC's Trusty Raises Concerns Over Copper Theft, (Sept. 11, 2025), https://broadbandbreakfast.com/fccs-trusty-raises-concerns-over-copper-theft/; Business Wire, Kinetic Offers $10,000 Reward Following Months of Copper-

(continued….)

allow carriers to begin building out more reliable and more robust next-generation networks sooner by redirecting money and time that would otherwise be spent making lengthy and costly repairs to vulnerable legacy facilities serving fewer and fewer customers.[338]

96.     We decline to adopt a commenter's proposal to extend the relevant time period for an emergency discontinuance from 60 days to six months and to require carriers to affirmatively contact each customer during that time to obtain explicit consent prior to any permanent discontinuance.[339]  Such requirements would impose burdensome requirements where a comparable service is already available across the affected service area.  Additionally, this proposal would require carriers to make repeated attempts to contact consumers who may choose not to respond or who may have permanently relocated during the emergency discontinuance period, and would completely negate any added efficiencies and benefits of this amendment to our rules.  The rule we adopt today strikes an appropriate balance between increasing market efficiency and allowing carriers to refocus their efforts away from maintaining vulnerable and unreliable legacy networks.  It would also encourage carriers to deploy higher-quality and more resilient next-generation networks and safeguard consumers by ensuring that they are not left stranded without voice service.

### b.      Processing of requests to permanently discontinue.

97.     To ensure the efficacy of the consumer safeguards we adopt in this Order, we decline to allow the streamlined processing of requests in an initial emergency discontinuance application to permanently discontinue the affected service.[340]  While we are constantly seeking ways to increase efficiency and speed the transition to next-generation networks and services, we find that streamlined processing of a discontinuance request as the result of a natural disaster or other emergency would not allow sufficient time for the Commission to conduct its review, nor for affected consumers and other stakeholders to lodge comments or objections.  Instead, we find that the existing procedures for processing requests to permanently discontinue services, as well as the requirements we adopt today where the emergency discontinuance leads to the carrier no longer having customers for the affected service,[341] strike the correct balance between allowing providers to phase out damaged legacy networks

(Continued from previous page) ───────────────────────────

Cable Thefts (Jul. 10, 2024), https://www.businesswire.com/news/home/20240709472141/en/Kinetic-Offers-%2410000-Reward-Following-Months-of-Copper-Cable-Thefts.  Incumbent LECs filed 11 emergency discontinuance applications in 2024 caused by copper thefts, and another 19 in 2025.  And the repair processes during the pendency of certain of these emergency discontinuance applications have been impeded by continued copper thefts.  *See* USTelecom Comments at 18; *see also Section 63.63 Application of AT&T Enterprises, LLC, Pacific Bell Tel. Co., SBC Long Distance, LLC for Authority Pursuant to Section 214 of the Communications Act of 1934, as Amended, to Discontinue the Provision of Service*, Section 63.63 Application of AT&T and Request for Waiver (rec. Sept. 19, 2025) (seeking emergency discontinuance authority resulting from "thousands of criminal acts – repeated and pervasive vandalism and theft" that occurred "throughout Los Angeles County, in some instances impacting the same location multiple times"); Letter from Brett Farley, Sr. Legal Counsel, AT&T, to Marlene Dortch, Secretary, FCC, WC Docket No. 25-294 (filed Nov. 10, 2025) (requesting renewal of its emergency discontinuance authorization, noting that "copper theft continues to be a serious issue in Los Angeles" since the filing of its discontinuance application); Letter from Brett Farley, Sr. Legal Counsel, AT&T, to Marlene Dortch, Secretary, FCC, WC Docket No. 25-294 (filed Jan. 7, 2026) (again requesting renewal of its emergency discontinuance authorization, noting that "copper theft continues to be a serious issue in Los Angeles" since the filing of its emergency discontinuance application).

[338] *See* USTelecom Reply at 17; Digital Progress Inst. Comments at 6-7; Rural & Agricultural Council of America Comments at 2 (asserting that "[e]very dollar forced into copper maintenance is a dollar that could bring next-generation service to another underserved rural home or agricultural business," and urging the Commission to treat emergency discontinuances caused by copper theft or damage "as opportunities for modernization—rather than triggers for burdensome red tape").

[339] *See* Public Knowledge/CWA Comments at 17.

[340] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5364, para. 101.

and affording customers and other stakeholders sufficient time to be made aware of such discontinuances and to raise objections with the Commission.  We reserve the right to revisit this conclusion at a later date, if future circumstances warrant a reconsideration of this finding.

### 8.    Eliminating Outdated Discontinuance Rules

98.    We next adopt our proposal in the *Network and Services Modernization Notice* to eliminate a number of outdated discontinuance rules that have outlived their usefulness.[342]  As proposed in the *Network and Services Modernization Notice*, we conclude that these discontinuance rules are outdated, obsolete, or redundant and are no longer relevant or necessary in today's communications marketplace,[343] with certain exceptions.  Commenters support these streamlining efforts.[344]  Specifically, we eliminate all of the outdated discontinuance rules discussed in the *Network and Services Modernization Notice*,[345] except for sections 63.60(f), 63.500, and 63.501.[346]

### a.    Eliminated Rules

99.    *Public toll stations*.  We eliminate section 63.504 of the Commission's rules, which details the contents of an application to close a public toll station where no other such toll station of the applicant will continue service in the community and where telephone toll service is not otherwise available to the public through a telephone exchange connected with the toll lines of a carrier.[347]  Commenters support this deletion.[348]  As we stated in the *Network and Services Modernization Notice*, "[t]hese rules were created more than six decades ago, at a time when public toll stations were far more prevalent …[and] it no longer makes sense to treat applications to discontinue this service distinctly from

---

(Continued from previous page)    ───────────────────────

[341] *See supra* Section III.B.7.b.

[342] *Network and Services Modernization Notice*, 40 FCC Rcd at 5364-67, paras. 102-15.

[343] *Id.*

[344] *See* USTelecom Comments at 39 ("USTelecom supports the Commission's proposal to review and eliminate several of its Section 214(a) rules, such as those related to public toll stations, telephone exchanges at military establishments, and trunk lines.  As the Commission recognizes, these rules are 'remnants of a bygone era,' and some are duplicative of other statutory requirements.  Eliminating such unnecessary hurdles will ensure that any Section 214 application required under the Commission's rules is focused on material that goes to the purpose of Section 214.") (internal citations omitted); Digital Progress Inst. Comments at 8 ("the Commission should adopt its proposals to eliminate outdated discontinuance rules, such as those governing public toll stations, telephone exchanges at military establishments, newspaper publication of notices, trunk lines, and traffic interchange, and public coast stations"); USTelecom Reply at 15-16.  *But see* Nina Beety Comments at 14 (asserting that the Commission "hid[] this important topic at the end and confused the public by labeling this as public toll stations without the common term 'phone booths'").

[345] *See* 47 CFR §§ 63.66, 63.90, 63.100, 63.504, 63.601.

[346] *Id.* §§ 63.60(b), 63.60(f), 63.500, 63.501.

[347] *Id.* § 63.504 (setting forth discontinuance application contents specific to public toll stations).  Section 63.60(f) of the Commission's rules defines "public toll station" as "a public telephone station, located in a community, through which a carrier provides service to the public, and which is connected directly to a toll line operated by such carrier."  *Id.* § 63.60(f).

[348] *See* USTelecom Comments at 39; Digital Progress Inst. Comments at 8; USTelecom Reply at 15-16.  One commenter, however, appears to have misunderstood our proposal to eliminate section 63.504.  *See* Nina Beety Comments at 14 (asserting that the Commission "hid[] this important topic at the end and confused the public by labeling this as public toll stations without the common term 'phone booths.' * * * *  In the past, a phone booth would be available outside 24/7, lit up for all  to find. Now, the FCC wants to doom those travelers.'"").  Discontinuances of public toll stations remain subject to our general discontinuance rules.

other types of service."[349]  In order to ensure that a carrier seeks Commission authorization to close a public toll station in a location where telephone toll service is not otherwise available, as contemplated by section 63.62(b) of our rules, we now make applications for the closures of such public toll stations subject to the general application content requirements set forth in section 63.505.[350]  We thus decline at this time to eliminate section 63.60(f), defining public toll stations for purposes of discontinuance applications.[351]  For these same reasons, we retain the references to public toll stations in section 63.60(b), addressing the types of actions encompassed within the term "discontinuance, reduction, or impairment of service."[352]

100.	*Telephone exchanges at military establishments*.  We eliminate section 63.66 of the Commission's rules, which requires that carriers file an informal request, in quintuplicate, with the Commission before altering service hours at telephone exchanges at deactivated military establishments.[353]  When Congress amended section 214 of the Act, it was concerned about "loss or impairment of service during" wartime,[354] particularly with respect to military establishments and industries.[355]  That was a very real concern at that time, when POTS was the only voice service widely available.[356]  However, this is no longer the case.  The nation at large and the military specifically have at their disposal voice, email, text, and video communications services provisioned over a variety of mediums, including fiber, wireless, and satellite.  Commenters support these streamlining efforts.[357]  We thus conclude that section 63.66 no longer serves any purpose and should be eliminated.

---

[349] *Network and Services Modernization Notice*, 40 FCC Rcd at 5365, para. 105 (internal citations omitted).

[350] *See infra* Appx. A, § 63.505.

[351] 47 CFR § 63.60(f) (defining "public toll station" as "a public telephone station, located in a community, through which a carrier provides service to the public, and which is connected directly to a toll line operated by such carrier").

[352] *Id.* § 63.60(b).

[353] *Id.* § 63.66.

[354] *See, e.g.*, *Network and Services Modernization Notice*, 40 FCC Rcd at 5365, para. 108; *Western Union Discontinuance Order*, 74 F.C.C.2d at 295, para. 6 n.4 ("The focus on a loss or impairment of service is supported by legislative history.  At the time Section 214 was amended, Congress also enacted Section 222, which allowed mergers of domestic telegraph companies.  The legislative history of this amendment to Section 214 reveals that at the time, one of Congress' main concerns was that such mergers might result in a loss or impairment of service during this war time period.  *See* 78 Cong. Rec. 818 (1943) (abandonment of existing telegraph offices); S. Rep. No. 13, 78th Cong., 1st Sess. 4 (1943) (reduction of telegraph circuits to the government agencies); and H. Rep. No. 69, 78th Cong., 1st Sess. 10 (1943) (discontinuance of service to military establishments and industries)); *see also Petitions of the Verizon Telephone Companies for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Boston, New York, Philadelphia, Pittsburgh, Providence and Virginia Beach Metropolitan Statistical Areas*, WC Docket No. 06172, Memorandum Opinion and Order, 22 FCC Rcd 21293, 21294, para. 1 & n.4 (2007) (*2007 Verizon Forbearance Order*).  "Dominant carrier regulations include, among other things, requirements arising under section 214 related to transfer of control and discontinuance, cost-supported tariffing requirements, and price regulation for services falling under the Commission's jurisdiction." *2007 Verizon Forbearance Order*, 22 FCC Rcd at 21295, para. 2.

[355] *See Lincoln Cty. Tel. Sys., Inc., Memorandum Opinion and Order*, 81 F.C.C.2d 328, paras. 11-12 (1980) (citing the legislative history showing that "one of Congress' main concerns was that . . . mergers might result in a loss or impairment of service during this wartime period"); *Western Union Discontinuance Order*, 74 F.C.C.2d at 295-96, paras. 6-7 & n.4 (same).

[356] *See, e.g.*, *Businesses Abandon Plain Old Telephone Service*, Wired (Aug. 23, 2025), https://www.wirednm.com/wired-blog/businesses-abandon-plain-old-telephone-service (noting how POTS was the backbone of business communication from its inception in the late 1800s to the advent of digital modes of communication in the 1990s).

[357] *See, e.g.*, US Telecom Comments at 39; Digital Progress Inst. Comments at 8.

101.    *Publication and posting of notices.*  We eliminate section 63.90 of the Commission's rules, imposing extensive requirements regarding the publication and physical posting of notices of discontinuances or reduced hours.[358]  While the specific requirements of this rule have changed over the years since this rule was adopted to accommodate the evolution of the communications marketplace and consumers' access to a variety of modes of communication,[359] we agree with commenters that the physical posting of notices of discontinuances or reduced hours is no longer necessary and that posting the information on a carrier's website is now sufficient notice for network changes.[360]

102.    *Notification of service outage.*  We eliminate section 63.100 of our rules, which directs providers to part 4 of the Commission's rules for the requirements concerning notifications of service outages.[361]  The outage notification requirements originally listed in section 63.100 are now found in part 4 of the Commission's rules.[362]  Commenters support these streamlining efforts.[363]  As section 63.100 itself no longer contains any substantive regulations, we conclude that it is no longer relevant or necessary.

103.    *Public coast stations.*  We eliminate section 63.601, pertaining to public coast stations,[364] and remove the references to public coast stations in sections 63.60(b), 63.60(c), and 63.63(a) of our rules.[365]  As we noted in the *Network and Services Modernization Notice*, the Commission classified public coast stations as part of commercial mobile radio service (CMRS) in 1994, rendering it subject to the forbearance simultaneously granted from section 214 discontinuance requirements for CMRS stations.[366]  Commenters support these streamlining efforts.[367]  Any remaining discontinuance obligations pertaining to public coast stations are addressed exclusively elsewhere in our rules.[368]  We thus find that these rules no longer serve any useful purpose.[369]

### b.    Retaining Sections 63.500 and 63.501

---

[358] 47 CFR § 63.90.

[359] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5366, para. 111 (discussing changes to notification requirements of 47 CFR § 63.90).

[360] *See, e.g.*, WTA Comments at 2-3 ("But given the significant changes over the last 30 years, those regulatory burdens are anachronisms that are unnecessary and counterproductive . . . . Posting the information on the service provider's website, and providing notice directly to any interconnected local exchange providers should suffice."); Digital Progress Inst. Comments at 8.

[361] 47 CFR § 63.100.

[362] 47 CFR pt. 4.

[363] *See, e.g.*, USTelecom Comments at 39.

[364] 47 CFR § 63.601 (contents of applications for authority to reduce the hours of service of public coast stations under the conditions specified in § 63.70).  Public coast stations are "land station[s] in the maritime mobile service" that "offer[]radio communication common carrier services to ship radio stations."  *Id.* § 80.5; *see also id.* § 63.60(b)(1).

[365] *Id.* §§ 63.60(b)(1)-(2), 63.60(c), 63.63.

[366] *Network and Services Modernization Notice*, 40 FCC Rcd at 5368, para. 119; *Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services*, GN Docket No. 93-252, Second Report and Order, 9 FCC Rcd 1411, 1448, para. 83 (1994), recon. dismissed in part and denied in part, 15 FCC Rcd 5231 (2000) (*CMRS Second Report and Order*); *see also* 47 CFR §§ 80.5, 80.453.

[367] *See, e.g.*, Digital Progress Inst. Comments at 8.

[368] *See* 47 CFR §§ 63.19, 80.5, 80.453; *see also Network and Services Modernization Notice*, 40 FCC Rcd at 5367-68, para. 118.

[369] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5368, paras. 119-21.

104.	We decline to eliminate sections 63.500 and 63.501 of the Commission's rules at this time.[370]  Section 63.500 sets forth the required contents of applications to dismantle or remove a trunk line.[371]  Section 63.501 does the same for applications to sever physical connection or to terminate or suspend interchange of traffic with another carrier.[372]  Given the ongoing network evolution and the ever-decreasing reliance on copper lines, we sought comment in the *Network and Services Modernization Notice* on whether eliminating these rules would better serve the public interest.[373]

105.	Based on the record in this proceeding, we determine that eliminating sections 63.500 and 63.501 of the Commission's rules is not consistent with the public interest at this time.  More specifically, we conclude that eliminating these rules at this time may cause unintended public safety consequences on the provision of 911 service.[374]  While copper is no longer the dominant transmission medium,[375] it remains necessary for local exchange service provider interconnection with incumbent LECs for the provision of 911 service where IP interconnection is unavailable between the incumbent

---

[370] 47 CFR §§ 63.500, 63.501; *see also* Bandwidth Comments at 9; Intrado Comments at 13; INCOMPAS Comments at 6-7.  We thus also retain the references to these rules in sections 63.19 and 63.62(a)-(b).  *See id.* §§ 63.19, 63.62(a)-(b).

[371] *Id.* § 63.500.

[372] *Id.* § 63.501.

[373] *Network and Services Modernization Notice*, 40 FCC Rcd at 5367, paras. 116-17.

[374] *See supra* Section III.B.3; *see also, e.g.*, Intrado Comments at 15 (stating that "eliminating the carrier interconnections requirements in sections 63.500 and 63.501 of [the Commission's] rules . . . would effectively grant the ILECs unrestricted authority to disconnect 911 trunks without prior Commission approval or pre-planning with the public safety industry – an action that would almost certainly result in a major 911 outage during the ongoing transition to NG911"); INCOMPAS Comments at 6-7 ("Eliminating 63.500 and 63.501 without replacing them with a strong, enforceable interconnection framework would effectively allow ILECs to withdraw essential facilities such as those required for 911 call delivery without public notice, Commission review, or regard for competitive consequences."); Bandwidth Comments at 7-9 ("The fact that rules 63.500 and 63.501 'were adopted at a time when copper was the dominant transmission medium' does not mean the rules are unnecessary. To the contrary, interconnection of networks is required whether carriers use copper, fiber, or coax and whether TDM or IP protocols are used to exchange voice traffic and deliver emergency calls."); Intrado Reply at 6-7 ("ILECs should continue to file with the Commission before dismantling a trunk line and suspending the interchange of traffic with another carrier"); Bandwidth Reply at 1 ("Bandwidth urges the Commission to be laser-focused on ensuring that its efforts . . . do not result in adverse consequences for TDM services that remain critical to the exchange of voice traffic and 911 call delivery during the transition period from TDM to IP interconnection and from selective routers to NG911"), 5 ("911 disruptions are already being caused by TDM service discontinuations combined with a lack of alternative routing solutions"); Competitive Carriers Ass'n Reply at 4-5 ("The record continues to show that ILEC refusal to implement fair IP interconnection jeopardizes the reliability of public safety services. Preservation of copper facilities until public safety is ready for next-generation technologies is a critical issue…. [A]brupt discontinuance of TDM circuits used for emergency call routing can disrupt service continuity.").  *But see* USTelecom Reply at 15-16 ("These rules are … incredibly and unnecessarily burdensome . . . .  Moreover, other Commission rules and statutory provisions already address any possible concerns about call delivery during technology transitions, including prohibitions on unjust and unreasonable call blocking.") (internal citations omitted).

[375] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5336, para. 19 ("At the end of 2003, the year in which the Commission extended its network change disclosure rules to copper retirements, incumbent LECs provisioned more than 80% of the roughly 181 million reported end-user switched access lines. Since then, reliance on legacy networks in the communications marketplace has drastically decreased, with only 18 million switched access lines by mid-2024 compared to 64.5 million interconnected VoIP subscriptions."); May 2025 Voice Telephone Services Report at 3 fig. 2; *see also Parties Asked to Refresh the Record on Telephone Access Charges Notice of Proposed Rulemaking*, WC Docket No. 20-71, Public Notice, 40 FCC Rcd 4041 (WCB 2025) (noting that "[o]ver the past five years, local exchange carriers' market share has declined while mobile and interconnected VoIP providers' market share has increased").

LEC and the local exchange service provider.[376]  We thus defer any potential elimination of these provisions until after we act on the proposed forbearance from the incumbent LEC-specific interconnection and related obligations.[377]

### C.  State Mandates Conflicting with the FCC's Section 214 Discontinuance Authorizations and Authority Are Subject to Preemption

106.  We determine below that existing legacy voice services can be jurisdictionally mixed. We then discuss the scope of the Commission's and the states' respective authority with respect to regulating the discontinuance of jurisdictionally mixed services.  Finally, we determine that, where the Commission has authorized discontinuance of interstate or jurisdictionally mixed legacy voice services, state requirements that make it impossible or impracticable for carriers to discontinue those services—and so in effect require carriers to continue providing interstate or jurisdictionally mixed telecommunications services—conflict with federal law, and the important federal policy represented by our modernized regulatory framework established in this Order for network changes and service discontinuances and are subject to preemption.

107.  *Jurisdictional nature of legacy voice service.*  Legacy voice service is the transmission of voice communications, usually over copper wires, using circuit-switched technology known as "time-division multiplexing" (TDM).[378]  Legacy voice service generally includes what is sometimes colloquially described as "local telephone service," although that term does not accurately reflect the jurisdictional nature of the service as a practical matter in today's networks.  Few, if any, networks today operate on a purely local or even intrastate level.[379]  Local exchange service and local toll service, while typically occurring within a single state, do in certain instances cross state lines.[380]  And the vast majority of consumers use the same provider for both their local and long distance service,[381] with some customers purchasing bundled access that includes local exchange service, local toll calling, and interstate long distance toll service.[382]  However, these services are provisioned over the same network using the same

---

[376] *See Network and Services Modernization Notice*, 40 FCC Rcd at 5337, para. 20 (stating that "network transitions subject to section 251(c)(5) may occur in areas where 911 authorities and originating service providers . . . have not yet transitioned to Next Generation 911 . . . and will therefore continue for some time to rely on legacy selective routers and other TDM-based infrastructure for delivery of 911 calls to public safety answering points").

[377] *See IP Interconnection Notice* at 17-20, paras. 32-43.

[378] *See 2016 Technology Transitions Order*, 31 FCC Rcd at 8285, para. 1.

[379] *See* Letter from Nirali Patel, Senior Vice Pres., Regulatory & Legal Affairs and General Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC WC Docket Nos. 25-208, 25-209, at 8 (filed Feb. 6, 2026) (USTelecom Feb. 6, 2026 *Ex Parte* Letter).

[380] *See* FCC Consumer Guide, *Local, Local Toll and Long Distance Calling*, https://www.fcc.gov/consumers/guides/local-local-toll-and-long-distance-calling (last updated Dec. 31, 2019).

[381] In the past, local exchange carriers were required to provide "equal access" service to long-distance carriers. *See United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 196 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also* 47 U.S.C. § 251(g).  "Equal access" refers to a class of service whereby all long-distance service providers receive equivalent connections to the local exchange carrier's network. *See* Common Carrier Bureau Releases Report on Equal Access Lines and Presubscribed Lines, 1997 WL 677407 (C.C.B. Nov. 3, 1997).  Recognizing transformations in the market for voice telephone services, the Commission in 2019 forbore from "the requirement that independent rate-of-return carriers offer long-distance telephone service through a separate affiliate." *Petition of USTelecom for Forbearance Pursuant to 47 U.S.C. § 160(c) to Accelerate Investment in Broadband and Next-Generation Networks*, WC Docket No. 18-141, Memorandum Opinion and Order, 34 FCC Rcd 2590, 2591, para. 1 (2019).

[382] *See* FCC Consumer Guide, *Local, Local Toll and Long Distance Calling*, https://www.fcc.gov/consumers/guides/local-local-toll-and-long-distance-calling (last updated Dec. 31, 2019).

technology.[383]  We acknowledge that, in the *2016 Technology Transitions Order*, the Commission stated that "wholly intrastate services such as local telephone service are excluded from [the] reach" of the Commission's section 214 discontinuance authority.[384]  Insofar as that statement might be understood to suggest that legacy voice service is a purely intrastate service, we find that the Commission in 2016 did not consider how state requirements might, on a practical level, prevent or conflict with the discontinuance of interstate or jurisdictionally mixed services.

108.    *Federal discontinuance authority under section 214.*  Section 214 authorizes the Commission to determine when interstate or jurisdictionally mixed telecommunications services may be discontinued.  The Commission has recognized that Congress enacted section 214 to "protect Americans' continued access to the nation's communications networks while also preserving carriers' ability to upgrade their services without the interruption of federal micromanaging."[385]  Section 214 thus does not guarantee that a particular service, such as legacy voice service, remains available to consumers or that consumers can purchase a particular service from a particular carrier.  Rather, section 214 seeks to ensure that consumers retain access to vital communications services, regardless of the identity of the service provider.[386]  Under section 214(a), except on a temporary or emergency basis, "[n]o carrier shall discontinue, reduce, or impair service to a community, or part of a community," without first "obtain[ing] from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby,"[387] and section 214(c) allows the Commission to tailor the scope of the discontinuance it authorizes "as in its judgment the public convenience and necessity may require."[388]  Once the Commission authorizes discontinuance, a carrier may discontinue the covered service "without securing [other] approval."[389]  Section 214 thus creates an exclusively federal discontinuance regime for interstate or jurisdictionally mixed telecommunications services.

109.    The federal discontinuance regime established in section 214(a)-(c) is consistent with the framework for the designation and relinquishment of eligible telecommunications carrier (ETC) status set out in section 214(e), including section 214(e)(4)'s mandate that a state commission permit an ETC to relinquish its designation if the area is served by at least one other ETC.[390]  Section 214(e) governs the approval and relinquishment of designations for common carriers that are eligible for universal service

---

[383] To the extent that USTelecom argues that *all* POTS offerings are jurisdictionally mixed services, we reject that conclusion.  *See* USTelecom Feb. 6, 2026 *Ex Parte* Letter at 9.  The Commission will consider on a case-by-case basis whether certain legacy voice services are interstate or jurisdictionally mixed.

[384] *2016 Technology Transitions Order*, 31 FCC Rcd at 8301, para. 52.

[385] *First Wireline Infrastructure Order*, 32 FCC Rcd at 11177, para. 133.

[386] *See Western Union Discontinuance Order*, 74 F.C.C.2d at 295, para. 6 and n.4 (discussing legislative history surrounding 1943 amendment to section 214(a) adding discontinuance requirements); USTelecom Feb. 6, 2026 *Ex Parte* Letter at 5; *see also* 47 U.S.C. § 214(e)(4); *Implementation of Section 402(b)(2)(A) of the Telecommunications Act of 1996; Petition for Forbearance of the Independent Telephone & Telecommunications Alliance*, CC Docket No. 97-11, AAD File No. 98-43, Report and Order in CC Docket No. 97-11, Second Memorandum Opinion and Order in AAD File No. 98-43, 14 FCC Rcd 11364, 11368, para. 5 (1999); USTelecom Comments at 27; USTelecom Feb. 6, 2026 *Ex Parte* Letter at 5.

[387] 47 U.S.C. § 214(a).

[388] *Id.* § 214(c).

[389] *Id.*

[390] *See* 47 U.S.C. § 214(e)(4) (providing that "[a] State commission (or the Commission in the case of a common carrier designated under paragraph (6)) *shall permit* an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier") (emphasis added).

support pursuant to section 254(e).[391]  There is nothing in the language of section 214(e) that supersedes or limits the federal processes established pursuant to section 214(a)-(c) with regard to service discontinuance.  Thus, while a carrier's ETC status determines whether that carrier may receive universal service support for the provisioning, maintenance, and upgrading of particular facilities or services under section 254(e), the question of whether a carrier may discontinue a specific interstate service is wholly governed by section 214(a)-(c) and the carrier need only show in its advance notice to the relevant state commission that the affected service area is "served by more than one eligible telecommunications carrier."[392]

110.    *State authority.*  Section 214 provides states with a limited role in the federal discontinuance regime, but that role does not provide states with additional authority over services for which a provider has obtained Commission approval for discontinuance.  Section 214(b) requires a carrier to notify each state in which the carrier proposes to construct, acquire, or operate a line or proposes to discontinue, reduce, or impair a service, and grants those states "the right . . . to be heard."[393]  This provision allows states to object to any federal discontinuance application prior to any Commission authorization.[394]  But it is the Commission that has sole jurisdiction to decide whether a carrier's proposed discontinuance adversely affects the public convenience and necessity and whether it should be approved or rejected.[395]  In section 214(c), Congress gave both states and state public utility commissions (PUCs) the right to bring a federal court action to enjoin any discontinuance of service that occurs "contrary to the provisions of" section 214.[396]  This provision allows states to bring suit in federal court to enjoin discontinuance if discontinuing a service would be in violation of, or without, a Commission authorization.[397]  But section 214(c) does not grant states the right to obtain federal court injunctions against discontinuances that are lawfully granted by the Commission.  Accordingly, neither section 214(b) nor section 214(c) provides states with the power to decide whether a carrier may discontinue interstate or jurisdictionally mixed service, or empowers states to impose requirements that frustrate or add extra conditions to Commission decisions allowing discontinuance.  Instead, Congress provided that, after obtaining the Commission's approval, carriers could "without securing approval other than such certificate . . . proceed with the discontinuance . . . of service."[398]

111.    We find that section 253(b) of the Act similarly does not provide states with additional authority over services for which a provider has obtained discontinuance approval at the federal level.  Section 253(b) provides a safe harbor from preemption under section 253(a) when states "impose, on a competitively neutral basis . . . , requirements necessary to preserve and advance universal service, protect

---

[391] *See id.* §§ 214(e)(1), 254(e).

[392] *Id.* § 214(e)(4).

[393] *Id.* § 214(b).

[394] Such a grant of an "explicit consultative role . . . works against, rather than for, [any] claim of other powers" by states in the context of service discontinuance. *Verizon New Eng., Inc. v. Me. Pub. Utils. Comm'n*, 509 F.3d 1, 7 (1st Cir. 2007) (discussing the similar state consultative role under section 271); *see also BellSouth Telecomms., Inc. v. Ky. Pub. Serv. Comm'n*, 669 F.3d 704, 709 (6th Cir. 2012) (state commission cannot "'parlay its limited role' in making recommendations to the FCC" under section 271 into authority to regulate).

[395] 47 U.S.C. § 214(c); *see also* Letter from Craig J. Miller, Pres., The New York State Telecomms. Ass'n, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 25-209, 25-208, at 1 (filed Mar. 19, 2026) (NYSTA Mar. 19, 2026 *Ex Parte* Letter).

[396] 47 U.S.C. § 214(c).

[397] Even if a state has obtained an injunction in federal court to prevent a carrier from discontinuing service, the basis for that injunction is "evaporated" once the carrier obtains Commission authorization for the discontinuance. *See Cablevision of Tex. III, L.P. v. Okla. W. Tel. Co.*, 993 F.2d 208, 210 (10th Cir. 1993).

[398] *See* 47 U.S.C. § 214(c).

the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."[399] Two commenters argue that section 253(b) thus preserves several COLR obligations.[400] To the extent these commenters suggest that section 253(b) gives states discontinuance authority over interstate services or jurisdictionally mixed services, we disagree. While section 253(b) does offer states a safe harbor from the reach of the Commission's section 253 preemption authority, the safe harbor is limited on its face to the provisions of section 253 itself. As stated in section 253(b), "[n]othing *in this section*"—i.e., in section 253—"shall affect the ability of states" to exercise the rights enumerated therein.[401] We find the safe harbor for the states in section 253 does not confer authority over services that have received federal approval for discontinuance under section 214.

112. *State requirements subject to preemption.* As explained below, once the Commission has authorized a carrier to discontinue an interstate or jurisdictionally mixed telecommunications service, states may not enforce any law, regulation, or other requirement that on its face or in practical terms requires the carrier to continue providing the interstate or jurisdictionally mixed service the Commission has authorized the carrier to discontinue. States may not, consistent with federal law, impose any additional conditions on the Commission's authorization of discontinuance, including conditions that purport to be technology neutral,[402] but that have the practical effect of requiring the carrier to continue providing an interstate or jurisdictionally mixed telecommunications service.[403]

113. It is well established that, under the "impossibility exception" to state jurisdiction, the Commission may preempt state law when (1) it is impossible or impracticable to regulate the intrastate aspects of a service without affecting interstate communications and (2) the Commission determines that such regulation would interfere with federal regulatory objectives.[404] More generally, under the U.S. Constitution, federal law is the "supreme Law of the Land."[405] As relevant here, state law is subject to conflict preemption if it "prevent[s] or frustrate[s] the accomplishment of a federal objective,"[406] and Commission actions taken under statutory authority will preempt state law.[407] The doctrine of "conflict

---

[399] 47 U.S.C. § 253(b).

[400] NASUCA Comments at 25-26; Pennsylvania PUC Comments at 4-5.

[401] 47 U.S.C. § 253(b) (emphasis added).

[402] *See, e.g.*, California PUC Reply at 2-5, 17.

[403] *See* USTelecom Comments at 12-15; USTelecom Reply at 26-32; USTelecom Mar. 19, 2026 *Ex Parte* Letter at 4. Since we do not have the record before us to, in this Order, opine on the application of this preemption to any specific state law, we decline to do so—including to exempt any specific state law or category of state law from the reach of this Order. *But see* Public Knowledge Mar. 16, 2026 *Ex Parte* Letter at 7 (in response to the public draft of this Order, "urges the Commission to modify its language on preemption to take advantage of the added resources of the states and to avoid unnecessary interference in state consumer protection, universal service, and 911 oversight").

[404] *See Minnesota PUC v. FCC*, 483 F.3d 570, 578 (8th Cir. 2007) (*Minnesota PUC v. FCC*); *see also Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 375 n.4 (1986) (*Louisiana PSC v. FCC*) (collecting cases); *Public Serv. Comm'n of Md. v. FCC*, 909 F.2d 1510, 1516 (D.C. Cir. 1990) (*PSC of Maryland v. FCC*).

[405] U.S. Const. art. VI, cl. 2.

[406] *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000); *see, e.g.*, *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 708 (1984) (*Capital Cities Cable v. Crisp*) (FCC's cable TV regulations preempted Oklahoma's alcohol-advertising ban that was "wholly at odds with the regulatory goals contemplated by the FCC"); *Qwest Corp. v. Ariz. Corp. Comm'n*, 567 F.3d 1109, 1119-20 (9th Cir. 2009) (*Qwest v. Arizona Corp. Comm'n*) (FCC rules preempted states from imposing unbundling requirements on telephone providers).

[407] *See City of New York v. FCC*, 486 U.S. 57, 64 (1988). We disagree with the California Public Utilities Commission's (California PUC) assertion that only an "unmistakably clear" statement in the Act could allow the Commission to preempt state statutes, regulations, and other legal requirements that require a carrier to continue providing a service for which the Commission has already granted discontinuance authorization. *See* California

(continued….)

preemption—true to its name—[applies] when the operation of federal and state law clash in a way that makes 'compliance with both state and federal law . . . impossible,' or when 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[408]

114. We determine that certain state and local statutes, regulations, and requirements are subject to federal preemption. We sought comment in the *Network and Services Modernization Notice* on state or local requirements that would inhibit or impede the transition to next-generation networks and services, and asked whether such requirements would conflict with this critical goal by, for example, compelling carriers to continue providing legacy voice service or preventing carriers from discontinuing service.[409] The record indicates that some states have adopted requirements that carriers assert operate to prevent them from discontinuing legacy voice service—whether as a matter of law or in practical effect.[410] The record also includes assertions that certain state or local statutes, regulations, or requirements have the effect of preventing carriers from seeking to retire deteriorating legacy networks and discontinuing outdated TDM-based services taken by ever-fewer customers for undetermined periods of time, leaving these providers unable to redirect time and resources away from the development and deployment of next-generation networks and technologies.[411] We agree with USTelecom that, where the Commission has exercised its section 214 discontinuance authority over interstate and/or jurisdictionally mixed services to allow a carrier to discontinue legacy voice service, state requirements that operate to require the carrier to continue providing those services conflict with federal law. Such state or local statutes, regulations, or legal requirements effectively "negate the Commission's exercise of its lawful authority because regulation of the interstate aspects of the matter cannot be severed from regulation of the intrastate aspects."[412] We conclude that if state and local requirements prevent a provider from

(Continued from previous page) ——————————————

PUC Reply at 11-12. As stated above, we find that the clear language of section 214 creates a federal regime for determining when a carrier may discontinue an interstate or jurisdictionally mixed telecommunications service.

[408] *Sickle v. Torres Advanced Enter. Solutions, LLC*, 884 F.3d 338, 347 (D.C. Cir. 2018) (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal quotation marks omitted)); *see also Capital Cities Cable v. Crisp*, 467 U.S. at 708 (FCC's cable TV regulations preempted Oklahoma's alcohol-advertising ban that was "wholly at odds with the regulatory goals contemplated by the FCC"); *Qwest Corp. v. Ariz. Corp. Comm'n*, 567 F.3d at 1119-20 (FCC rules preempted states from imposing unbundling requirements on telephone providers).

[409] *Network and Services Modernization Notice*, 40 FCC Rcd at 5369, para. 125.

[410] *See* USTelecom Comments at 12-15; USTelecom Reply at 26-32; USTelecom Feb. 6, 2026 *Ex Parte* Letter at 1 n.3 (citing examples); USTelecom Mar. 19, 2026 *Ex Parte* Letter at 1-4 (asserting that states may be misapplying section 214(e)(4) of the Act in a manner that prevents them from discontinuing POTS and thus from relinquishing their ETC designation).

[411] *See* USTelecom Comments at 27, 30-32; Letter from Nirali Patel, Senior Vice Pres., Regulatory & Legal Affairs and General Counsel, USTelecom, to Marlene H. Dortch, Secretary, FCC WC Docket Nos. 25-208, 25-209, at 1 (filed Feb. 6, 2026) (USTelecom Feb. 6, 2026 *Ex Parte* Letter); NYSTA Mar. 19, 2026 *Ex Parte* Letter at 1-2.

[412] *Implementation of the Telecommunications Act of 1996 et al.*, CC Docket Nos. 96-115 and 96-149, Second Report and Order and Further Notice of Proposed Rulemaking, 13 FCC Rcd 8061, 8075, para. 16 (1998); *see also* U.S. Const. art. VI, cl. 2 (Supremacy Clause); 47 U.S.C. § 214(c); USTelecom Comments at 28-30 (identifying state COLR regulations as an example of state and local regulations that negate the relief that carriers would otherwise receive from the Commission through the section 214 discontinuance process by obligating carriers to maintain a network capable of providing POTS to all locations, even in areas where the Commission has authorized carriers to discontinue POTS); Rural & Agriculture Council of America Comments at 3; U.S. Chamber of Commerce Comments at 3; Taxpayers Protection Alliance Comments at 2. *But see* California PUC Comments at 2-12 (contending that the state's COLR rules do not require providers to retain copper infrastructure or POTS); Rural County Representatives of California (RCRC) Comments at 2 (stating that "some states may still require a modest baseline for minimum access service via COLR obligations"); Pennsylvania PUC Comments at 3-6 (stating that the Pennsylvania PUC does not review or approve carriers' technology transitions—whether in terms of a COLR

(continued….)

discontinuing the interstate portion of a legacy voice service for which the Commission has already granted discontinuance authorization pursuant to section 214, then the requirements negate a valid federal regulatory objective because the interstate impacts of the state or local requirements cannot be unbundled from the intrastate aspects of those requirements.[413]  We stress that states lack authority to regulate interstate services.  And, moreover, where the Commission has lawfully exercised its section 214 authority to allow discontinuance of a service within its regulatory sphere, section 214(c) expressly provides that carriers do not require any other "approval" to discontinue the covered service, including any state commission or Commission approval that might otherwise be required under section 214(e)(4) for relinquishment of the carrier's ETC status, if there is another ETC throughout the relevant service area.[414]  We determine here that any such state requirements, to the degree they regulate services shown to be jurisdictionally mixed, are subject to preemption pursuant to both the impossibility exception and general principles of conflict preemption.[415]

115.     It is beyond the scope of this proceeding to evaluate individual state requirements in their particulars, or to determine whether they conflict with federal law.  We accordingly do not, in this Order, make any preemption determination as to any specific state or local law or requirement.  If, however, the Commission has authorized a carrier to discontinue legacy voice service and any state requirement conflicts with that authorization, or if a carrier wants to seek Commission discontinuance authorization for a legacy voice service but that carrier believes that a state requirement prevents it from doing so, the carrier may opt to seek a determination from the Commission that the state requirement is preempted.

---

(Continued from previous page)

obligation or as an abandonment of service—and that a full ban on all COLR obligations could encompass a wide swathe of legitimate Pennsylvania PUC regulatory activities); USTelecom Feb. 6, 2026 *Ex Parte* Letter at 2.

[413] *See Mozilla Corp. v. FCC*, 940 F.3d 1, 77-78 (D.C. Cir. 2019); *Minnesota PUC v. FCC*, 483 F.3d at 578 ("It was proper for the FCC to consider the economic burden of identifying the geographic endpoints of VoIP communications in determining whether it was impractical or impossible to separate the service into its interstate and intrastate components."); *Vonage Holdings Corporation Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, WC Docket No. 03-211, Memorandum Opinion and Order, 19 FCC Rcd 22404, 22413, 22414, 22429, paras. 17, 19, 40 (2004); *Incarcerated People's Communications Services; Implementation of the Martha Wright-Reed Act Rates for Interstate Inmate Calling Services*, WC Docket Nos. 23-62, 12-375, 39 FCC Rcd 7647, 7691, 7926, paras. 85-86, 536 (2024); *Rural Call Completion*, WC Docket No. 13-39, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 16154, 16204, para. 119 (2013) (finding that it would be impractical and infeasible to have separate federal and state rules about ring signals having different meanings for interstate versus intrastate traffic, and stating that the Commission had reached similar conclusions with regard to call signaling requirements for caller ID purposes—that it would be impractical to require separate federal and state signaling systems) (citing *Louisiana PSC v. FCC*, 476 U.S. at 375 n.4); *see also generally North Carolina Utils. Comm'n v. FCC*, 537 F.2d 787 (4th Cir. 1976); *North Carolina Utils. Comm'n v. FCC*, 552 F.2d 1036 (4th Cir. 1977) (where the Commission acted within its authority to permit subscribers to provide their own telephones, preemption of inconsistent state regulation prohibiting subscribers from connecting their own phones unless used exclusively in interstate service upheld since state regulation would negate the federal tariff)).

[414] *See* USTelecom Mar. 20, 2026 *Ex Parte* Letter at 2-3.  As discussed elsewhere in this Order, the Commission will deny a discontinuance application if it finds that the discontinuance will adversely affect the present or future public convenience and necessity, as required by section 214(a) of the Act.  47 U.S.C. § 214(a).  If a state commission believes that a carrier's discontinuance of a service for which it has requested Commission authorization would have such an adverse effect, the state may file an objection with the Commission.  Moreover, after a carrier receives a discontinuance grant from the Commission and makes a showing to the relevant state commission that another ETC serves the affected service area, section 214(e)(4) requires the state to allow the carrier to relinquish its ETC designation without erecting additional hurdles.

[415] Similarly, where the Commission has exercised its section 214(a) authority over interstate and/or jurisdictionally mixed service to allow a carrier to *grandfather* legacy voice service, *see supra* Section III.B.2, federal law preempts state requirements that operate to require the carrier to continue offering that interstate or jurisdictionally mixed grandfathered service to new customers.

## IV.     PROCEDURAL MATTERS

116.     *Paperwork Reduction Act*.  This document may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  Specifically, the rules adopted in 47 CFR §§ 51.329, 51.333, 63.60, 63.62(a)-(b), (d), 63.63, 63.66, 63.71, 63.90, 63.100, 63.504, 63.601, and 63.602 may require new or modified information collections.  All such new or modified information collection requirements will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA.  OMB, the general public, and other Federal agencies will be invited to comment on the new or modified information collection requirements contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.  In this document, we describe several steps we have taken to minimize the information collection burdens on small entities.[416]

117.     *Regulatory Flexibility Act*.  The Regulatory Flexibility Act of 1980, as amended (RFA),[417] requires that an agency prepare a regulatory flexibility analysis for notice-and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[418]  Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this Fourth Report and Order on small entities.  The FRFA is set forth in Appendix B.

118.     *Congressional Review Act.*  The Commission has determined, and the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this Report and Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

## V.     ORDERING CLAUSES

119.     Accordingly, IT IS ORDERED that pursuant to sections 1-4, 10, 201(b), 214(a)-(c), 251(c)(5) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-54, 160, 201(b), 214(a)-(c), 251(c)(5), the Report and Order hereby IS ADOPTED.[419]

120.     IT IS FURTHER ORDERED that the Commission's rules ARE HEREBY AMENDED as set forth in Appendix A and such amendments shall become effective 30 days after publication in the Federal Register, except that the amendments to sections 51.329, 51.333, 63.60, 63.62(a)-(b), (d)-(e), 63.63, 63.71, and 63.602, which may contain new or modified information collection requirements, will not become effective until the Office of Management and Budget completes review of any information collection requirements that the Wireline Competition Bureau determines is required under the Paperwork Reduction Act.  The Commission directs the Wireline Competition Bureau to announce the effective date for sections 51.329, 51.333, 63.60, 63.62(a)-(b), (d)-(e), 63.63, 63.71, and 63.602 by subsequent Public Notice.

121.     IT IS FURTHER ORDERED that, pursuant to 47 CFR § 1.4(b)(1), the period for filing petitions for reconsideration or petitions for judicial review of this Report and Order will commence on

---

[416] *See infra* Appx. B, Section E.

[417] 5 U.S.C. §§ 601 *et seq*., as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, 110 Stat. 857 (1996).

[418] 5 U.S.C. § 605(b).

[419] Pursuant to Executive Order 14215, 90 Fed. Reg. 10447 (Feb. 20, 2025), this regulatory action has been determined to be not significant under Executive Order 12866, 58 Fed. Reg. 68708 (Dec. 28, 1993).

the date that a summary of this Report and Order is published in the Federal Register.

122. IT IS FURTHER ORDERED that the Commission's Office of the Secretary, SHALL SEND a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

123. IT IS FURTHER ORDERED that the Office of the Managing Director, Performance Evaluation and Records Management, SHALL SEND a copy of this Report and Order in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

## APPENDIX A

## Final Rules

For the reasons set forth above, Parts 51 and 63 of Title 47 of the Code of Federal Regulations are amended as follows:

**PART 51 – INTERCONNECTION**

1.        The authority for part 51 continues to read as follows:

AUTHORITY: 47 U.S.C. 151-55, 201-05, 207-09, 218, 225-27, 251-52, 271, 332 unless otherwise noted.

2.        Amend § 51.329 by removing paragraph (c), and revising paragraph (a) as follows:

**§ 51.329 Notice of network changes: Methods for providing notice.**

(a) An incumbent LEC may provide the required notice to the public of network changes through publicly accessible industry fora, industry publications, or the incumbent LEC's website.

\* \* \* \* \*

3.        Amend § 51.333 by removing paragraphs (b) through (f) and (g)(1)(iii), redesignating paragraph (g)(1)(i) and (ii) and (g)(1)(iv) and (v) as paragraph (b)(1)(i) through (iv), and revising section heading, paragraph (a), and redesignated paragraph (b)(2)(i) and (ii), as follows:

**§ 51.333 Notice of network changes: Short-term network changes and copper retirement.**

(a) ***Direct notice.*** If an incumbent LEC wishes to provide less than six months' notice of planned network changes, or provide notice of a planned copper retirement, the incumbent LEC must serve a copy of its public notice upon each telephone exchange service provider that directly interconnects with the incumbent LEC's network, 911 service providers, and directly interconnecting local exchange service providers that support essential functions within 911 networks in the affected service areas, provided that, with respect to copper retirement notices, such service may be made by postings on the incumbent LEC's website if the directly interconnecting telephone exchange service provider has agreed to receive notice by website postings.  For purposes of this section, "911 service provider" is defined as an entity that provides 911, E911, or NG911 capabilities such as call routing, automatic location information, automatic number identification, or the functional equivalent of those capabilities, directly to a public safety answering point (PSAP), statewide default answering point, or appropriate local emergency authority as defined in § 9.3; and/or operates one or more central offices that directly serve a PSAP.

(1) An incumbent LEC must provide the required direct notice of a short-term network change at least 10 days prior to implementation.

(2) An incumbent LEC must provide direct notice of a planned copper retirement at least 90 days prior to implementation, except that it must provide direct notice of a planned copper retirement involving copper facilities not being used to provision services to any customers at least 15 days prior to implementation.

(b) **Limited exemption from advance notice and timing requirements –**

\* \* \*

(2) **Other events outside an incumbent LEC's control.**

(i) Notwithstanding the requirements of this section, if in response to circumstances outside of its control other than a force majeure event addressed in paragraph (b)(1) of this section, an incumbent LEC cannot comply with the timing requirement set forth in paragraph (a), hereinafter referred to as the waiting period, the incumbent LEC must give notice of the network change as soon as practicable.

(ii) A short-term network change or copper retirement notice subject to paragraph (b)(2) of this section must include a brief explanation of the circumstances necessitating the reduced waiting period and how

the incumbent LEC intends to minimize the impact of the reduced waiting period on directly interconnected telephone exchange service providers.

* * *

**PART 63 – EXTENSION OF LINES, NEW LINES, AND DISCONTINUANCE, REDUCTION, OUTAGE AND IMPAIRMENT OF SERVICE BY COMMON CARRIERS; AND GRANTS OF RECOGNIZED PRIVATE OPERATING AGENCY STATUS**

1.        The authority for part 63 continues to read as follows:

AUTHORITY: 47 U.S.C. 151, 154(i), 154(j), 160, 201–205, 214, 218, 403, and 571, unless otherwise noted.

2.        Amend § 63.19 by revising paragraphs (a) and (b), as follows:

**§ 63.19 Special procedures for discontinuances of international services.**

(a) With the exception of those international carriers described in paragraphs (b) and (c) of this section, any international carrier that seeks to discontinue, reduce, or impair service, including the retiring of international facilities, dismantling or removing of international trunk lines, shall be subject to the following procedures in lieu of those specified in §§ 63.61 through 63.505:  * * *

(b) The following procedures shall apply to any international carrier that the Commission has classified as dominant in the provision of a particular international service because the carrier possesses market power in the provision of that service on the U.S. end of the route.  Any such carrier that seeks to retire international facilities, dismantle or remove international trunk lines, but does not discontinue, reduce or impair the dominant services being provided through these facilities, shall only be subject to the notification requirements of paragraph (a) of this section.  If such carrier discontinues, reduces or impairs the dominant service, or retires facilities that impair or reduce the service, the carrier shall file an application pursuant to §§ 63.62 and 63.505.

* * * * *

3.        Amend § 63.60 by revising paragraphs (a), (b)(1) and (2), (c), and (g), as follows:

**§ 63.60 Definitions.**

(a) For the purposes of §§ 63.60 through 63.71, the term "carrier," when used to refer either to all telecommunications carriers or more specifically to non-dominant telecommunications carriers, shall include interconnected VoIP providers.

(b) *Discontinuance, reduction, or impairment of service* includes, but is not limited to the following:

(1) The closure by a carrier of a telephone exchange rendering interstate or foreign telephone toll service, or a public toll station serving a community or part of a community;

(2) The reduction in hours of service by a carrier at a telephone exchange rendering interstate or foreign telephone toll service or at any public toll station (except at a toll station at which the availability of service to the public during any specific hours is subject to the control of the agent or other persons controlling the premises on which such office or toll station is located and is not subject to the control of such carrier); the term *reduction in hours of service* does not include a shift in hours which does not result in any reduction in the number of hours of service;

(c) *Emergency discontinuance, reduction, or impairment of service* means any discontinuance, reduction, or impairment of the service of a carrier occasioned by conditions beyond the control of such carrier where the original service is not restored or comparable service is not established within a reasonable time.  For the purpose of this part, a reasonable time shall be deemed to be a period not in excess of 60 days.

* * * * *

(g) For the purposes of §§ 63.60 through 63.71, the term "service," when used to refer to a real-time, two-way voice communications service, shall include interconnected VoIP service as that term is defined in § 9.3 of this chapter but shall not include any interconnected VoIP service that is a "mobile service" as defined in § 20.3 of this chapter.

\* \* \* \* \*

4.       Amend § 63.62 by revising the introductory text and paragraphs (a) and (b), and (d), as follows:

### § 63.62 Type of discontinuance, reduction, or impairment of telephone service requiring formal application.

Authority for the following types of discontinuance, reduction, or impairment of service shall be requested by formal application containing the information required by the Commission in the appropriate sections to this part, including § 63.505, or in emergency cases (as defined in § 63.60(b)) as provided in § 63.63:

(a) The dismantling or removal of a trunk line (for contents of application see §§ 63.71 & 63.500) for all domestic carriers and for dominant international carriers except as modified in § 63.19;

(b) The severance of physical connection or the termination or suspension of the interchange of traffic with another carrier (for contents of application see §§ 63.71 & 63.501);

\* \* \* \* \*

(d) The closure of a public toll station where no other such toll station of the applicant in the community will continue service (for contents of application, see § 63.505): *Provided, however,* That no application shall be required under this part with respect to the closure of a toll station located in a community where telephone toll service is otherwise available to the public through a telephone exchange connected with the toll lines of a carrier;

\* \* \* \* \*

5.       Amend § 63.63 by revising paragraphs (a) and (b), as follows:

### § 63.63 Emergency discontinuance, reduction or impairment of service.

(a) Application for authority for emergency discontinuance, reduction, or impairment of service shall be made by electronically filing an informal request through the "Submit a Non-Docketed Filing" module of the Commission's Electronic Comment Filing System. Such requests shall be made as soon as practicable but not later than 65 days after the occurrence of the conditions which have occasioned the discontinuance, reduction, or impairment. The request shall make reference to this section and show the following:

\* \* \*

(b) Authority for the emergency discontinuance, reduction, or impairment of service for a period of 60 days shall be deemed to have been granted by the Commission effective as of the date of the filing of the request unless, on or before the 15th day after the date of filing, the Commission shall notify the carrier to the contrary. Renewal of such authority may be requested by letter, filed with the Commission not later than 10 days prior to the expiration of such 60-day period, making reference to this section and showing that such conditions may reasonably be expected to continue for a further period and what efforts the applicant has made to restore the original or establish comparable service. If the same or comparable service is reestablished before the termination of the emergency authorization, the carrier shall notify the Commission promptly. However, the Commission may, upon specific request of the carrier and upon a proper showing, contained in such informal request or in the initial application, authorize such discontinuance, reduction, or impairment of service for an indefinite period or permanently. In addition, the carrier may permanently discontinue, reduce, or impair a service for which it has received authority for emergency discontinuance, reduction, or impairment upon a showing that (1) it has had no customers or reasonable requests for service during the 60-day period immediately preceding the discontinuance,

and (2) an adequate replacement service is available throughout the affected service area.

**§ 63.66 [Removed and Reserved]**

6. Remove and reserve § 63.66.

7. Amend § 63.71 by:

    a. Revising paragraph (a)(5) and removing paragraph (a)(6);

    b. Removing paragraph (c)(4), redesignating paragraphs (c)(2), (c)(3), and (c)(5) as paragraphs (c)(3), (c)(4), and (c)(9);

    c. Adding new paragraphs (c)(2) and (c)(5) through (8);

    d. Revising paragraphs (f)(1) and (2);

    e. Removing paragraphs (h) and (l) and redesignating paragraphs (i), (j) and (k) as paragraphs (h), (i) and (j), respectively;

    f. Revising newly redesignated paragraphs (h) and (j); and

    g. Adding new paragraph (k).

The revisions and additions read as follows:

**§ 63.71 Procedures for discontinuance, reduction or impairment of service by domestic carriers.**

(a) * * *

(5) (i) The following statement: The FCC will normally authorize this proposed discontinuance of service (or reduction or impairment) unless it is shown that customers would be unable to receive service or a reasonable substitute from another carrier or that the public convenience and necessity is otherwise adversely affected.  If you wish to object, you should file your comments as soon as possible, but no later than 15 days after the Commission releases public notice of the proposed discontinuance.  You may file your comments electronically through the FCC's Electronic Comment Filing System using the docket number established in the Commission's public notice for this proceeding, or you may address them to the Federal Communications Commission, Wireline Competition Bureau, Competition Policy Division, Washington, DC 20554, and include in your comments a reference to the § 63.71 Application of (carrier's name).  Comments should include specific information about the impact of this proposed discontinuance (or reduction or impairment) upon you or your company, including any inability to acquire reasonable substitute service.

(ii) For discontinuances involving technology transitions, as defined in § 63.60(i):  In addition to the statement required by paragraph (5)(i) of this section, (A) specific information as to how a customer who wants to object to or comment on the proposed discontinuance of service will be able to do so, including but not limited to providing the master docket number established by the Wireline Competition Bureau for such objections and comments and the webpage(s) identified by the Wireline Competition Bureau for further guidance and resources to file an objection or comment.

* * * * *

(c) * * *

(2) For technology transitions discontinuance applications, as defined in § 63.60(i):

(i) Statement identifying the application as involving a technology transition;

(ii) Statement of the difference in price, if any, between the service being discontinued and replacement services available in the affected service area; and

(iii) Brief description of the affected community or part of a community, including the population size and any relevant characteristics of the customer population affected;

* * * * *

(5) Brief description of replacement services, whether available from the applicant or third parties, that would remain in the affected community or part of the affected community in the event the application is granted, including the name of any other carrier(s) providing replacement services to the affected community, and where in the affected community those services are available;

(6) Statement of the factors otherwise showing that neither the present nor future public convenience and necessity would be adversely affected by the granting of the application;

(7) For applications to discontinue a service supporting interconnection trunks or the exchange of traffic, in addition to the requirements set forth in §§ 63.500 and 63.501 of this chapter:

(i) Specific identity of the type of service to be discontinued in addition to any branded name of the service being discontinued;

(ii) Statement that at least 90 days prior to the planned discontinuance, the carrier provided a designated point of contact with authority to facilitate the orderly transition from legacy facilities that support 911 to the 911 Authorities, as defined in § 9.28 of this chapter, 911 service providers, and local exchange service providers that support essential functions within 911 networks in the affected service area. For purposes of this section, "911 service provider" is defined as an entity that provides 911, E911, or NG911 capabilities such as call routing, automatic location information, automatic number identification, or the functional equivalent of those capabilities, directly to a public safety answering point (PSAP), statewide default answering point, or appropriate local emergency authority as defined in § 9.3; and/or operates one or more central offices that directly serve a PSAP; and

(iii) List of the 911 Authorities, 911 service provider, and local exchange service providers that support essential functions within 911 networks in the affected service areas with which the carrier has coordinated and the date(s) of that coordination;

(8) A certification, executed by an officer or other authorized representative of the applicant and meeting the requirements of § 1.16 of this chapter, that the information required by this section is true and accurate; and

* * * * *

(f)

(1) The application to discontinue, reduce, or impair service that does not constitute a technology transition or, if constituting a technology transition, meets the requirements of paragraph (f)(2) of this section, shall be automatically granted on the 31st day after its filing with the Commission without any Commission notification to the applicant unless the Commission has notified the applicant that the grant will not be automatically effective. For purposes of this section, an application will be deemed filed on the date the Commission releases public notice of the filing.

(2) An application to discontinue, reduce, or impair an existing retail service as part of a technology transition, as defined in § 63.60(i), may be automatically granted only if the applicant certifies that in every location throughout the affected service area, at least one of the following types of services is available:

(i) a facilities-based interconnected VoIP service, as defined in § 9.3 of this chapter;

(ii) a facilities-based mobile wireless service operating at speeds of at least 5 Mbps download and 1 Mbps upload, consistent with the coverage parameters set forth in §1.7004(c)(3) of this chapter;

(iii) a voice service offered pursuant to an obligation from one of the Commission's modernized high-cost support programs;

(iv) a voice service already available from the applicant in the affected service area that that the applicant certifies offers substantially similar levels of network performance and availability as the legacy voice

service being discontinued based on the applicant's own internal network testing in connection with rolling out a new product or service, provides access to 911 and complies with applicable 911 requirements in part 9 of this title, and permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network or any successor network that utilizes numbers issued pursuant to the North American Numbering Plan and supports access to 911 and complies with applicable 911 requirements in part 9 of this title; or

(v) a widely available alternative service offered by a third party that the applicant certifies offers substantially similar levels of network performance and availability as the legacy voice service being discontinued, and permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network or any successor network that utilizes numbers issued pursuant to the North American Numbering Plan and supports access to 911 and complies with applicable 911 requirements in part 9 of this title.

* * * * *

(h) An application to discontinue, reduce, or impair a service filed by a competitive local exchange carrier in response to a copper retirement notice provided pursuant to § 51.333 of this chapter shall be automatically granted on the effective date of the copper retirement; provided that:

(1) The competitive local exchange carrier submits the application to the Commission for filing at least 40 days prior to the copper retirement effective date; and

(2) The application includes a certification, executed by an officer or other authorized representative of the applicant and meeting the requirements of § 1.16 of this chapter, that the copper retirement is the basis for the application and that the applicant has notified and coordinated with all 911 Authorities as defined in § 9.28 of this chapter with jurisdiction within the affected service area.

* * * * *

(j) Notwithstanding any other provision of this section, a carrier is not required to file an application to grandfather a legacy voice service, lower-speed data service, or interconnected VoIP service provisioned over copper wire; however, it must provide notice to existing customers that it is grandfathering a service they current receive from that carrier.  Such notice shall include (i) an approximate date by which it intends to seek to permanently discontinue the service, and (ii) a statement regarding alternative services available in the affected service area.  For purposes of this rule, we define "lower-speed data service" as a data service operating at speeds below 25 Mbps download and 3 Mbps upload.

(k) Notwithstanding any other provision of this section, where a wholesale provider is engaging in a technology transitions discontinuance of a legacy voice service resold by another provider, the reseller is not required to file an application to discontinue the resold service, except that the reseller must provide notice to its customers, as soon as practicable, that it will no longer be able to provide the relevant legacy voice service.  Such notice shall be via any means to which the customer has previously provided express, verifiable approval.  Notice shall include the following:

> (1) Name and address of carrier;

> (2) Date of planned service discontinuance, reduction or impairment;

> (3) Points of geographic areas of service affected;

> (4) Brief description of type of service affected; and

> (5) Statement regarding the availability of alternative services in the affected service area.

**§§ 63.90, 63.100, 63.504, 63.601, and 63.602 [Removed and Reserved]**

8.       Remove and reserve §§ 63.90, 63.100, 63.504, 63.601, and 63.602.

## APPENDIX B

### Final Regulatory Flexibility Analysis

1.	As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] the Federal Communications Commission (Commission) incorporated an Initial Regulatory Flexibility Analysis (IRFA) in the *Network and Services Modernization Notice* (*Notice*) released in 2025.[2]  The Commission sought written public comment on the proposals in the *Notice*, including comment on the IRFA.[3]  No comments were filed addressing the IRFA.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA and it (or summaries thereof) will be published in the Federal Register.[4]

### A.	Need for, and Objectives of, the Rules

1.	In the *Report and Order* (*Order*), the Commission takes important steps aimed at bringing the existing regulatory environment in line with today's communications marketplace by overhauling the Commission's rules applicable to technology transitions discontinuance applications under section 214 of the Communications Act of 1934, as amended (the Act),[5] and reforming and updating the filing requirements associated with its rules implementing section 251(c)(5)'s network change disclosure mandate.[6]  Specifically, within the *Order*, the Commission:  (1) eliminates the filing requirements associated with our rules implementing section 251(c)(5)'s network change disclosure mandate;[7] (2) adopts one consolidated rule applicable to all technology transitions discontinuance applications and eliminates rule provisions thereby rendered irrelevant; (3) grants blanket section 214(a) authority for carriers to grandfather legacy voice services, lower-speed data telecommunications services, and interconnected VoIP service provisioned over copper wire; (4) grants forbearance relief to resellers when the wholesale provider of their resold service engages in a technology transitions discontinuance; (5) revises section 63.71 of its rules to apply the 31-day automatic grant period to all discontinuance applications regardless of the applicants' status as dominant or non-dominant;[8]  (5) adopts discontinuance application content requirements; (6) revises its rules applicable to emergency discontinuances to permit permanent discontinuance of a service under specific circumstances;[9] (7) eliminates a number of outdated discontinuance rules rendered irrelevant or redundant by today's communications marketplace;[10] and (8) finds any state or local statute, regulation, or other legal requirement that—either by law or in practice—has the effect of continuing to require carriers to provide POTS or other legacy services in an area where carriers have obtained Commission authorization under section 214(a) of the Act to discontinue the legacy service in question or where carriers have☐been discouraged from seeking such Commission authorization are subject to preemption.

---

[1] 5 U.S.C. §§ 601 *et seq.*, as amended by the Small Business Regulatory Enforcement and Fairness Act (SBREFA), Pub. L. No. 104-121, 110 Stat. 847 (1996).

[2] *Reducing Barriers to Network Improvements and Service Changes; Accelerating Network Modernization*, WC Docket Nos. 25-208, 25-209, Notice of Proposed Rulemaking, 40 FCC Rcd 5329 (2025) (*Network and Services Modernization Notice*).

[3] *Network and Services Modernization Notice*, 40 FCC Rcd at Appx. B.

[4] 5 U.S.C. § 604.

[5] *See* 47 U.S.C. § 214(a); 47 CFR §§ 63.60 *et seq.*

[6] *See* 47 U.S.C. § 251(c)(5); 47 CFR §§ 51.325 *et seq.*

[7] *See* 47 U.S.C. § 251(c)(5); 47 CFR §§ 51.325 *et seq.*

[8] 47 CFR § 63.71(f)(1).

[9] 47 CFR § 63.63.

[10] *See* 47 CFR §§ 63.60(f), 63.66, 63.90, 63.100, 63.500, 63.501, 63.504, 63.601.

B.	**Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

2.	There were no comments raised that specifically addressed the proposed rules and policies presented in the *Notice*. However, the Commission considered the potential impact of the rules proposed in the IRFA on small entities and took steps where appropriate and feasible to reduce the compliance burden for small entities in order to reduce the economic impact of the rules enacted herein on such entities.

C.	**Response to Comments by the Chief Counsel for the Small Business Administration Office of Advocacy**

3.	Pursuant to the Small Business Jobs Act of 2010, which amended the RFA,[11] the Commission is required to respond to any comments filed by the Chief Counsel for the Small Business Administration (SBA) Office of Advocacy, and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[12] The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

D.	**Description and Estimate of the Number of Small Entities to Which the Rules Will Apply**

4.	The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the adopted rules.[13] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[14] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act (SBA).[15] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[16] The SBA establishes small business size standards that agencies are required to use when promulgating regulations relating to small businesses; agencies may establish alternative size standards for use in such programs, but must consult and obtain approval from SBA before doing so.[17]

5.	These actions, over time, may affect small entities that are not easily categorized at present. We therefore describe three broad groups of small entities that could be directly affected by these actions.[18] In general, a small business is an independent business having fewer than 500 employees.[19] These types of small businesses represent 99.9% of all businesses in the United States,

---

[11] Small Business Jobs Act of 2010, Pub. L. No. 111-240, 124 Stat. 2504 (2010).

[12] 5 U.S.C. § 604(a)(3).

[13] *Id*. § 604.

[14] *Id*. § 601(6).

[15] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[16] 15 U.S.C. § 632.

[17] 13 CFR § 121.903.

[18] 5 U.S.C. § 601(3)-(6).

[19] *See* SBA, Office of Advocacy, *Frequently Asked Questions About Small Business* (July 23, 2024), https://advocacy.sba.gov/wp-content/uploads/2024/12/Frequently-Asked-Questions-About-Small-Business_2024-508.pdf.

which translates to 34.75 million businesses.[20] Next, "small organizations" are not-for-profit enterprises that are independently owned and operated and are not dominant in their field.[21]

6.      While we do not have data regarding the number of non-profits that meet that criteria, over 99 percent of nonprofits have fewer than 500 employees.[22] Finally, "small governmental jurisdictions" are defined as cities, counties, towns, townships, villages, school districts, or special districts with populations of less than fifty thousand.[23] Based on the 2022 U.S. Census of Governments data, we estimate that at least 48,724 out of 90,835 local government jurisdictions have a population of less than 50,000.[24]

7.      The rule reforms and modifications adopted in the *Order* will apply to small entities in the industries identified in the chart below by their six-digit North American Industry Classification System (NAICS)[25] codes and corresponding SBA size standard.[26] Based on currently available U.S. Census data regarding the estimated number of small firms in each identified industry, we conclude that the adopted rules will impact a substantial number of small entities. Where available, we also provide additional information regarding the number of potentially affected entities in the identified industries below.

**Table 1.  2022 U.S. Census Bureau Data by NAICS Code**

| Regulated Industry (Footnotes specify potentially affected entities within a regulated industry where applicable) | NAICS Code | SBA Size Standard | Total Firms[27] | Total Small Firms[28] | % Small Firms |
|---|---|---|---|---|---|
| Wired Telecommunications | 517111 | 1,500 employees | 3,403 | 3,027 | 88.95% |

---

[20] *Id.*

[21] 5 U.S.C. § 601(4).

[22] *See* SBA, Office of Advocacy, *Small Business Facts, Spotlight on Nonprofits* (July 2019), https://advocacy.sba.gov/2019/07/25/small-business-facts-spotlight-on-nonprofits/.

[23] 5 U.S.C. § 601(5).

[24] *See* U.S. Census Bureau, 2022 Census of Governments –Organization, https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html, tables 1-11.

[25] The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy. *See* www.census.gov/NAICS for further details regarding the NAICS codes identified in this chart.

[26] The size standards in this chart are set forth in 13 CFR 121.201, by six digit NAICS code.

[27] *U.S. Census Bureau*, "*Selected Sectors: Employment Size of Firms for the U.S.: 2022*." Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEEMPFIRM, 2025, and "*Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2022*." Economic Census, ECN Core Statistics Economic Census: Establishment and Firm Size Statistics for the U.S., Table EC2200SIZEREVFIRM, 2025.

[28] *Id.*

| Carriers[29] | | | | | |
|---|---|---|---|---|---|
| Wireless Telecommunications Carriers (except Satellite) | 517112 | 1,500 employees | 1,184 | 1,081 | 91.30% |
| Telecommunications Resellers[30] | 517121 | 1,500 employees | 955 | 847 | 88.69% |
| Satellite Telecommunications | 517410 | $44 million | 332 | 195 | 58.73% |
| All Other Telecommunications | 517810 | $40 million | 1,673 | 1,007 | 60.19% |

**Table 2. Telecommunications Service Provider Data**

| 2024 Universal Service Monitoring Report Telecommunications Service Provider Data [31] (Data as of December 2023) | SBA Size Standard (1500 Employees) | | |
|---|---|---|---|
| **Affected Entity** | **Total # FCC Form 499A Filers** | **Small Firms** | **% Small Entities** |
| Cable/Coax CLEC | 67 | 62 | 92.54 |
| Competitive Local Exchange Carriers (CLECs)[32] | 3,729 | 3,576 | 95.90 |
| Incumbent Local Exchange Carriers (Incumbent LECs) | 1,175 | 917 | 78.04 |
| Interexchange Carriers (IXCs) | 113 | 95 | 84.07 |
| Local Exchange Carriers (LECs)[33] | 4,904 | 4,493 | 91.62 |
| Local Resellers | 222 | 217 | 97.75 |
| Other Toll Carriers | 74 | 71 | 95.95 |
| Prepaid Card Providers | 47 | 47 | 100.00 |

---

[29] Affected Entities in this industry include Cable System Operators (Telecom Act Standard), Competitive Local Exchange Carriers (CLECs), Incumbent Local Exchange Carriers (Incumbent LECs), Interexchange Carriers (IXCs), Local Exchange Carriers (LECs), and Other Toll Carriers.

[30] Affected Entities in this industry include Local Resellers, Prepaid Calling Card Providers, and Toll Resellers.

[31] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2024), https://docs.fcc.gov/public/attachments/DOC-408848A1.pdf.

[32] Affected Entities in this industry include all reporting local competitive service providers.

[33] Affected Entities in this industry include all reporting fixed local service providers (CLECs & ILECs).

| 2024 Universal Service Monitoring Report Telecommunications Service Provider Data [31]  (Data as of December 2023) | SBA Size Standard  (1500 Employees) | | |
|---|---|---|---|
| **Affected Entity** | **Total # FCC Form 499A Filers** | **Small Firms** | **% Small Entities** |
| Toll Resellers | 411 | 398 | 96.84 |
| Wired Telecommunications Carriers[34] | 4,682 | 4,276 | 91.33 |
| Wireless Telecommunications Carriers (except Satellite)[35] | 585 | 498 | 85.13 |

### E. Description of Economic Impact and Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities

8.	The RFA directs agencies to describe the economic impact of adopted rules on small entities, as well as projected reporting, recordkeeping and other compliance requirements, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.[36]

9.	In the *Order*, the Commission reforms and modifies its existing rules applicable to discontinuance applications under section 214 of the Act[37] generally and as to technology transitions discontinuance applications specifically, as well as the filing requirements associated with its rules implementing section 251(c)(5)'s network change disclosure mandate.[38]  The Commission minimized the burdens associated with any new reporting, recordkeeping, or compliance requirements adopted in the *Order*, which are aimed at ensuring 911 continuity and that consumers are sufficiently protected.  The Commission anticipates the approaches taken in these rule modernization efforts will have minimal cost implications because the reporting, recordkeeping and compliance requirements that remain after these reforms and updates already exist.  We do not expect any additional burdens for small businesses entities.

10.	In determining the economic impact and projected compliance requirements for small and other entities, the Commission sought comment on the costs and benefits associated with the proposals made in the in the *Order*.  As discussed above, several comments were filed related to small entities.  The Commission finds that the reforms adopted in the *Order* will expedite the Commission's existing discontinuance process without imposing any additional burdens.

11.	We estimate that the rule changes discussed in the *Order* will result in a reduction in the time and expense associated with filing petitions and will not result in significant, material changes to reporting, recordkeeping, or compliance obligations for small and other Commission licensees.  Additional resources or personnel should not be required to fulfill these requirements because all affected

---

[34] Local Resellers fall into another U.S. Census Bureau industry (Telecommunications Resellers) and therefore data for these providers is not included in this industry.

[35] Affected Entities in this industry include all reporting wireless carriers and service providers.

[36] 5 U.S.C. § 604(a)(5).

[37] *See Order* Section III.B.

[38] *See Order* Section III.A.

providers should already be familiar with these procedures, as they are required to comply with existing Commission regulations.

12.    After reviewing the record, we received no concerns about unique burdens from small businesses that would be impacted by the modifications adopted in the *Order* and proposed in the *Further Notice*.  The Commission believes these revisions will make its rules more transparent and accessible to small entities and reduce the time and cost associated with its discontinuance requirements.  As a result, we cannot estimate the cost of complying with the rules, or compare such costs for small and other entities.

13.    In addition, we received no concerns about unique burdens from small businesses that would be impacted by the new certifications adopted in the *Order*.  As such, we do not have sufficient information on the record to determine whether small entities will be required to hire professionals to comply with its decisions or to quantify the cost of compliance for small entities.

### F.    Discussion of Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

14.    The RFA requires an agency to provide "a description of the steps the agency has taken to minimize the significant economic impact on small entities. . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[39]

**15.**    The Commission sought comment on whether any of the burdens associated with the filing, recordkeeping and reporting requirements described in the *Order* could be minimized for small entities.  As discussed above, the Commission minimized the burdens associated with any new reporting, recordkeeping, or compliance requirements adopted, which are aimed at ensuring 911 continuity and that consumers are sufficiently protected.  As such, the Commission finds that the costs associated with the adopted rules and clarifications are likely minimal as a result of the anticipated decrease in filing burdens as well as through the elimination of outdated discontinuance rules.  Thus, the Commission anticipates that the approaches it has taken to implement these reforms and updates will have minimal reporting, recordkeeping, or other compliance requirements or costs. We do not expect any additional burdens for small businesses entities.

### G.    Report to Congress

16.    The Commission will send a copy of the *Order*, including this Final Regulatory Flexibility Analysis, in a report to Congress pursuant to the Congressional Review Act.[40]  In addition, the Commission will send a copy of the *Order*, including this Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the SBA and will publish a copy of the will publish a copy of the *Order*, and this Final Regulatory Flexibility Analysis (or summaries thereof) in the Federal Register.[41]

---

[39] 5 U.S.C. § 604(b).

[40] 5 U.S.C. § 801(a)(1)(A).

[41] *Id.* § 604(b).

**STATEMENT OF**
**CHAIRMAN BRENDAN CARR**

Re:     *Reducing Barriers to Network Improvements and Service Changes; Accelerating Network Modernization,* WC Docket Nos. 25-209; 25-208, Report & Order (March 26, 2026).

Today's decision marks an important step in accelerating America's transition to modern, high-speed networks.  For too long, outdated rules and regulations have forced providers to maintain aging copper infrastructure and to keep consumers on broken, antiquated networks.  And this has come at a high cost.  One provider alone reports that they have been spending about $6 billion a year maintaining copper lines for a dwindling number of consumers.  That changes today.  This vote effectively frees up those billions of dollars so that Americans can benefit from an upgrade to the types of modern, high-speed networks that they want and need.

At the same time, we take a balanced approach that protects consumers and preserves access to critical services like 911.  Our updated rules ensure that Americans will still have reliable access to the voice services they rely on for public safety communications and everyday communications alike.  And at prices that remain comparable to what they pay today.  In other words, we are advancing modernized networks while making sure no one is left behind.

Today's item also sends a clear signal.  Bad actors cannot use outdated state and local requirements to undermine the federal policies the FCC codifies today.  Requirements that would leave communities stuck on aging copper will be preempted so that Americans in every community benefits from new investments and next-gen networks.

I want to thank the FCC staff whose hard work made today's item possible, including Michele Berlove, Marie Bordelon, Jodie Griffin, Rhonda Lien, John Visclosky, Jodie May, Joseph Calascione, Malena Barzilai, Sarah Citrin, David Furth, and Rachel Waxman.  And thank you to all of you that have driven progress on our network modernization efforts over the last year.

**STATEMENT OF**
**COMMISSIONER ANNA M. GOMEZ**

Re:     *Reducing Barriers to Network Improvements and Service Changes; Accelerating Network and Service Modernization*, WC Docket Nos. 25-209 and 25-208, Report and Order (March 26, 2026).

        Today the Commission takes a meaningful step in modernizing our regulatory framework for the transition away from legacy copper telephone networks to IP-based services.

        Our nation's copper infrastructure is aging, costly to maintain, and increasingly vulnerable to theft and natural disaster. The future is IP-based, and our rules should facilitate, not obstruct, carriers' ability to build it.

        I also want to recognize that this proceeding generated a serious and substantive record. Carriers, public safety advocates, rural providers, competitive carriers, and consumer organizations each engaged with the hard questions this transition raises. The Commission is better for that engagement, and it shows in this Order. I am pleased to support this item, and I want to thank the Chairman for his willingness to work collaboratively to strengthen the public safety, consumer, and competition safeguards in it.

        The transition from legacy copper to IP-based services is not a uniform experience. Those who are most affected are often in rural, remote, tribal, and low-income communities, where alternatives are least mature and the consequences of a gap in service are most severe.

        Getting the public safety, consumer protection, and competition pieces right matters enormously, and I am pleased that after working through some of our requested edits, this Order strikes the right balance between moving the transition forward, protecting our nation's 911 network, which has special considerations as the states migrate to next generation 911 services, fostering a robust and competitive market for the services that will replace legacy voice, and ensuring no one is left without a path forward when their service changes.

        One concrete example of our collaboration with the Chair's office is worth highlighting. This Order now establishes a centralized docket where consumers can file objections and track concerns related to service discontinuances, and it requires carriers to include notice of that docket and how to access it when notifying customers of a planned discontinuance. It also directs the relevant bureaus to update consumer-facing pages on the Commission's website so that people know how to use the docket, how to file, and how to access the express filing process.

        That is a practical, meaningful step. A consumer who receives notice that their existing phone service is going away should also receive clear information about where to go if something goes wrong. This Order now ensures that. Of course, we recognize that not all consumers have ready access to the internet or the resources to navigate these processes on their own. With our assistance, we hope that consumer advocates, community organizations, and state and local partners will help ensure that those consumers are also able to make their voices heard.

        I also want to recognize the important role that states play in protecting consumers, safeguarding public safety, and combating fraud. States are often the first line of defense for consumers navigating problems with their communications services, and their authority in these areas is not diminished by today's action. The preemption framework adopted here is appropriately scoped to the discontinuance of interstate and jurisdictionally mixed services, and does not reach state consumer protection laws, state universal service obligations, or state authority over 911 service.

        That is the right line to draw. The Commission has seen firsthand how powerful the federal and state partnership can be, including through our memoranda of understanding with state attorneys general

to combat illegal robocalls. That same spirit of partnership will be essential as this transition unfolds, and I look forward to continuing to build on it.

I want to thank the Chairman for the collaborative process through which we were able to work together to ensure consumers are not left behind as this transition unfolds.

And I also want to express my sincere appreciation to the Wireline Competition Bureau for their careful and thorough work on a genuinely complex rulemaking, and for their time walking me and my staff through our questions. I look forward to continuing this work together.

## STATEMENT OF
## COMMISSIONER OLIVIA TRUSTY

Re:     *Reducing Barriers to Network Improvements and Service Changes; Accelerating Network and Service Modernization*, WC Docket Nos. 25-209 and 25-208, Report and Order (March 26, 2026).

Like few other areas of communications policy, the IP transition brings together a range of issues, including: connectivity, innovation, public safety, and consumer protection. Addressing any one aspect requires the Commission to remain mindful of the broader ecosystem. Even as we look to the future, and the foundation for advanced technologies, like artificial intelligence, that same principle applies, requiring a focus on sustained innovation, robust and resilient connectivity, and a commonsense approach to regulation. That is the balance the Commission is striving to achieve in the IP transition.

This approach, sometimes described as "smart deregulation," involves removing outdated or unduly burdensome requirements that hinder the deployment of advanced communications services, while preserving core protections for consumers, public safety, and national security.

Building on the Wireline Competition Bureau's initial efforts, this item provides greater clarity and predictability for service providers navigating technology transitions, while preserving opportunities for stakeholders to raise concerns in the rare cases where issues may arise.

I appreciate this item highlighting the tools Americans rely upon to access emergency assistance, foremost among them, the ability to call 911. As networks evolve, ensuring reliable 911 connectivity must remain a top priority. I am pleased this item takes steps to require coordination with 911 authorities and key service providers before a service discontinuance request is filed, helping to keep public safety front of mind throughout the transition.

The IP transition holds tremendous promise for consumers and will position the United States to lead globally in new communications technologies and services. As we move from legacy networks to next-generation infrastructure, protecting existing consumer interests along the way is key to expanding our innovation capacity and delivering the economic benefits of these technology developments to all Americans. I look forward to continuing to work with Commission staff, industry, and stakeholders to strike the right balance. And I thank the Wireline Competition Bureau for their hard work on this important item.